

RECEIVED
CLERK'S OFFICE

2014 APR 22 PM 4: 42

U.S. DISTRICT COURT
MIDDLE DIST. OF GEORGIA
MACON, GEORGIA

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

| | | |
|---|---|---|
| UNITED STATES *ex rel.* June P. Brinson, Barbara A. Burke, Adrienne D. Reynolds, Demeka N. Smith, Lisa P. Torras and Inez Mitchell-Warrick | ) ) ) ) ) ) ) | |
| BRINGING THIS ACTION ON BEHALF OF THE UNITED STATES OF AMERICA AND THE STATES OF GEORGIA AND FLORIDA | ) ) ) ) ) | CIVIL ACTION FILE NO. **5 : 14-CV- 157** JURY TRIAL DEMANDED |
| Plaintiffs-Relators, | ) ) | **FILED *IN* CAMERA AND UNDER SEAL** |
| vs. | ) ) | |
| UNIVERSAL HEALTH SERVICES, INC., A DELAWARE CORPORATION, UHS OF DELAWARE, INC., A DELAWARE CORPORATION, PSYCHIATRIC SOLUTIONS, INC., A DELAWARE CORPORATION, HHC ST. SIMONS, INC., A GEORGIA CORPORATION DOING BUSINESS AS ST. SIMONS BY-THE-SEA OR FOCUS BY-THE-SEA, MONICA COOK, GAYLE ECKERD, LESLI JETER, M. J. MARTELLI, M.D., P.C. AND ASSOCIATES and MIGUEL MARTELLI, M.D. Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **DO NOT PUT IN PACER OR SERVE** |

## COMPLAINT

#40775
J 4000

## SUMMARY OF CLAIMS

This action is brought on behalf of the United States of America and the State of Georgia by June P. Brinson, Barbara A. Burke, Adrienne D. Reynolds, Demeka N. Smith, Lisa P. Torras, and Inez Mitchell-Warrick (collectively, "Plaintiff-Relator") pursuant to the qui tam provisions of the False Claims Act, 31 U.S.C. § 3729–3733 ("FCA"), the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168 ("Georgia FCA" or the "Georgia False Claims Act") and the Florida False Claims Act (Fla. Stat. Ann §68.081, et seq.) (the "Florida FCA" or the "Florida False Claims Act"). This action is premised on Defendants' knowing submission of false or fraudulent claims for payment to state and federal government healthcare payors ("Government Payors") involving a variety of illegal and fraudulent billing practices by Defendants at Saint Simons By-The-Sea Hospital, an acute care inpatient psychiatric hospital for children and adults owned by Defendants Universal Health Services, Inc., Psychiatric Solutions, Inc., and HHC St. Simons, Inc., and located in Saint Simons Island, Georgia. Plaintiff-Relator believes that the wrongful billing practices alleged herein may also be occurring at all of Defendant's Georgia and Florida hospitals. In short, Defendants made or caused to be made by false and fraudulent statements in inpatient clinical records and false and fraudulent statements in inpatient admission, diagnoses and

2

continuation of stay requests concerning the nature and severity of inpatient conditions and behaviors. In so doing, Defendants:

- fraudulently admitted patients;

- prolonged inpatient days;

- submitted fraudulent information to the State of Georgia, the State of Florida, Medicare, Medicaid, TRICARE and others in order to receive certification from them to admit and allow as inpatients and to remain at St. Simons By-The-Sea for medically unnecessary days and receive medically unnecessary services;

- submitted bills to the State of Georgia, the State of Florida, Medicare, Medicaid, TRICARE and others for these fraudulently prolonged inpatient days and the services provided during these days; and

- were paid Medicaid monies from the State of Georgia, the State of Florida Medicare and TRICARE from the Government, and insurance monies from private payors, to which Defendants were not legally entitled, but which Defendants accepted.

As a result, and since at least 2010, and in violation of various federal and State of Georgia and State of Florida Medicaid statutes and regulations, including the FCA, the Georgia FCA and the Florida FCA, Defendants have knowingly claimed and received from Medicaid, Medicare, and TRICARE millions of dollars

3

in payments and private insurance payments to which they were not legally entitled.

## JURISDICTION AND VENUE

1.

This court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 and pursuant to FCA 31 U.S.C. §§ 3729–3733 and 31 U.S.C. § 3730(b); and supplemental jurisdiction over claims arising under the Georgia False Medicaid Claims Act and the Florida False Claims Act, as provided under 28 U.S.C. § 1367(a). This court may exercise personal jurisdiction over Defendants and venue is appropriate in this district pursuant to 31 U.S.C. § 3732(a) and (b).

## THE PARTIES

2.

Plaintiff-Relator June P. Brinson ("Brinson") is an individual and resident of the State of Georgia.

3.

Plaintiff-Relator Brinson was last employed as Business Officer Director by Defendant St. Simons By-The-Sea and was employed from November 1984 through August 2013.

4

4.

Plaintiff-Relator Barbara Burke ("Burke") is an individual and resident of the State of Georgia.

5.

Plaintiff-Relator Burke was last employed as financial counselor by Defendant St. Simons By-The-Sea and was employed from April 2010 through July 2013.

6.

Plaintiff-Relator Adrienne D. Reynolds ("Reynolds") is an individual and resident of the State of Georgia.

7.

Plaintiff-Relator Reynolds was last employed as Therapist and Admissions Counselor by Defendant St. Simons By-The-Sea and was employed from July 2006 through August 2013.

8.

Plaintiff-Relator Demeka N. Smith ("Smith") is an individual and resident of the State of Georgia.

9.

Plaintiff-Relator Smith was last employed as Therapist/Discharge Planner by Defendant St. Simons By-The-Sea and was employed from June 2005 through March 2013.

5

10.

Plaintiff-Relator Lisa P. Torras ("Torras") is an individual and resident of the State of Georgia.

11.

Plaintiff-Relator Torras was last employed as Director of Admissions and previous to that Director of Business Development by Defendant at St. Simons By-The-Sea and was employed from November 1986 through July 2013.

12.

Plaintiff-Relator Inez Mitchell-Warrick ("Mitchell-Warrick") is an individual and resident of the State of Georgia.

13.

Plaintiff-Relator Mitchell-Warrick was last employed as a Collector in the Business Office by Defendant at St. Simons By-The-Sea and was employed from November 2007 through September 2013.

14.

Defendant Universal Health Services, Inc. ("UHS"), a 2013 FORTUNE 500 company, whose stock is publicly traded on the New York Stock Exchange, is a Delaware Corporation, doing business in the Southern District of Georgia in St. Simons Island, Glynn County, Georgia. Its corporate headquarters are located at 367 South Gulph Road, King of Prussia, Pennsylvania. UHS is a holding company

6

and operates through its subsidiaries including its management company, UHS of Delaware, Inc.

15.

UHS of Delaware, Inc. ("UHS Delaware") is the management company for, and is on information and belief, a wholly-owned subsidiary of Universal Health Services, Inc. Service can be made on UHS and UHS Delaware by serving the registered agent of UHS Delaware, whose registered agent is CT Corporation System, located at 1201 Peachtree Street, Atlanta, Georgia 30361.

16.

Defendant UHS and its subsidiaries and affiliates own and operate at least 11 acute care psychiatric hospitals in the State of Georgia and does business in Georgia as Anchor Hospital (Atlanta), located at 5454 Yorktowne Drive, Atlanta, Georgia 30349; Coastal Behavioral Health (Savannah), located at 663 Stephenson Avenue, Savannah, Georgia 31405; Coastal Harbor Treatment Center (Savannah), located at 1150 Cornell Avenue, Savannah, Georgia 31406; Crescent Pines Hospital (Stockbridge), located at 1000 Eagles Landing Parkway, Stockbridge, Georgia 30281; Lake Bridge Behavioral Health (Macon), located at 3500 Riverside Drive, Macon, Georgia 31210; Lighthouse Care Center of Augusta (Augusta), located at 3100 Perimeter Parkway, Augusta, Georgia 30909; Professional Probation Services (Norcross), located at 1170 Indian Trail Lilburn Road, Suite

7

350, Norcross, Georgia 30093; St. Simons By-The-Sea (St. Simons), located at 2927 Demere Road, St. Simons Island, Georgia 31522; Summit Ridge Hospital (Lawrenceville), located at 250 Scenic Highway, Lawrenceville, Georgia 30046; Talbott Recovery Campus (Atlanta), located at 5448 Yorktowne Drive, Atlanta, Georgia 30349; and Turning Point Hospital (Moultrie), located at 3015 Veterans Parkway 5, Moultrie, Georgia 31788. Lake Bridge Behavioral Health and Turning Point Hospital are located in the U.S. District Court (U.S.D.C.) Middle District of Georgia. Anchor Hospital, Crescent Pines Hospital, Professional Probation Services, Summit Ridge Hospital and Talbott Recovery Campus are located in the U.S.D.C. Northern District of Georgia. Coastal Behavioral Health, Coastal Harbor Treatment Center, Lighthouse Care Center of Augusta and St. Simons By-The-Sea are located in the U.S.D.C. Southern District of Georgia.

17.

According to its website (www.uhsinc.com) Defendant UHS, through subsidiaries and affiliates operate more than 225 acute care psychiatric hospitals, behavioral health facilities and ambulatory centers nationwide, in the U.S. Virgin Islands and Puerto Rico.

18.

According to its website (www.uhsinc.com) and its Annual Report for 2012 Defendant UHS, through its subsidiaries and affiliates operates 197 behavioral

8

health care facilities in 37 states including Alabama, Arkansas, California, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Kentucky, Maryland, Michigan, Mississippi, New Jersey, New Mexico, Nevada, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, Washington, Wyoming. UHS controls all aspects of the operations of these facilities including St. Simons By-The-Sea.

19.

Defendant Psychiatric Solutions, Inc. ("PSI") a Delaware corporation, was formerly a public company and was acquired by Defendant UHS in May 2010. Prior to its acquisition by Defendant UHS, Defendant PSI owned St. Simons By-The-Sea doing business in the Southern District of Georgia in St. Simons Island, Glynn County, Georgia. Its corporate headquarters is located at Universal Corporate Center, 367 South Gulph Road, King of Prussia, Pennsylvania, 19406-0958.

20.

According to Defendant UHS's 2010 Annual Report with is acquisition of Defendant PSI, Defendant's Behavioral Health Division became the nation's largest provider of psychiatric healthcare services. "The transaction is the largest in healthcare industry in 2010, created a company with a total of 196 behavioral facilities and more than 19,000 inpatient psychiatric beds in 37 states, the District

9

of Columbia, Puerto Rico and the U.S. Virgin Islands." (UHS 2010 Annual Report at page 11, available at www.uhsinc.com ). On or about May 17 2010, the Wall Street Journal reported that the price for the acquisition of PSI was approximately $2 billion.

21.

Defendant HHC St. Simons, Inc., is a Georgia corporation doing business as St. Simons By-The-Sea or Focus By-The-Sea (also referred to herein as "St. Simons By-The-Sea").

22.

Defendant Monica Cook ("Cook") on information and belief, is an individual and resident of the State of Georgia.

23.

Cook was the acting Chief Executive Officer and Chief Nursing Officer of St. Simons By-The-Sea and is a registered nurse.

24.

Defendant Gayle Eckerd ("Eckerd") on information and belief, is an individual and resident of the State of Florida.

25.

Following the acquisition of PSI by Defendant UHS, Defendant Eckerd was made CEO/Group Director of River Point Behavioral Health ("River Point") and

10

Wekiva Springs Center both in Jacksonville, Florida and St. Simons By-The-Sea in St. Simons, Georgia.

### 26.

On information and belief, Defendant Eckerd had previously been employed as a staff member, then CEO of River Point.

### 27.

Defendant Lesli Jeter ("Jeter") on information and belief, is an individual and resident of the State of Georgia.

### 28.

Following the acquisition of Defendant PSI by Defendant UHS, Defendant Jeter was made Chief Financial Officer of St. Simons By-The-Sea with direct reporting responsibilities and acting under the direction of the CEO of St. Simons By-The-Sea and the Divisional CFO.

### 29.

Defendants Cook, Eckerd and Jeter oversaw Relator Torras as Director of Admissions and all admissions, patient services, physicians, staff and billings at St. Simons By-The-Sea.

### 30.

Defendant Miguel Martelli ("Martelli") on information and belief, is an individual and resident of the State of Georgia.

11

31.

Defendant Martelli, a licensed psychiatrist, has on information and belief been employed by Defendants at St. Simons By-The-Sea Hospital since 2008.

32.

On information and belief, Martelli was acting Medical Director during certain relevant times herein.

33.

Defendant M.J. Martelli, M.D., P.C. and Associates ("Martelli PC") is a Georgia corporation, and on information and belief, owned by Defendant Martelli with a location at #7 St. Andrews Court, Brunswick, Georgia 31520 and 4019 GA Highway 40 E, St. Marys, Georgia, 31558.

34.

Defendant Martelli PC can be served through its registered agent at M. J. Martelli, M.D., P.C., 7 St. Andrews Court, Brunswick, Georgia 31520.

35.

On information and belief Defendant Martelli was employed and paid by Defendant UHS a monthly salary plus bonuses.

36.

On information and belief, Defendant UHS billed and collected various government payors for Defendant Martelli's inpatient psychiatric services at St.

12

Simons By-The-Sea through its billing company Northeast Ohio Medical Management Systems ("NEOMed") based in Youngstown, Ohio.

37.

St. Simons By-the-Sea is a 101-bed psychiatric and addictive disease hospital for adults and adolescents, located in St. Simons Island, Georgia. According to its website (www.ssbythesea.com), St. Simons By-The-Sea has two inpatient programs for adults: Psychiatry and Addictive Disease. The Adult Psychiatric Unit is designed for patients struggling with depression, psychosis anxiety or other mental health issues. The Addictive Disease /Dual Diagnosis Unit treats patients diagnosed to have a chemical dependency in both with and without a psychiatric disorder. On information and belief, approximately 50% of the patients admitted at St. Simons By-The-Sea are given this Addictive Disease/Dual Diagnosis. A significant portion of these patients estimated at 20-25% were dependents of the United States military on active duty and retirees.

38.

On information and belief, approximately 30% of St. Simons By-the-Sea patient mix during all relevant times were insured by Medicare, 15% by Medicaid and approximately 25% by TRICARE.

39.

In January 2013, St. Simons By-The-Sea was moved into Defendant UHS's Florida Division under the control of Defendant Eckerd.

13

40.

Over time Defendants began to view Relators, long time employees at the St. Simons By-The-Sea as trouble makers and resistant to their billing schemes and management practices and were not happy about complaints by Relators about billing fraud.

41.

In an effort to reduce costs, Defendants would not permit overtime to Relators and other employees who were working 50-60 hours per week. When the census was down, Defendants frequently sent some of the Relators and other employees home. Employees were to "clock out" for lunch to avoid paying overtime. Relators frequently working through lunch and stayed late even if the census was low and did not request overtime.

42.

The work environment became so difficult and hostile that a number of employees, including one of the Relators, resigned. In fact, tens of employees of St. Simons By-The-Sea were fired or forced to resign by Defendants following the UHS acquisition. The Relators are part of this group.

43.

Defendants told Relator Torras to fire several of the Relators and to hire younger, prettier employees. Most if not all replacements hired by Defendants at

14

St. Simons By-The-Sea were much younger, white and most of them were in their thirties and willing not to question Defendants' fraudulent billing practices.

44.

On information and belief, Relators believe that St. Simons By-The-Sea has not had a RAC Audit in many years.

## APPLICABLE FEDERAL AND STATE STATUTES
## FEDERAL FALSE CLAIMS ACT

45.

The Federal False Claims Act imposes liability on persons or entities who submit or cause to be submitted false or fraudulent claims to federal government funded programs, including but not limited to Medicare and Medicaid, 31 U.S.C. §§ 3729–3733.

46.

Relators, on behalf of the government plaintiffs, are asserting pre- and post-FERA[1] FCA claims against the Defendants for their respective violations of the FCA during the applicable time periods before and after the FERA amendments. Thus, the following versions of the FCA are relevant and applicable to this Complaint

---

[1] The False Claims Act was amended in 2009 by the Fraud Enforcement and Recovery Act of 2009, Public Law 111-21 ("FERA"). Relator's allegations about conduct prior to the effective date of FERA, May 20, 2009, are brought under the FCA pre-FERA, while allegations about conduct after that date are brought under the FCA as amended by FERA.

15

47.

The pre-FERA federal false claims statue provides in pertinent part:

31 U.S.C. § 3729. False claims

(a)    Liability for certain acts.  Any person who-

    (1)    Knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claims for payment or approval;

    (2)    Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

    (3)    Conspires to defraud the Government by getting a false or fraudulent

       ....

is liable to the Under States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person.

The post-FERA Amendments to the federal FCA, in pertinent part, provide:

31 U.S.C. § 3729. False Claims

(a) Liability for certain acts.

(1) In general. Subject to paragraph (2), any person who--

    (A)    Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

16

(B)    Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;[2]

(C)    Conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

....

is liable to the Under States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

48.

Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the False Claims Act civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

49.

For purposes of the False Claims Act:

(1)        the terms "knowing" and "knowingly"--

(A)    mean that person, with respect to information--

(i)    has actual knowledge of the information;

---

[2] A material fact is one capable of influencing the government's decision to pay the claim. See United States ex rel. Hutcheson v. Blackstone Medical, Inc., 647 F.3d 377, 394 (1st Cir. 2011).

17

(ii)     acts in deliberate ignorance of the trust or falsity of the information; or

(iii)    acts in reckless disregard for the trust or falsity of the information, and

(B)    require no proof of specific intent to defraud.

31 U.S.C. § 3729(b).

## THE *STARK* STATUTE, 42 U.S.C. § 1395nn

### 50.

Enacted as amendments to the Social Security Act, 42 U.S.C. § 1395nn (commonly known as the "*Stark* Statute") prohibits a hospital (or other entity providing healthcare items or services) from submitting Medicare claims for payment based on patient referrals from physicians having a "financial relationship" (as defined in the statute) with the hospital.    The regulations implementing 42 U.S.C. § 1395nn expressly require that any entity collecting payment for a healthcare service performed under a prohibited referral must refund all collected amounts on a timely basis.  42 C.F.R. § 411.353.

### 51.

The *Stark* Statute establishes the clear rule that the government will not pay for items or services prescribed by physicians who have improper financial relationships with other providers.   In enacting the statue, Congress found that improper financial relationships between physicians and entities to which they refer patients can compromise the physician's professional judgment as to whether

18

an item or service is medically necessary, safe, effective, or of good quality. Congress relied upon various academic studies consistently showing that physicians who had financial relationships with hospitals and other entities used more of those entities' services than similarly situated physicians who did not have such relationships. The statute was designed specifically to reduce the loss suffered by the Medicare program due to such increased questionable utilization of services.

52.

Congress enacted the *Stark* Statue in two parts, commonly known as *Stark* I and *Stark* II. Enacted in 1989, *Stark* I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the clinical lab provider. See Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

53.

In 1993, Congress extended the *Stark* Statute (*Stark* II) to referrals for ten additional health services. See Omnibus Act of 1993, P.L. 103-66 § 13562, Social Security Act Amendments of 1994, P.L. 103-432 § 152.

54.

As of January 1, 1995, *Stark* II applied to patient referrals by physicians with a prohibited financial relationship for the following ten additional "designated health services" ("DHS"): (1) inpatient and outpatient hospital services, (2)

19

physical prosthetics, orthotics, and prosthetic devices and supplies; (9) outpatient prescription drugs; and (10) home health services.

See 42 U.S.C. § 1395nn(h)(6).

In pertinent part, the *Stark* Statute provides:

(a)    Prohibition of certain referrals

    (1) In general. Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then--

        (A)    <u>The physician may not make a referral to the entity</u> for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

        (B)    <u>The entity may not present or cause to be presented a claim under this subchapter or bill</u> to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn (emphasis added).

55.

*Stark* is a strict liability statute. *Stark* prohibits profit-sharing between DHS providers and employee physicians. If a prohibited relationship does not meet an exception or if an employment agreement is void for failing to meet an exception, every referral made by the implicated physician could be considered a prohibited referral.

20

56.

If no exception applies to a *Stark* violation, then all referrals from the referring employee physician to the DHS entity are subject to prohibition.

## RELATORS' FEDERAL CLAIMS
## THE FEDERAL ANTI-KICKBACK STATUTE

57.

Paying or accepting remuneration for arranging for care under federally funded healthcare programs is expressly prohibited by the Medicare and Medicaid Patient Protection Act, 42 U.S.C. § 1320a-7b(b) ("Anti-Kickback Statute" or "AKS").

58.

Participation in Medicare is conditioned on compliance with AKS. Thus, claims submitted by a noncompliant hospital that is paying illegal remuneration in violation of the AKS are false claims were actionable under the FCS.

59.

The AKS prohibits any person or entity from offering, paying, soliciting, making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare and Medicaid programs.

In pertinent part, the AKS states:

(b) Illegal remuneration

21

(1)     Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind--

> (A)     in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B)     in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2)     whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –

> (A)     to refer an individual to a person for the furnishing or arranging for the furnishing or any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B)     to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

AKS, 42 U.S.C. § 1320a7b(b).

### 60.

Write-offs of co-payments by Defendants constitute a violation of the Act

and State Acts referenced herein and an illegal kickback under Federal Anti-

22

Kickback Statute (42 U.S.C. § 1320-7b(b)) and state Anti-Kickback Statutes (including those of the States of Georgia and Florida) ("State Anti-Kickback Statutes") and other applicable laws.

61.

The Anti-Kickback Statute also makes it a criminal offense to knowingly and willfully offer, pay, solicit, or receive any remuneration to induce or reward referrals of items or services reimbursable by a Federal health care program. Where remuneration is paid purposefully to induce or reward referrals of items or services payable by a Federal health care program, the Anti-Kickback Statute is violated. By its terms, the statute ascribes criminal liability to parties on both sides of an impermissible "kickback" transaction. For purposes of the Anti-Kickback Statute, "remuneration" includes the transfer of anything of value, directly or indirectly, overtly or covertly, in cash or in kind.

62.

Violation of the statute also constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both. Conviction will also lead to automatic exclusion from Federal health care programs, including Medicare and Medicaid. 42 U.S.C. § 1320a-7(a)(1). Where a party commits an act described in section 1320a-7(b) of the Act, the OIG may also initiate administrative

23

proceedings to exclude such party from the Federal health care programs under the Act.[3]

### 63.

In effect, by writing off the co-payments that the patients have contractually agreed to pay, this creates an incentive to refer patients to the Defendants. Waivers of co-payments and deductibles are specifically included under the definition of "remuneration" for purposes of the Beneficiary Inducement Statute. In addition, such practice violates the applicable Medicaid and Medicare contract which requires the Defendant to collect the co-pay and deductible. Such practice also violates HIPPA which requires healthcare providers to collect a co-pay or deductible and the failure to do so constitutes fraud.[4] Under HIPAA, it is considered mail fraud to have a scheme intended to "defraud any health care benefit program" which is a crime under federal law.

---

[3] In a 1994 Special Fraud Alert released by the Office of the Inspector General ("OIG") for the U.S. Department of Health and Human Services, the "routine" waiver of Medicare Part B copayments and deductibles was identified as a violation of the Federal Anti-Kickback Statute and False Claims Act. In 1996, Congress added 42 U.S.C. § 1320a-7a(a)(5) to the Anti-Kickback Statute, imposing a civil monetary penalty upon a person who offers or transfers to a Medicare or Medicaid beneficiary any remuneration that the person knows or should know is likely to influence the beneficiary's selection of a particular provided, practitioner, or supplier of Medicare of Medicaid payable items or services. The amendment expanded the definition of "remuneration" to the beneficiary to include, without limitation, "waivers of copayments and deductible amounts (or any part thereof)."

[4] Section 231(h) defines "remuneration" as including, *inter alia,* the waiver of coinsurance and deductible amounts (or any part thereof). Waivers of coinsurance and deductible amounts are expected from the definition of remuneration if: (i) the waiver is not offered as part of any advertisement or solicitation; (ii) the person making the waiver does not routinely waive coinsurance or deductible amounts; and (iii) the person making the waiver (a) waives the coinsurance and deductible amounts after determining in good faith that the individual is in financial need; or (b) fails to collect coinsurance or deductible amounts after making reasonable collection efforts.

24

64.

The U.S. Department of Health and Human Services has issued fraud alerts, clarifying that the routine waiver of co-payments and deductibles under Medicare and Medicaid constitutes fraud and may violate the Federal Anti-Kickback Statute. Office of the Inspector General, ("OIG") Special Fraud Alert, reprinted in 59 Fed. Reg. 65372 (December 19, 1994) (https://oig.hhs.gov/fraud/docs/alertsandbulletins/ 121994.html. The OIG reasoned that the beneficiary would be improperly induced to receive unnecessary items or services if there was no amount owed by the patient, in turn increasing costs to the Medicare and Medicaid programs.

65.

A number of states have enacted direct prohibitions related to a healthcare provider's waiver of co-payments and deductibles obligated in the insurance policy contract. Florida (Fla. Admin. Code Ann. 690-153.003) (Florida's criminal statute prohibits the knowing presentment or preparation of a claim containing materially false information or omissions); (Fla. Stat. Ann. § 817.234 (7)(a) (West 2013) (Florida's insurance fraud statute prohibits any service provider, other than a hospital, from billing amounts as the provider's usual and customary charge if the provider has agreed with the insured or intends "to accept less for the health care services rendered than is reflected on the claim form" or "has agreed with the insured or intends to waive deductibles or copayments, or does not for any other

25

reason intend to collect the total amount of such charge.") and Georgia (Ga. Code Ann. § 43-1-19.1(a) (2013)) (Georgia's civil statute makes it "a deceptive or misleading practice for any person duly licensed and authorized to provide any type of health care services to advertise, as an inducement to attract patients, the waiver of a deductible or copayment required to be made to such person under the patient's health insurance policy or plan.").

66.

The term "any remuneration" encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, cash or in kind. 42 U.S.C. § 1320a-7b(b)(1). Any ownership interest or compensation arrangement that constitutes a financial relationship under *Stark* would also constitute remuneration as defined by the Anti-Kickback Statute, unless a kickback safe harbor applies.

67.

Knowing and willful conduct is a necessary element of this criminal offense. 42 U.S.C. § 1320a-7b(b)(1). An act is willful if "the act was committed voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law." United States v. Starks, 157 F3d 833, 837–38 (11th Cir. 1998). The statue has been interpreted to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. See, e.g., United

26

States v. Kats, 871 F.2d 105, 108 (9th Cir. 1989); United States v. Greber, 760
F.2d 68, 69 (3rd Cir.), cert. denied, 474 U.S. 988 (1985).

### 68.

Violation of the Anti-Kickback Statute constitutes a felony punishable by a
maximum fine of $25,000, imprisonment up to five years, or both. Any party
convicted under the Anti-Kickback Statute must be excluded (i.e., not allowed to
bill for any services or rendered) from Federal health care programs for a term of at
least five years. Even without a conviction, if the Secretary of HHS funds
administratively that a provider has violated the Anti-Kickback Statute, the
Secretary may exclude that provider from the Federal health care programs for a
discretionary period, and may impose administrative sanctions of $50,000 per
kickback violation. 42 U.S.C. § 1320a-7(b).

### 69.

The Anti-Kickback Statute arose out of congressional concern that payments
to entities who can steer or direct patients could influence healthcare decisions and
result in goods and services being provided that are medically unnecessary, of poor
quality, or even harmful to a vulnerable patient population. To protect the integrity
of the program from these difficult to detect harms, Congress enacted a per se
prohibition against the payment of kickbacks in any form, regardless of whether

27

the particular kickback give rise to over utilization of federal healthcare services or poor quality of care.

70.

First enacted in 1972, Congress strengthened the Anti-Kickback Statute in 1977 and 1987, to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. See Social Security Amendments of 1972, Pub. L No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

71.

The fact that these are legitimate reasons for remuneration is irrelevant if even one of the purposes is to induce the referral purchase or recommendation at issue. See United States v. McClatchey, 217 F.3d 823, 835 (10th Cir. 2000).

72.

The Defendants' provision of paying for patient transportation to induce patient referrals to the facility as described in this Complaint constitute an illegal inducement under the Anti-Kickback Statute.

73.

The offering of free transportation services to patients receiving Medicare covered medical services qualifies as remuneration with AKS and a patient's decision to use the medical services from that provider.

28

74.

The Office of the Inspector General ("OIG") has recognized that free transportation services are considered an integral part of fraudulent or abusive schemes which lead to inappropriate steering of patients, overutilization, and the provision of medically unnecessary services. Examples of abusive arrangements involving free transportation services include:

- Psychiatric facilities offering out-of-state patients free round-trip airline tickets to Florida in order to receive services at their facilities;

- Van drivers soliciting, and offering free transportation services to, Medicaid patients for health care providers who compensate the drivers on a per patient or per service basis;

- Unscrupulous healthcare providers offering residents of nursing facilities and other congregate care facilities free transportation services to and from their offices for services that are frequently of questionable necessity; and

- Hospitals offering patients free limousine services.

See, e.g., OIG Advisory Opinion No. 00-7, Issued: November 17, 2000 http://oig.hhs.gov/fraud/docs/advisoryopinions/2000/ao00_7.htm. The OIG has previously taken the position that "incentives that are only nominal in value are not

29

prohibited by the statute," and has interpreted "nominal value to be no more than $10 per item, or $50 in the aggregate on an annual basis." 65 Fed. Reg. 24400, 24410-24411 (April 26, 2000) (preamble to the final rule on the CMP).

## RELATORS' GEORGIA CLAIMS

### 75.

The Defendant St. Simons By-The-Sea as well as Defendant UHS (collectively the "Georgia Defendant Hospitals") have been enrolled as providers in the Georgia Medicaid Program during all times relevant to this action.

## GEORGIA PROHIBITS KICKBACKS TO INDUCE REFERRALS

### 76.

The Georgia Medical Assistance Act, O.C.G.A. § 49-4-146.1(b), the Georgia Medicaid regulations and the Georgia provider participation agreement prohibit providers like the Georgia Defendant Hospitals from paying for referrals of Medicaid patients particularly described below.

### 77.

Obtaining Medicaid funds by "any funds scheme or device" is a crime in Georgia. The Georgia Medical Assistance Act (MAA), O.C.G.A. § 49-4-146.1(b), makes it unlawful for any person to:

(1)  Obtain, attempt to obtain, or retain for himself, herself, or any other person any medical assistance or other benefits or payments under this article, or under a managed care program operated, funded, or

30

reimbursed by the Georgia Medicaid program, to which the person or provider is not entitled, or in an amount greater than that to which the person or provider is entitled, when the assistance, benefit, or payment is obtained attempted to be obtained, or retained, by:

(A)  Knowingly and willfully making a false statement or false representation;

(B)  Deliberate concealment of any material fact; [or]

(C)  Any fraudulent scheme or device.

78.

Each claim for healthcare services provided and submitted by Defendants

constitutes a violation of the MAA because it involves an attempt by the Georgia

Defendant Hospitals to obtain Medicaid funds by a fraudulent scheme.

79.

As Medicaid providers, the Georgia Defendants are required to execute the

State's Medicaid Provider Agreement called a "Statement of Participation". See,

e.g., form of "Statement of Participation" executed by Defendant St. Simons By

The Sea and other Defendants, attached hereto as Exhibit "A"[5].

The Statement of Participation states in relevant part:

2.  PROVIDER'S OBLIGATIONS

A.  Legal Compliance. Provider shall comply with all of the Defendant's requirements applicable to the category(ies) of service which Provider participates under this Statement of Participation, including Part I, Part II and the applicable Part III manuals.

---

[5] Similar provisions have been included in Statement of Participation since at least 1978. See, e.g., Exhibit "B" attached hereto.

31

The Part I Policies and Procedures for Medicaid/PeachCare for Kids (Ga. Dept. of Community Health, Division of Medicaid) ("Part I Manual") states in part, that providers shall:

> [n]ot contact, provide gratuities or advertise "free" services to Medicaid or PeachCare for Kids members of the purpose of soliciting members' requests for services ... Any offer or payment for remuneration, whether direct, indirect, overt, covert, in cash or in kinds, in return for the referral of a Medicaid or PeachCare for Kids member is prohibited.

See relevant pages of Part I Manual, particularly including Chapter 100, 9. 1-19, sec. 106 "General Conditions of Participation," para. E, attached hereto as Exhibit "C".

### 80.

By executing the "Statement of Participation," the Georgia Defendant Hospitals acknowledged and represented that they shall "comply with all of the department requirements applicable to the categories of service offered by the provider, including (the "Part I Manual"). See, e.g., Exhibit "A" hereto.

### 81.

The Georgia Defendant Hospitals are subject to Georgia's Medicaid Provider Agreement and the Provider's obligations made a part thereof, as set forth above and infra.

32

82.

The referenced Part I Manual provision prohibits payments (kickbacks) made in exchange for referral of patients, and said prohibition of kickbacks is a condition of participation in the state Medicaid program.  See Exhibits "A" and "C".

## THE GEORGIA FALSE MEDICAID CLAIMS ACT

83.

The Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168, is substantively similar to the federal FCA and imposes liability on any person who:

(1)     Knowingly presents, or causes to be presented to the Georgia Medicaid program, a false or fraudulent claim for payment or approval to the state;

(2)     Knowingly makes, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or

(3)     Conspires to defraud the Georgia Medicaid program by getting a false claim allowed or paid.

O.C.G.A. § 49-4-168.1(a)(1)–(3).

## THE FLORIDA FALSE CLAIMS ACT

84.

The Florida False Claims Act, Fla. Stat. §68.081 - 68.92, is modeled after the federal FCA and authorizes both Florida's government and private individuals (acting on the government's behalf) to bring civil actions for damages against persons engaging in prohibited conduct.  Specifically, and among other things, the

33

Florida FCA creates civil liability for a person who: (1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval; (2) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim; (3) Conspires to commit a violation of Fla. Stat. §68.082(2); and (4) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state.

Fla. Stat. §68.081 – 68.92.

## MEDICARE PROGRAM

### 85.

In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services. 42 U.S.C. § 1395.

### 86.

The Centers for Medicare and Medicaid Services ("CMS") is an agency of HHS and is directly responsible for the administration for the Medicare program.

### 87.

Medicare has several parts, including Part A, which is primarily for hospital-based charges (hereinafter referred to as "Medicare Part A"). The Medicare Part A

34

program authorized payment for hospital in-patient care, including behavioral health inpatient care. 42 U.S.C. §§ 1395c-1395i-4.

88.

Providers who participate in Medicare Part A must periodically sign and submit to CMS an application for participation in the Medicare program, to wit, a Hospital Insurance Benefit Agreement (Form HCFA-1561), under which each hospital agrees "to conform to the provisions of Section 1866 of the Social Security Act and applicable provisions in 42 C.F.R., Parts 405- 406, 420 and 489" (https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms1561.pdf).

89.

Each of the Hospital Defendants have executed and submitted to CMS a Hospital Insurance benefit Agreement (Form HCFA-1561).

90.

Providers who participate in Medicare Part A must periodically sign and submit to CMS Form 855A – Medicare Enrollment Application – Institutional Providers.

91.

The Hospital Defendants executed and submitted to CMS a CMS Form 855A – Medicare Enrollment Application – Institutional Providers. By executing and submitting SMC Form 855A, the Hospital Defendants expressly certified to

35

CMS as follows: "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider ... I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including but not limited to, the Federal anti-kickback statute and the *Stark* law), and on the provider's compliance with all applicable conditions of participation in Medicare." CMS-855A (07/11) (emphasis added) (https://www.cms.gov/Medicare/CMS-Forms/CMS-forms/downloads/cms855a.pdf).

### 92.

As a necessary condition to payment by Medicare, CMS requires hospitals to submit on an annual basis a Form CMS-2552, more commonly known as the "Hospital Cost Report." (For inpatient psychiatric facilities, CMS-2552-96 before May 1, 2010 and CMS-2552-10 after May 1, 2010, see 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20; see also 42 C.F.R. § 405.1801(b)(1)).

### 93.

At all times relevant to this Complaint, each of the Hospital Defendants were required to submit Hospital Cost Reports to CMS. Each Hospital Cost Report contains an express certification that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

36

94.

The Hospital Cost Report Certification is a preface to the cost report's

certification, where the following warning appears:

MISREPRESENTATION OR FALSIFICATION OF ANY
INFORMATION CONTAINED IN THIS COST REPORT MAY BE
PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE
ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL
LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS
REPORT WERE PROVIDED OR PROCURED THROUGH THE
PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR
WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND
ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT
MAY RESULT.

This advisory is followed by the actual certification language itself:

CERTIFICATION BY OFFICER OR ADMINISTRATOR OR
PROVIDER(S)

I HEREBY CERTIFY that I have read the above statement and that I
have examined the accompanying electronically filed manually
submitted cost report and the Balance Sheet and State of Revenue and
Expenses prepared by [name of facility, ID number and facility] for
the cost reporting period beginning [date] and ending [date] and that
to the best of my knowledge and belief, it is a true, correct and
complete statement prepared form the books and records of the
provider in accordance with applicable instructions, except as noted. I
further certify that I am familiar with the laws and regulations
regarding the provision of the health care services, and that the
services identified in the cost report were provided in compliance with
such laws and regulations. (This is followed by: signing of facility's
officer, title and date).

95.

Hospital Cost Reports submitted by the Defendants UHS and St. Simons By-

The-Sea were, upon information and belief, at all times material to this Complaint

37

signed by their respective authorized employees (including employees of its various predecessors), usually a hospital official who attested, among other things, to certification quoted above.

96.

Under the Medicare Conditions of Participation, hospitals must establish utilization management committees. According to 42 C.F.R. § 482.30, "The hospital must have in effect a utilization management review (UR) plan that provides for review of services furnished by the institution and by members of the medical staff to patients entitled to benefits under the Medicare and Medicaid programs."

97.

The UR plan must be implemented by a committee that addresses the utilization of services furnished by the hospital and its medical staff to Medicare and Medicaid patients. Utilization and quality control peer review committees are charged with using their authority and influence to secure practitioner compliance with federal obligations: 42 U.S.C. § 1320c-5(c).

Review process. The committee evaluates medical necessity with respect to

- hospital admission (i.e., Medicare claims status review);
- duration of care (i.e., continued-stay review); and
- professional services rendered, such as drugs and biologicals (i.e., outliers in cost or utilization).

38

98.

The admitting physician first determines whether a Medicare beneficiary is acutely ill and requires Medicare-covered hospital services available only in an inpatient setting. A case manager or other representative of the utilization management staff then reviews the patient's record – sometimes prospectively in the emergency department, but usually during the first 24 hours after admission. Using an accepted screening tool, the case manager or committee determines if the admission satisfies medical necessity criteria. If, after consulting with the admitting physician, the utilization management committee finds that a longer stay is not medically necessary, then it should promptly notify the hospital administration, patient and physician of this decision.

99.

As a condition of payment for hospital inpatient services under Medicare Part A, section 1814(a) of the Social Security Act requires physician certification of the medical necessity that such services be provided on an inpatient basis. The order to admit as an inpatient ("practitioner order") is a critical element of the physician certification, and is therefore also required for hospital inpatient coverage and payment under Part A. The physician certification, which includes the practitioner order, is considered along with other documentation in the medical record as evidence that hospital inpatient service(s) were reasonable and necessary.

39

(www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/

AcuteInpatientPPS/Downloads/IP-Certification-and-Order-09-05-13.pdf). The

complete requirements for the physician certification are found in 42 C.F.R. Part

424 subpart B and 42 C.F.R. § 412.3.

100.

As part of the Inpatient Psychiatric Facility Prospective Payment System

(IPF PPS), the admissions, medical records, treatment plan, discharge and related

requirements for Inpatient Psychiatric Hospital Services are also governed by,

among other things, the Medicare Benefit Policy Manual, Chapter 2-Inpatient

Psychiatric Hospital Services (available at http://www.cms.gov/Regulations-and-

Guidance/Guidance/Manuals/downloads/bp102c02.pdf).

101.

The IPF PPS is codified at 42 C.F.R. § 412, Subpart M and provides

payment for inpatient psychiatric treatment when provided to a patient in

psychiatric hospitals. Section 124 of the Medicare, Medicaid and SCHIP (State

Insurance Health Insurance Program) mandated the development and

implementation of a per diem PPS for inpatient hospital services furnished in

psychiatric hospitals and psychiatric units. Section 30 of the IPS PPS requires that:

> The medical records maintained by an IPF must permit determination
> of the degree and intensity of the treatment provided to individuals
> who are furnished services in the institution, according to 42 C.F.R. §
> 412.27 and 42 C.F.R. § 482.61. In addition, consistent with sound

40

clinical practice, all medical records, including progress notes and treatment plan, should be legible and complete, and should be promptly signed and dated by the person (identified by name and discipline) who is responsible for ordering, providing or evaluating the service furnished.

30.1 Development of Assessment Diagnostic Data.

Medical records must stress the psychiatric components of the record, including history of findings and treatment provided for the psychiatric condition for which the patient is hospitalized.

(1)    The identification data must include the patient's legal status.

(2)    A provisional or admitting diagnosis must be made on every patient at the time of admission, and must include the diagnoses of comorbid diseases as well as the psychiatric diagnoses.

(3)    The reasons for admission must be clearly documented as stated by the patient and/or others significantly involved.

(4)    The social service records, including reports of interviews with patients, family members, and others, must provide an assessment of home plans and family attitudes, and community resource contacts as well as a social history.

(5)    When indicated, a complete neurological examination must be recorded at the time of the admission physical examination.

30.2 Psychiatric Evaluation.

Each patient must receive a psychiatric evaluation that must—

(1)    Be completed within 60 hours of admission;

(2)    Include a medical history;

(3)    Contain a record of mental status;

(4)    Note the onset of illness and the circumstances leading to admission;

41

30.2.2 Active Treatment.

(5)    Describe attitudes and behavior;

(6)    Estimate intellectual functioning, memory functioning, and orientation; and

(7)    Include an inventory of the patient's assets in descriptive, not interpretative fashion.

### 30.2.1 Certification and Recertification Requirements.

### 30.2.1.1 Certification

The certification that a physician must provide with respect to IPF services is required to include a statement that the services furnished can reasonably be expected to improve the patient's condition or for diagnostic study. The certification is required at the time of admission or as soon thereafter that is reasonable and practicable. See Pub.100-01, Medicare General Information, Eligibility and Entitlement Manual, chapter 4, §10.9, for certification requirements.

### 30.2.1.2 Recertification

If the patient continues to require active inpatient psychiatric treatment, then a physician must recertify as of the 12th day of hospitalization (with subsequent recertifications required at intervals established by the IPF's Utilization Review committee on a case-by-case basis, but no less frequently than every 30 days) that the services were and continue to be required for treatment that could reasonably be expected to improve the patient's condition, or for diagnostic study, and that the patient continues to need, on a daily basis, active treatment furnished directly by or requiring the supervision of inpatient psychiatric facility personnel. In addition, the hospital records should show that services furnished were intensive treatment services, admission or related services, or equivalent services. See Pub.100-01, Medicare General Information, Eligibility and Entitlement Manual, chapter 4, §10.9, for recertification requirements.

### 30.2.2 Active Treatment.

Payment for IPF services is to be made only for "active treatment" that can reasonably be expected to improve the patient's condition. To

42

assure that payment is made only under such circumstances, the law includes certain requirements that must be met before the services furnished in an IPF can be covered, including medical necessity and certification. [See 42 C.F.R. § 482.61, Conditions of Participation for Hospitals, for a full description of what constitutes active treatment.]

102.

Hospital providers are also required by Medicare conditions of participation

to ensure that services provided to Medicare beneficiaries are in fact medically

necessary.

30.3.1 - Individualized Treatment or Diagnostic Plan
Each patient must have an individual comprehensive treatment plan that must be based on an inventory of the patient's strengths and disabilities. The written plan must include—

(1)     A substantiated diagnosis;

(2)     Short-term and long-range goals;

(3)     The specific treatment modalities utilized;

(4)     The responsibilities of each member of the treatment team; and

(5)     Adequate documentation to justify the diagnosis and the treatment and rehabilitation activities carried out.

## MEDICARE EMTALA REQUIREMENT

103.

Medicare participating hospitals must meet the Emergency Medical

Treatment and Labor Act (EMTALA) statute codified at §1867 of the Social

Security Act, (http://www.ssa.gov/OP_Home/ssact/title18/1867.htmtl) the

accompanying regulations in 42 C.F.R. § 489.24 and the related requirements at 42

43

C.F.R. § 489.20(l), (m), (q), and (r). EMTALA requires hospitals with emergency departments to provide a medical screening examination to any individual who comes to the emergency department and requests such an examination, and prohibits hospitals with emergency departments from refusing to examine or treat individuals with an emergency medical condition (EMC). (http://www.cms.gov/Regulations-and-Guidance/Legislation/EMTALA

/downloads/CMS-1063-F.pdf). A participating hospital may also not delay provision of an appropriate medical screening examination required or further medical examination and treatment required in order to inquire about the individual's method of payment or insurance status.

104.

EMTALA, also known as the patient antidumping statute, was passed in 1986 as part of the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), Public Law 99–272, 42 U.S.C. § 1395dd. Congress incorporated these antidumping provisions within the Social Security Act to ensure that any individual with an emergency medical condition (EMC), regardless of the individual's insurance coverage, is not denied essential lifesaving services.

105.

The term "hospital" includes critical access hospitals. The provisions of EMTALA apply to all individuals (not just Medicare beneficiaries) who attempt to

44

gain access to a hospital for emergency care. The regulations define "hospital with an emergency department" to mean a hospital with a dedicated emergency department (ED). In turn, the regulation defines "dedicated emergency department" as any department or facility of the hospital that either (1) is licensed by the state as an emergency department; (2) held out to the public as providing treatment for emergency medical conditions; or (3) on one-third of the visits to the department in the preceding calendar year actually provided treatment for emergency medical conditions on an urgent basis. <u>This includes individuals who may present as unscheduled ambulatory patients to units (such as labor and delivery or psychiatric units of hospitals) where patients are routinely evaluated and treated for emergency medical conditions.</u>

106.

Hospitals with dedicated emergency departments are required to take the following measures:

- Adopt and enforce policies and procedures to comply with the requirements of 42 C.F.R. § 489.24;

- Post signs in the dedicated ED specifying the rights of individuals with emergency medical conditions and women in labor who come to the dedicated ED for health care services, and indicate on the signs whether the hospital participates in the Medicaid program;

- Maintain medical and other records related to individuals transferred to and from the hospital for a period of five years from the date of the transfer;

45

- Maintain a list of physicians who are on-call to provide further evaluation and or treatment necessary to stabilize an individual with an emergency medical condition;

- Maintain a central log of individuals who come to the dedicated ED seeking treatment and indicate whether these individuals:

  o Refused treatment,

  o Were denied treatment,

  o Were treated, admitted, stabilized, and/or transferred or were discharged;

- Provide for an appropriate medical screening examination;

- Provide necessary stabilizing treatment for emergency medical conditions and labor within the hospital's capability and capacity;

- Provide an appropriate transfer of an unstabilized individual to another medical facility if:

  o The individual (or person acting on his or her behalf) after being informed of the risks and the hospital's obligations requests a transfer,

  o A physician has signed the certification that the benefits of the transfer of the patient to another facility outweigh the risks or

  o A qualified medical person (as determined by the hospital in its by-laws or rules and regulations) has signed the certification after a physician, in consultation with that qualified medical person, has made the determination that the benefits of the transfer outweigh the risks and the physician countersigns in a timely manner the certification. (This last criterion applies if the responsible physician is not physically present in the emergency department at the time the individual is transferred.

- Provide treatment to minimize the risks of transfer;

- Send all pertinent records to the receiving hospital;

- Obtain the consent of the receiving hospital to accept the transfer,

- Ensure that the transfer of an unstabilized individual is effected through qualified personnel and transportation equipment, including the use of medically appropriate life support measures;

- Medical screening examination and/or stabilizing treatment is not to be delayed in order to inquire about payment status;

- Accept appropriate transfer of individuals with an emergency medical condition if the hospital has specialized capabilities or facilities and has the capacity to treat those individuals; and

- Not penalize or take adverse action against a physician or a qualified medical person because the physician or qualified medical person refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized or against any hospital employee who reports a violation of these requirements.

See State Operations Manual, http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/ downloads/som107ap_v_emerg.pdf.

107.

Hospitals and doctors that violate EMTALA are subject to fines of up to $50,000 per violation. Violators of EMTALA may be excluded from participation in the Medicare and Medicaid programs.

108.

Patient dumping in connection with the enticement of homeless individuals to seek admission to hospitals violates AKS.

109.

The Medicare and Medicaid Conditions of Participation prohibit patient dumping. Hospitals must have in effect a discharge planning process that applies to

47

all patients (See 42 C.F.R. § 482.43). In addition hospitals must be in compliance with applicable Federal laws related to the health and safety of patients (42 C.F.R. § 482.11).

## HIPAA

### 110.

The Health Insurance Portability and Accountability Act of 1996 (HIPAA), Public Law 104-191, was enacted on August 21, 1996. (http://www.hhs.gov/ocr/privacy/hipaa/administrative/statute/hipaastatutepdf.pdf).

### 111.

The U.S. Department of Health and Human Services ("HHS") issued the Privacy Rule to implement the requirement of HIPAA. The Privacy Rule standards address the use and disclosure of individuals' health information called "protected health information," by organizations subject to the Privacy Rule called "covered entities," as well as standards for individuals' privacy rights to understand and control how their health information is used. The complete suite of HIPAA Administrative Simplification Regulations can be found at 45 C.F.R. Parts 160, 162, and 164. See, e.g., HIPPA Administration Simplification Regulation Text, www.hhs.gov/ocr/privacy/hipaa/administrative/combined/hipaa-simplification-201303.pdf.

48

112.

The Privacy Rule protects all "individually identifiable health information"

held or transmitted a covered entity or its business associate, in any form or media,

whether electronic, paper, or oral. 45 C.F.R. § 160.103. The Privacy Rule calls this

information "protected health information (PHI)."

113.

"Individually identifiable health information" is information, including

demographic data, that relates to:

- the individual's past, present or future physical or mental health or condition,

- the provision of health care to the individual, or

- the past, present, or future payment for the provision of health care to the individual, and that identifies the individual or for which there is a reasonable basis to believe it can be used to identify the individual.[13]

114.

Individually identifiable health information includes many common

identifiers (e.g., name, address, birth date, Social Security Number).

115.

Under 45 C.F.R. § 164.501, a covered entity must obtain an individual's

authorization to use or disclose psychotherapy notes with the following exceptions:

- The covered entity who originated the notes may use them for treatment.

49

- A covered entity may use or disclose, without an individual's authorization, the psychotherapy notes, for its own training, and to defend itself in legal proceedings brought by the individual, for HHS to investigate or determine the covered entity's compliance with the Privacy Rules, to avert a serious and imminent threat to public health or safety, to a health oversight agency for lawful oversight of the originator of the psychotherapy notes, for the lawful activities of a coroner or medical examiner or as required by law. 45 C.F.R. § 164.532.

"Psychotherapy notes" means:

notes recorded (in any medium) by a health care provider who is a mental health professional documenting or analyzing the contents of conversation during a private counseling session or a group, joint, or family counseling session and that are separated from the rest of the of the individual's medical record. Psychotherapy notes excludes medication prescription and monitoring, counseling session start and stop times, the modalities and frequencies of treatment furnished, results of clinical tests, and any summary of the following items: diagnosis, functional status, the treatment plan, symptoms, prognosis, and progress to date.

45 C.F.R. § 164.501.

116.

Permitted Uses and Disclosures. A covered entity is permitted, but not required, to use and disclose protected health information, without an individual's authorization, for the following purposes or situations: (1) To the Individual (unless required for access or accounting of disclosures); (2) Treatment, Payment, and Health Care Operations; (3) Opportunity to Agree or Object; (4) Incident to an otherwise permitted use and disclosure; (5) Public Interest and Benefit Activities; and (6) Limited Data Set for the purposes of research, public health or health care

operations. 45 C.F.R. § 164.502(a)(1). Covered entities may rely on professional ethics and best judgments in deciding which of these permissive uses and disclosures to make. Id.

117.

There are extremely limited situations, where a covered entity may disclose such health information to law enforcement officials. See 45 C.F.R. § 164.512(f). Covered entities may disclose protected health information to law enforcement officials for law enforcement purposes under the following six circumstances, and subject to specified conditions: (1) as required by law (including court orders, court-ordered warrants, subpoenas) and administrative requests; (2) to identify or locate a suspect, fugitive, material witness, or missing person; (3) in response to a law enforcement official's request for information about a victim or suspected victim of a crime; (4) to alert law enforcement of a person's death, if the covered entity suspects that criminal activity caused the death; (5) when a covered entity believes that protected health information is evidence of a crime that occurred on its premises; and (6) by a covered health care provider in a medical emergency not occurring on its premises, when necessary to inform law enforcement about the commission and nature of a crime, the location of the crime or crime victims, and the perpetrator of the crime. 45 C.F.R. § 164.512(f).

51

118.

Failure to comply with HIPAA can result in both civil and criminal penalties. These civil and criminal penalties can apply to both covered entities and individuals.

119.

Section 13410(D) of the HITECH Act, which became effective on February 18, 2009 (http://www.gpo.gov/fdsys/pkg/PLAW-111publ5/pdf/PLAW-111publ5.pdf), revised section 1176(a) of the Social Security Act by establishing:

- four categories of violations that reflect increasing levels of culpability;
- four corresponding tiers of penalties that significantly increase the minimum penalty amount for each violation; and
- a maximum penalty amount of $1.5 million for all violations of an identical provision.

**MEDICAID PROGRAM**

120.

The Medicaid Program is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. Medicaid providers submit claims for payment to states, which pay the claims and then seek partial reimbursement form the federal government. The State of Georgia has also in recent years contracted with a number of third parties such as Magellan, Cenpatico and Wellcare to administer Medicaid behavioral healthcare services.

52

121.

In Georgia, provider hospitals participating in the Medicaid program submit claims by hospital services rendered to Medicaid beneficiaries to the Georgia Department of Community Health for payment.

## TRICARE/CHAMPUS PROGRAM

122.

TRICARE/Champus, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces. 10 U.S.C. § 1076d. The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees, and survivors. 5 U.S.C. §§ 8901–8914.

## INDIAN HEALTH SERVICE

123.

Indian Health Services ("IHS"), a division of the Department of Health and Human Services, is the Federal Health Program for American Indians and Alaska Natives. The Indian Health Care Improvement Act of 1976 allows HIS to bill for medical services provided by HIS facilities to Indians eligible for Medicare and Medicaid.

53

## DEFENDANTS' FRAUDULENT SCHEMES

### 1.   Fraudulent Billings for Admissions and Continued Stays.

124.

On or about the time of the acquisition of Defendant PSI by Defendant UHS, and thereafter, Relators began to observe increasing pressure from Defendant UHS being exerted on the Relators, St. Simons By-The-Sea's psychiatrists, psychologists, social workers, therapists and nurses by the CFO and CEO of Defendants to increase its daily census. This increase in its daily census t was to be accomplished by falsely and fraudulently diagnosing, admitting and keeping patients without medical necessity and adequate documentation.   In addition, Defendants provided specific lengths of stay to meet the budget and in order to achieve their goal to make at least $1.5 million of earnings for St. Simons By-The-Sea. St. Simons By-The-Sea averaged approximately 2,500 patients per year.

125.

Based on Defendant's 2012 Annual Hospital Questionnaire filed by Defendant St. Simons By-The-Sea and signed by Defendant Cook, dated March 18, 2013 (copy attached as Exhibit "D"), St. Simons By-The-Sea reported a total of 2,409 admissions and 22,588 inpatients days.  In St. Simons By-The-Sea's 2011 Hospital Financial Survey filed with the Georgia Department of Community Health, by Defendant Jeter on August 13, 2012 (copy attached as Exhibit "E"), St.

54

Simons By-The-Sea reported total inpatient admissions of 2,552 and inpatient gross revenue of $31,312,947, a decrease of approximately $3 million of revenue from the 2010 Hospital Financial Survey.

126.

St. Simon's By-The-Sea is an acute crises stabilization facility. The required admission criteria and coverage by Medicare, Medicaid and TRICARE and other payors requires suicidal/homicidal psychotic or life threatening withdrawals by a patient that require medical detoxification and monitoring.

127.

For example, as a result of Defendants' pressure to meet financial goals and census, Relator Torras and those in the admissions department were told by Defendants, including Defendant CEO Cook to bring in "15 every day. I'm not joking. If we bring in 10 patients per day that is approximately 300-310 admissions per month. Increasing the volume of admissions will definitely assist in the process … This is serious. We have met and exceeded our budget by managing, but that is not enough. We already know that the microscope is on the facility. Now that we have not met our budget, the attention on the facility will increase …" See full email from Defendant Cook, dated April 30, 2013, attached as Exhibit "F". Relators noticed that every budget provided by Defendants had estimated lengths of stay.

55

128.

When the census was low, to drum up business, Defendants Cook, Eckerd and Brad Westphal, Defendant UHS Divisional Admissions Director told Plaintiff-Relator Torras to bring in and readmit former patient calling them on the pretext of doing "wellness checks". These calls where thinly veiled efforts to entice theses former patients to come in to be readmitted if they had insurance coverage, regardless of whether there was a medical necessity or whether they had relapsed. Plaintiff-Relator Torras was required weekly by Defendants to document how many calls and admissions using wellness checks were made and was required to fill out forms to that effect. The form required employees to call these former patients for "wellness checks" not once but three times and to document the time and date of each call. As an additional incentive for employees to raise census figures and to bring in patients, employees had to leave work early and had their pay cut if the census was low. When the census was low Defendants Cook and Jeter also ordered the admissions staff to go to Manna House (where meals and other support services are provided to the homeless) and ask who has a red, white and blue card Medicare insurance card) to get them admitted to St. Simons By-The-Sea.

56

129.

Medical evidence in at least hundreds of Medicare patients files and charts per year demonstrate that (i) Defendants improperly and illegally billed Medicaid, Medicare and TRICARE (which constituted at least 60-70% of the provider payor mix) and others for admissions and treatment and continued admissions at St. Simons By-The-Sea; (ii) that the acute level of care that Defendants were billing these providers for was not medically necessary and not the condition the patient was actually treated for; (iii) that the practice of submitting ongoing claims for extended treatment and lengths of stay was not medically necessary or justified, was inappropriate, and was a violation of federal and state law; and (iv) Defendants often failed to provide complete, accurate and timely discharge plans, if any, as required by federal providers.

130.

Medicare regulations require all healthcare providers and practitioners (including hospitals) to ensure that services and items ordered for delivery are:

- provided economically, and only when and to the extent they are medically necessary
- Of a sufficient level of quality to meet professionally recognized standards of care
- Supported by evidence of medical necessity and quality capable of satisfying the federal Medicare Utilization and Quality Control Peer Review Organization programs

131.

Medical necessity[6] is a legal doctrine by which evidence based on clinical standards of care are used to determine whether a treatment or procedure is reasonable, necessary and/or appropriate. In general, public and private insurance plans and managed care organizations cover only those services that are deemed medically necessary. Under Medicare law and regulations, the program will reimburse only for items and services that are "reasonable and necessary for the diagnosis for treatment of illness or injury or to improve the functioning of a malformed body member," unless another statutory authorization for payment applies. Social Security Act Section 1862(a)(i)(A), 42 U.S.C. § 1395y.

132.

Failure to abide by medical necessity guidelines is a violation of the federal False Claims Act, the Georgia False Claims Act and the Florida False Claims Act.

133.

For example, in order to fraudulently bill TRICARE for treating family members of active members of the armed forces, Defendants pressured staff to diagnose and admit patients who had substance abuse problems as "dual diagnosis" patients. Dual diagnosis patients have a dual diagnosis of psychological disorders as primary diagnosis and substance abuse as a secondary diagnosis. A patient

---

[6] The Health Insurance portability and Accounting Act of 1996 provides fines up to $10,000 per claim in response to a "pattern of medical or other items or services that a person knows or should have known are not medically necessary." 42 U.S.C. § 1320a-7a(a)(1)(E).

admitted to the Dual Diagnosis Unit of the St. Simons By-The-Sea would generally be admitted to a long 21 day program. The average per diem is close to $700 per day inclusive of medicine but exclusive of physician billing which was billed and collected by Defendants. TRICARE nor Wellcare, Amerigroup and others on behalf of Peach State Health Plans, will not pay for "opiate dependency" as a diagnosis so Defendants fraudulently cased its physicians to use the Dual Diagnosis in order for TRICARE to pay for admissions. Attached as Exhibit "G" is a selected list of substance abuse patients admitted to St. Simons By-The-Sea and treated on the Dual Diagnosis Unit but who were admitted with a psychiatric diagnosis.

134.

The medical treatment for records and physician discharge orders of Defendants for these patients reveal that these patients were treated and discharged for substance abuse. Relators also observed this same fraudulent diagnosis and billing actions for Medicaid and Medicare patients.

135.

The treatment notes of Dr. Robert E. Bryan Jr, who was the treating physician for many of these cases show that these patients were treated for substance abuse. Dr. Bryan is an osteopath who is an "addictionologist" not a

59

psychiatrist. Dr. Bryan was the only treating physician on the Dual Diagnosis Unit.

136.

Relators, including Brinson in the business office, frequently noticed that the dual diagnosis did not match the revenue codes or treatment notes because many patients were only treated for chemical dependency. The only department that could change a diagnosis once made was the Medical Records Department, which was controlled by Defendant Jeter. Relators observed many occasions where employees were specifically instructed and directed to change diagnosis codes on medical records so that it could be billed to Medicare, Medicaid, TRICARE and others. Relator Brinson refused to do so on a number of occasions. Other physicians on staff, including Dr. Bruce McLaulin, threatened to go to OIG with these illegal activities.

137.

Defendant Jeter also controls the Utilization Review Department. The Utilization Review Department (included Linda Gulyes, Glenda Pickren and Tracy Hehr) was controlled by Defendant Jeter, acted in essence as a rubber stamp, and failed to enforce utilization review protocols required by, among other things, Medicare as a condition of program participation. Relators themselves and Dr. Bryan frequently complained to Defendants Eckerd, Cook and Jeter of these illegal

60

and fraudulent billing practices. In fact, Defendant Cook told Relator Torras specifically and repeatedly not to give psychiatric patients to Dr. Bryan on the Dual Diagnosis Unit in order to avoid Dr. Bryan providing a psychiatric diagnosis on admission and a substance abuse diagnosis on discharge. Defendant Jeter made it known that if Dr. Bryan was resistant to such a diagnosis that the staff should go to more compliant physicians on staff.

138.

As part of this continuing pressure by Defendants to meet financial goals, Relators also observed that a significant number of patient admissions and discharges were made based on orders by Jennifer Holmes, a nurse practitioner rather than a physician as required by applicable law. In addition, in nearly 50% of admissions, Defendants' physicians routinely failed to conduct the required psychiatric evaluation and/or history and physical examination within 24 hours of admission as required by law and, and General Conditions of Participation and provided canned documentation responses from a template. Patients' medical records which are in electronic form will corroborate this.

139.

Relators also observed that if patients qualified for Medicare, they were routinely kept at St. Simons By-The-Sea 14 days or longer regardless of medical

61

necessity or whether they were stabilized and without the required physician recertification.

140.

In addition, the following requirements must be met for Medicare to pay for inpatient psychiatric hospital services:

- The patient must be furnished active psychiatric treatment that can be reasonably expected to improve his or her condition;

- Services must be furnished while the patient is receiving either active psychiatric treatment or admission and related services necessary for diagnostic treatment;

- A physician must provide certification at the time of admission or as soon thereafter as is reasonable and practicable that the patient needs, on a daily basis, active inpatient treatment furnished directly by or requiring the supervision of Inpatient Psychiatric Facility (IPF) personnel; and

- A physician must provide

  o The first re-certification as of the 12th day of hospitalization; and

  o Subsequent re-certifications at intervals established by the utilization review committee (on a case-by case basis, if it so chooses) but no less than every 30 days that the patient continues to need, on a daily basis, active inpatient treatment furnished directly by or requiring the supervision of IPF personnel.

141.

Beginning in 2012 to increase profits, Defendants also began to pressure staff to provide rehab therapy for Medicare substance abuse patients in addition to

62

detox because of its higher reimbursement. Rehab provides Defendants with a higher per diem and additional medical billing. Relators have observed that in many cases, there was not adequate documentation in the physician's admissions orders. Medicaid, TRICARE and certain other insurers take the position for coverage purposes that marijuana, crack and opiates do not cause life threatening withdrawal symptoms. Medicaid, and other Champus insurers will not cover detox for opiates because it is not deemed, among other things, "medically necessary or required." Medicare for example, establishes strict criteria to bill for inpatient rehab. Relators believe that a majority of the inpatient rehab patients who were not acutely ill, did not satisfy all of Medicare's inpatient criteria and were not reasonable or necessary. The Admissions Department, headed by Relator Torras, was pressured by Defendants Eckerd, Jeter and Cook, to improperly admit and keep patients. Exhibit "H" contains a sampling list of inpatients admitted to St. Simons By-The-Sea, many of whom did not satisfy the criteria for admission to rehab required by Medicare. In addition, the starred patient's files also lack the necessary submissions and treating, documentation to support medical necessity and continued inpatient stays in the files.

### 142.

When the census became low, the bar would drop even further for admissions and pressure by Defendants to fill beds and increase profits would

63

escalate dramatically. For example, one crack addicted patient who had been a bipolar patient at a competing Greenleaf Hospital, who had no symptoms and had not used in 40 days, was admitted through the efforts of Lesli Jeter for detox therapy. There is simply no detox program for crack! Another patient, P309, a known "frequent flyer" who needed to get his heart medications, was eagerly falsely admitted by Defendants.

143.

To meet Defendants census, Defendant resorted to filling beds with "7" "frequent flyers" who were attracted to the St. Simon By-The-Sea's "three hot meals and a cot." Many of these inpatient "frequent flyers" were homeless people with substance abuse problems who had nowhere else to go and did not meet any criteria for admission.

144.

The goal of Defendants for Medicare patients was to keep them as long as their insurance would pay or until all available insurance days were used up. For example, P22, a Medicare patient in "detox" was kept by Defendants 6 months. Medicare was billed for 34 days and P22 paid for the remainder of the stay. P22 was only admitted initially with a psych issue but remained at St. Simons By-The-Sea because he was court ordered to treatment for 6 months. P81 is another.

64

145.

For example, in an effort to achieve Defendants' financial goals and build up census, Defendants instructed Relators and other staff that "if the patient is not ready to go, we need to advocate for the patient." See Exhibit "I" (containing a sampling list of patients who were kept longer than medically or therapeutically necessary). These patients were treated by Relator Smith. Insurance would pay to "use up their days." Medicare provides 190 lifetime days of coverage with 60 days of continuous benefit. A patient can be readmitted after another 60 days and have full coverage except for the deductible.

146.

The "frequent flyers" not only did not meet admissions criteria but also have been kept at St. Simons By-The-Sea longer than medically necessary. In many cases, there is nothing in their medical records to justify a long continued length of stay or that treatment was medically necessary. See Exhibit "J" for a sample list of "frequent flyers".

## 2.     Defendants Illegally Paid For Transportation for Patients in Violation of the Anti-Kickback Statute and State Anti-Kickback Statute.

147.

In order to keep up with the census at St. Simons By-The-Sea, and in order to drum up business and induce patient referrals, Defendants began to pay a

65

number of car services including Island Cab (St. Simons) and Jitney Jim (Ponte Vedra, Florida) to pick up prospective patients at their homes and other locations from far away locations including Statesboro, Waycross, St. Mary's and Savannah, Georgia and St. Augustine and Jacksonville, Florida a passing several other closer to the patient's home treatment facilities along the way.  For example, these taxis were paid approximately $100 to $125 for picking up prospective patients from Savannah and Statesboro.  In fact, Defendants advised Relators that anyone within three hours of St. Simons By-The-Sea could be dispatched by taxi and paid by Defendants without any further inquiry or need.  Many of these patients were "frequent flyers" (such as P51, P470 and P81).  This illegal practice produced at least 12 – 15 new patients per month.  P51 is one example.  The practice was so widespread that Island Cab is listed twice on the St. Simons By-The-Sea Employee Directory.  See Exhibit "K".

148.

In addition, Relators observed on a number of occasions that Defendants paid for ambulance transportation from ambulance transport companies such as Central EMS for patients who did not physically need ambulance transport (i.e. meet Medicaid criteria for a stretcher) to St. Simons By-The-Sea.  For example, in the summer of 2012, when the census was at a low 30%, Defendants paid the ambulance bill of a patient, was a (1013) involuntary statute patient and was

66

transported to the Hospital by EMS. St. Simons had a standing policy that if insurance would deny payment for the ambulance, they would pay.

149.

Such invoices were approved by CFO Jeter and given to Jamie Burriss, staff accountant at that time in Payroll, AP and Purchasing, to pay. On a number of occasions, Plaintiff-Relator Torras and Brinson questioned this practice and these payments in flash/morning meetings. Defendants Cook and Eckerd stated that [UHS] "Corporate has a policy to do this".

## 3.  Fraudulent Billing for Defendant Martelli and MJ Martelli PC When Defendant Martelli Did Not Actually See the Patient as Billed.

150.

Defendants have for several years knowingly billed Medicare, Medicaid, TRICARE, and other payors for psychiatric services of Dr. Martelli. Dr. Martelli is the "Acting Medical Director" for patients in the Hospital's Adolescent Unit and both Adult Units! In addition to his employment at St. Simons By-The-Sea, Dr. Martelli is on staff at Southeast Georgia Health System in Brunswick, Georgia and Southeast Georgia Health Systems in Camden, Georgia and sees private patients in his office in Saint Marys and Brunswick, Georgia. At St. Simons By-the-Sea, Dr. Martelli is required to see every adolescent one-one-one, each day of their admission. Based on the often high number of patients assigned by Defendants to

67

him, Dr. Martelli rarely sees patients one-on-one. Defendants knowingly billed daily for Dr. Martelli under its Tax ID number regardless of if Dr. Martelli actually saw the patient. This fraudulent billing practice was widely known by staff at St. Simons By-the-Sea for many years, including Defendants.

### 151.

Dr. Martelli was required to, among other things, perform psychiatric evaluations and discharges, to check a box for each patient everyday indicating low, medium or high intensity, and sign at the bottom of the required form with his attestation for billing purposes. This form was routinely sent to Defendant Jeter for approval and Defendant Jeter approved these forms and sent them to, among others, Relator Mitchell-Warrick. From there, these approved billings were sent to Defendants' billing company NEOMed, specifically to the hospitals representative, Terri Eich, to be billed by Defendants.

### 152.

It was common for Dr. Martelli to bill for one-on-one individual sessions if he saw a patient in the hall or in group setting.

### 153.

Relator Torras and others repeatedly complained to Defendants Eckerd and Cook of this illegal practice. Relator Torras was told by Defendants Eckerd and Cook that they had already spoken with Defendant Martelli about "the amount of

68

time that Defendant Martelli was spending with patients." The patient charts show in many cases that while the Defendants billed for Dr. Martelli's psychiatric services, the chart notes were done by Dr. Martelli's nurse (and one time girlfriend) and that she falsified the medical records by signing Dr. Martelli's name.

154.

As evidence of this fraudulent bill practice by Defendants, Exhibit "L" attached hereto are daily census reports, replicating a sample list of patients and dates who Defendants' billing records show were seen by Dr. Martelli. On many of these dates, Dr. Martelli allegedly saw a number of newly admitted patients, each of which would have required one-on-one time in excess of one to two hours for each of these patients. It is a physical impossibility for Dr. Martelli to have maintained his positions at two hospitals and two private practices while at the same time having seen this many patients at St. Simons By-The-Sea! Each physician is required to complete daily billing sheets with a few limited billing codes and visit and discharge lines/boxes listed.

**4.    Violation of Defendants of Anti-Kickback Statutes and State Anti-Kickback Statutes.**

69

155.

A.    Physicians

Physicians at St. Simons By-The-Sea, including Dr. Martelli, were paid a handsome salary pursuant to written contracts and other oral agreements and as incentive, a bonus based on financial performance and the number of patients and consults or evaluations seen.    Dr. Martelli and other physicians were fairly motivated to self-refer patients from their private practice to St. Simons By-The-Sea and from St. Simons By-The-Sea to their private practice on discharge. Plaintiff-Relator heard Dr. Martelli state on numerous occasions that he was "circling the drain" to send his patients to St. Simons By-The-Sea. In addition, Dr. Martelli and other physicians were also financially incentivized to admit and keep patients at St. Simons By-The-Sea without medical necessity as described herein.

156.

The incentive payments to the recipient psychiatrists constitute a direct financial relationship under the *Stark* Statute between Defendant St. Simons By-The-Sea and the recipient psychiatrists.

157.

The recipient psychiatrists referred patients to Defendant St. Simons By-The-Sea for the furnishing of designated health services for which payment may be

70

made under the Social Security Act in violation of the *Stark* Statute. 42 U.S.C. § 1395nn(a)(1)(A).

158.

The referrals made by recipient psychiatrists to Defendant St. Simons By-The-Sea did not qualify for any statutory or regulatory exception from the *Stark* Statute referral prohibition.

159.

Defendant St. Simons By-The-Sea's submission of claims for the services furnished pursuant to the prohibited referrals made by the recipient psychiatrists violated the *Stark* Statute. 42 U.S.C. § 1395nn(a)(1)(B).

160.

Defendant St. Simons By-The-Sea also violated the False Claims Act by knowingly presenting, causing to be presented, and conspiring to present false claims for payment or a related false record or statement to agents of the United States Government Payors for designated health services relating to referrals from the recipient psychiatrists because Defendant St. Simons By-The-Sea was expressly prohibited by statute from receiving the claims for designated health services furnished pursuant to a referral prohibited by the *Stark* Statute. 31 U.S.C. § 3729(a). Submitting a claim under the false pretense of entitlement is fraudulent.

71

161.

The recipient psychiatrists referred patients to Defendant St. Simons By-The-Sea for the furnishing of items of services for which payment may be made in whole or in part under a Federal health care program in violation of 42 U.S.C. § 1320a-7b.

162.

To induce patient referrals, Defendant St. Simons By-The-Sea knowingly and willfully paid to the recipient psychiatrists remuneration prohibited under the AKA in the form of the incentive payments determined in a manner that takes into account the volume or value of referrals by the recipient psychiatrists to Defendant St. Simons By-The-Sea in violation of 42 U.S.C. § 1320a-7b(b)(2).

163.

In return for patient referrals, the recipient psychiatrists knowingly and willfully received from the Defendant St. Simons By-The-Sea remuneration prohibited under the Anti-Kickback Statute and the State Anti-Kickback Statute in the form of the incentive payments determined in a manner that takes into account the volume or value of referrals by the recipient psychiatrists to Defendant St. Simons By-The-Sea. 42 U.S.C. § 1320a-7b(b)(1).

72

164.

The remuneration paid by Defendant St. Simons By-The-Sea to the recipient psychiatrists in the form of the incentive payments did not qualify for the statutory exclusion or regulatory safe harbor from the kickback referral prohibition for amounts paid to an employee because the Recipient Psychiatrists were not employees of Defendant. 42 U.S.C. § 1320a-7b(b)(3); 42 C.F.R. § 1001.952(i).

165.

The incentive payments made indirectly to Defendant St. Simons By-The-Sea to the recipient psychiatrists did not qualify for any other statutory exception or safe harbor from the Anti-Kickback Statute and the State Anti-Kickback Statute remuneration prohibition.

166.

B.    Failure to Collect "Relax" Co-Payments from Patients

When the census for the St. Simons By-The-Sea was low, Relator Brinson and other employees in the Billing Office were instructed by Defendants to "relax co-pays to make sure everyone got in the door". In one month in 2013, for example, collections on up front co-pays, deductibles and amounts due after insurance payments went from $250,000 to $100,000. It was the practice of the Billing Office to collect as much of the co-pays due at the time of admission. However, they were instructed by Defendants Cook and Jeter that when the census

73

was low to remove any obstacles that would keep a patient out of the hospital and "knock down all barriers to admissions" and "bring them in". This included not requiring the collection of co-pays and deductibles or even discussing amounts due at the time of admission. It was reported that the patients were even instructed by some of the admissions counselors on how to get themselves (in some cases) qualified for charity so that the billing office would just adjust co-pays and deductible to charity based on poverty guidelines. This practice by Defendants violates the Anti-Kickback Statute and HIPAA.

## 5.  **Defendants Violations of EMTALA**

167.

In violation of EMTALA, Defendants compiled a list of patients "not to admit." These patients primarily consisted of patients who had "exhausted their medical days" under Medicare, Medicaid, TRICARE and other provider plans or were "out of benefit" periods. One such patient on this list was P472.

168.

A number of critical need patients were either not admitted or had their treatment delayed until there was insurance in force in violation of EMTALA. By way of example of another EMTALA violation, P471, an adolescent female was assessed by St. Simons By-The-Sea on December 31, 2013, and determined to meet criteria for admission. She was held in the lobby of St. Simons By-The-Sea

74

for many hours before Defendant Cook instructed the nurses to place on the unit. However, her treatment was intentionally delayed by Defendants since this patient's insurance coverage would not be effective until January 1, 2014. Defendants Cook instructed nurses on the Adolescent Unit not to provide and document any treatment until January 1, 2014.

## 6. Defendants Violations of HIPAA

169.

Defendants frequently violated HIPAA by sharing health information with the Georgia Bureau of Investigation. Plaintiff-Relator observed a common practice by Defendants whereby Defendant Jeter would contact her husband, an agent with the Georgia Bureau of Investigation, share adolescent patient's parent information and request help with finding out legal issues they may have and patient mental health information with him and ask her husband to investigate if particular patients waiting to be or actually admitted had law enforcement problems or violations.

## 7. Retaliation by Defendants Against Plaintiff-Relator Smith.

170.

On or about March 8, 2013. Plaintiff-Relator Smith was present with the treatment team to discuss a patient who would be discharged on this date. Plaintiff-Relator Smith and Dr. Robert E. Holland discussed the discharge of

75

approximately 7 to 9 patients who were no longer in need of treatment. The same day, during the staff morning meeting, Linda Gulyas Director of Utilization Review, became very upset due to the number of patients being discharged by Relator and Dr. Holland without her knowledge, and made the comment that administration would not be happy with her due to the number of unexplained discharges. As the meeting progressed she became more and more upset as the discussion continued about the discharge of patients. Dr. Holland then initiated for me to high five him in the meeting, which was nothing out of the ordinary during these morning meetings.

171.

Later in the day, Maria Weiss, Director of Clinical Services and the immediate supervisor of Relator Smith, came to Plaintiff-Relator Smith and asked if there were in fact some patients set for discharge that Defendants could keep because all of their insurance days were not utilized. Relator Smith told her that. Dr. Holland and the treatment team felt the patients being discharged were no longer in need of treatment and did not meet criteria for a continued stay in the hospital and most of them were already prepared to discharge on that day. Maria Weiss then attempted to speak with Dr. Holland to persuade him to resend some of his discharges due to a low census in the hospital.

76

172.

When Relator Smith returned to work the following Tuesday, March 12

2013, she was written up by Defendants on the pretense of giving Dr. Holland a

high five in treatment team. After receiving the write up she spoke to Dr. Holland

about the write up and he became upset because he stated he initiated the high five

and if anything he should have been written up. He then went to speak with

Monica the interim CEO to verbalized his discontentment with their actions.

173.

Later in that day fearing immediate termination, Relator Smith attempted to

speak with Defendant Cook about the write up and told her that Relator Smith was

being targeted to be terminated for rightfully and legally discharging patients and

refusing to commit fraud.  After speaking with Defendant Cook, she was assured

that she would not be terminated for these actions.

174.

The next morning, Plaintiff-Relator Smith, concerned about being

terminated, again spoke with Linda. Gulyas in her office. Ms Gulyas apologized

and stated she did not know that Relator Smith would be written up and stated she

was written up as well for her behavior as well.   Plaintiff-Relator Smith then told

Ms Gulyas that Plaintiff-Relator Smith would now keep notes about the unlawful

things going on at St Simons By-The Sea and report them to directly Medicare and

77

Medicaid for fraud. Plaintiff-Relator Smith also told Ms Gulyas that she could tell Defendant Jeter what Plaintiff-Relator Smith said.

175.

Shortly, thereafter, a few days later Plaintiff-Relator Smith was wrongfully terminated for the pretext of noting the incorrect time on a patient's discharge paperwork. She was told by Defendants that she was not making appropriate discharge plans for patients. Ironically, she also trained Maria Weiss (who actually terminated her) on discharge planning. Incredibly, the month before, Relator Smith, was given a gift card from her supervisor, Maria Weiss and Defendant's for doing "such a great job". Following her wrongful termination, Relator was told by a current employee of St. Simons By-the-Sea that she was terminated for "sending them a message" that she was going to report their illegal and fraudulent activities.

## **DEFENDANTS AND THEIR AFFILIATES ARE SUBJECT TO EXISTING CORPORATE INTEGRITY AGREEMENTS AS A RESULT OF PRIOR FALSE CLAIMS AND OTHER INVESTIGATIONS**

176.

Hospitals owned or controlled by Defendants have, as part of their settlement of false claims cases and investigations entered into at least two five year Corporate Integrity Agreements ("CIAS") with the U.S. Health and Human Services Office of the Inspector General ("HHS OIG").

78

177.

These CIAS incorporate a variety of ongoing compliance measures, including, but not limited to, annual reporting, designation of a compliance officer, updating of staff training and policies and procedures relating to accurate coding and submission of claims, AKS and Stark Laws, proper and improper medical necessity documentation, and overpayments.

178.

Each of these CIAS provide that a material breach of these CIAS will "constitute an independent basis for exclusion from participation in the Federal health insurance programs." See Exhibit "M" attached herewith for the CIAS for each of BHC Sierra Vista Hospital, Inc. and McAllen Hospitals, L.P.

## PENDING LAWSUITS AGAINST ST. SIMONS BY-THE-SEA RELATING TO QUALITY OF CARE

179.

On information and belief, there are a number of pending lawsuits against St. Simons By-The-Sea involving quality of care issues. There have been several deaths at St. Simons By-The-Sea related to dispensing of the drug Suboxone and respiratory distress.

79

## COUNT ONE

## <u>VIOLATION OF FEDERAL FALSE CLAIMS ACT 31 U.S.C. § 3729-33</u>

### 180.

Paragraphs 1 through 179 are incorporated into Count One as if fully set forth herein.

### 181.

This is a civil action brought by Relators on behalf of the United States against the Defendants under the Federal False Claims Act, 31 U.S.C. § 3729.

### 182.

Defendants knowingly or reckless disregarded or in deliberate ignorance of the truth or the falsity of the information involved, presented or caused to be presented, false or fraudulent claims for payment to federally-funded health insurance programs, in violation of, <u>inter alia</u> 31 U.S.C. § 3729(a)(1)(A).

### 183.

Further, Defendants in reckless disregard or deliberate ignorance of the truth or the falsity of the information involved, made, used, caused to be made, or caused to be used, false or fraudulent records and statements to get false or fraudulent claims paid or approved, in violation of, <u>inter alia</u> 31 U.S.C. § 3729(a)(1)(B).

80

184.

The Government Payors, unaware of the falsity of the claims and/or statements made or caused to be made by the Defendants, and in reliance on the accuracy of these claims and/or statements, paid for purported medical procedures and services provided to individuals insured by federally-funded health insurance programs, including Medicare and other Government Payors. Had the United States known that the bills presented by Defendants for payment were false and misleading, payment would have not have been made for such claims.

185.

Additionally, Defendants have violated 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using or causing to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the Government.

186.

As a result of Defendants' actions, the Government Payors have been severely damaged.

## COUNT TWO

## CONSPIRACY TO VIOLATE THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(C)

### 187.

Paragraphs 1 through 186 are incorporated into Count Two as if fully set forth herein.

### 188.

Defendants conspired with one another to get false and fraudulent claims allowed and paid by the Government Payors. Said Defendants also conspired to pay physicians excessive compensation in violation of the *Stark* and Federal Anti-Kickback laws.

### 189.

These Defendants conspired with others and withheld information specifically known to said Defendants regarding the fraudulent billing of patients and the improper payment of excessive compensation and illegal incentives to physicians who were in a position to refer and/or influence referrals of Medicare patients to Defendants.

### 190.

Accordingly, the Defendants acted in a concerted fashion to defraud the Government Payors, and the Defendants acted with others in keeping the facts necessary to investigate the fraud and the damages caused by the fraud away from the United States. Accordingly, the Defendants violated 31 U.S.C. § 3729(a)(1)(C).

191.

As a result of the Defendants' actions, the Government Payors have been severely damaged.

## COUNT THREE

### VIOLATION OF GEORGIA FALSE CLAIMS ACT
### O.C.G.A. § 49-4-168

192.

Paragraphs 1 through 191 are incorporated into Count Three as if fully set forth herein.

193.

This is a civil action brought by Relators on behalf of the State of Georgia against the Defendants under the Georgia False Claims Act O.C.G.A. § 49-4-168.

194.

Defendants knowingly or reckless disregarded or in deliberate ignorance of the truth or the falsity of the information involved, presented or caused to be presented, false or fraudulent claims for payment to federally-funded health insurance programs, in violation of, inter alia O.C.G.A. § 49-4-168.1(a).

GAMD  Page 89

195.

Further, Defendants in reckless disregard or deliberate ignorance of the truth or the falsity of the information involved, made, used, caused to be made, or caused to be used, false or fraudulent records and statements to get false or fraudulent claims paid or approved, in violation of, inter alia O.C.G.A. § 49-4-168.1(a).

196.

The State of Georgia, unaware of the falsity of the claims and/or statements made or caused to be made by the Defendants, and in reliance on the accuracy of these claims and/or statements, paid for purported medical procedures and services provided to individuals insured by federally-funded health insurance programs, including Medicare and other Government Payors.   Had the State of Georgia known that the bills presented by Defendants for payment were false and misleading, payment would have not have been made for such claims.

197.

As a result of Defendants' actions, the State of Georgia has been severely damaged.

## COUNT FOUR

### CONSPIRACY TO VIOLATE THE GEORGIA FALSE CLAIMS ACT
### O.C.G.A. § 49-4-168(c)

84

198.

Paragraphs 1 through 197 are incorporated into Count Four as if fully set forth herein.

199.

Defendants conspired with one another to get false and fraudulent claims allowed and paid by the State of Georgia. Said Defendants also conspired to pay physicians excessive compensation in violation of the MAA.

200.

These Defendants conspired with others and withheld information specifically known to said Defendants regarding the fraudulent billing of patients and the improper payment of excessive compensation and illegal incentives to physicians who were in a position to refer and/or influence referrals of Medicaid patients to Defendants.

201.

Accordingly, the Defendants acted in a concerted fashion to defraud the State of Georgia, and the Defendants acted with others in keeping the facts necessary to investigate the fraud and the damages caused by the fraud away from the United States. Accordingly, the Defendants violated O.C.G.A. § 49-4-168.1(a)(3) and the MAA.

85

202.

As a result of the Defendants' actions, the State of Georgia has been severely damaged.

## COUNT FIVE

## VIOLATION OF THE GEORGIA MEDICAL ASSISTANCE ACT
## O.C.G.A. § 49-4-146

203.

Paragraphs 1 through 202 are incorporated into Count Five as if fully set forth herein.

204.

Defendants' conduct described herein constituted a violation of the MAA, O.C.G.A. § 49-4-146.

205.

As a direct result therefrom, the State of Georgia and the taxpayers of the State of Georgia have been directly damaged.

## COUNT SIX

## VIOLATION OF THE FLORIDA FALSE CLAIMS ACT
## FLA STAT ANN. § 68.081 *et seq*.

206.

Paragraphs 1 through 205 are incorporated into Count Six as if fully set forth herein.

86

207.

Defendants' conduct described herein constitutes a claim under the Florida False Claims Act, (Fla. Stat. Ann § **68.081** *et seq.*)

208.

The Plaintiff-Relator has standing to maintain this action by virtue of the Florida False Claims Act, (Fla. Stat. Ann § **68.081** *et seq.*).

209.

By virtue of the acts described above and Defendants' deceptive and fraudulent actions, Defendants knowingly presented false or fraudulent claims for payment or knowingly caused false or fraudulent claims for payment to be presented, to officials to the State of Florida in violation of the Florida False Claims Act.

210.

The false claims for payment presented or caused to be presented by Defendants include all claims for reimbursement from the State of Florida since the inception of the scheme described herein.

211.

By virtue of the false claims presented or caused to be presented by Defendants, the State of Florida has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties

87

of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT SEVEN

## CONSPIRACY TO VIOLATE THE FLORIDA FALSE CLAIMS ACT FLA. STAT. ANN § 68.081 *et seq*.

### 212.

Paragraphs 1 through 211 are incorporated into Count Seven as if fully set forth herein.

### 213.

Defendants' conduct described herein constitutes a claim under the Florida False Claims Act, (Fla. Stat. Ann **§ 68.081 *et seq*.**).

### 214.

Plaintiff-Relator has standing to maintain this action by virtue of the Florida False Claims Act (Fla. Stat. Ann **§ 68.081 *et seq*.**).

### 215.

By virtue of the acts described above and Defendants' use of, or activities causing to be used, false records and statements to get false and fraudulent claims paid and approved by the State of Florida, Defendants caused to be made or used false records or statements to get false and fraudulent claims paid or approved by an agency of the State of Florida, in violation of the Florida False Claims Act.

88

216.

By virtue of, and as a result of, the false records and statements used to get false claims by the State of Florida, the State of Florida suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT EIGHT

## VIOLATION OF STARK STATUE

## 42 U.S.C. § 1395(nn)

217.

Paragraphs 1 through 216 are incorporated into Count Eight as if fully set forth herein.

218.

Defendants conduct described herein constituted a violation of the Stark statutes, 42 U.S.C. § 1395(nn).

219.

As a direct result therefrom, Government Payors and the taxpayers of the United States have been directly damaged.

89

## COUNT NINE

## <u>VIOLATION OF ANTI-KICKBACK ACT</u>

### <u>42 U.S.C. § 1320a-7b</u>

220.

Paragraphs 1 through 219 are incorporated into Count Nine as if fully set forth herein.

221.

Defendants conduct described herein constituted violation of the Anti-Kickback Act, 42 U.S.C. § 1320a-7b.

222.

As a direct result therefrom, Government Payors and the taxpayers of the United States have been directly damaged.

## COUNT TEN

## <u>RETALIATION</u>

223.

Paragraphs 1 through 222 are incorporated into Count Ten as if fully set forth herein.

224.

As set forth at length above, Plaintiff-Relator Smith was harassed, intimidated and threatened in employment and was discharged in retaliation for protected activities including investigating and opposing fraudulent practices of

90

Defendants, in violation of 31 U.S.C. § 3730(h) and applicable provisions of the Georgia False Claims Act and Florida False Claims Act.

### 225.

Pursuant to this statute, Plaintiff-Relator Smith is entitled to be reinstated at the same level of seniority she would have enjoyed absent Defendants' illegal acts; an award of two times the amount of back pay (including bonus) plus interest; compensation for special damages including emotional distress; and litigation costs and reasonable attorneys' fees.

## PRAYOR FOR RELIEF

WHEREFORE, Relator prays for judgment against Defendants as follows:

(a)     That Defendants be ordered to cease and desist from submitting and/or causing the submission of additional false claims or otherwise violating 31 U.S.C. § 3729 *et seq.*, O.C.G.A. § 49-4-168 *et seq.* and Fla. Stat. Ann § 68.081 *et seq.*;

(b)     That judgment be entered in favor of the United States, the State of Georgia, the State of Florida and Plaintiff-Relator and against the Defendants in the amount of each and every false or fraudulent claim multiplied as provided by 31 U.S.C. § 3729, plus a civil penalty of not less than Five Thousand Five Hundred and No/100 ($5,500.00) Dollars, and no more than Eleven Thousand and No/100 ($11,000.00) Dollars per claim, as provided by 31 U.S.C. § 3729,

91

to the extent such multiplied penalties shall fairly compensate the United States of America, the State of Georgia and the State of Florida for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(c)     That Relators, the United States, the State of Georgia and the State of Florida be awarded the maximum amount permissible according to 31 U.S.C. § 3730(d);

(d)     That judgment be granted for the United States of America, the State of Georgia, the State of Florida and Plaintiff-Relator for all violations by the Defendants of the False Claims Act, the *Stark* laws, the Federal Anti-Kickback laws, the Georgia False Claims Act, the Florida False Claims Act, and MAA, as well as all other applicable laws referenced herein;

(e)     That United States of America, the State of Georgia, the State of Florida and Plaintiff-Relator recover any and all damages available to them as a result of Defendants' stated violations of the False Claims Act, the *Stark* laws, the Federal Anti-Kickback laws, the Georgia False Claims Act and the Florida False Claims Act, as well as all other applicable laws referenced herein;.

(f)     That judgment be granted for the United States of America, the State of Georgia, the State of Florida and Plaintiff-Relator and against

92

Defendants for any costs, including, but not limited to, court costs, expert fees, and all attorneys' fees incurred by Relators in the prosecution of this case; and

(g)     Plaintiff-Relator Smith be awarded all damages and any other compensation amounts necessary against Defendants pursuant to U.S.C. § 3730(h) to make her whole from Defendant's retaliation.

(h)     That the United States, the State of Georgia, the State of Florida and Plaintiff-Relator be granted such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff-Relator hereby requests a trial by jury on all issues triable by jury.

## [ATTORNEY SIGNATURES ON NEXT PAGE]

93

Respectfully submitted this 22nd day of April, 2014. [7]

Raymond L. Moss
Counsel for Plaintiff-Relator
Georgia Bar No. 526569

**MOSS & GILMORE LLP**
3630 Peachtree Road
Suite 1025
Atlanta, Georgia 30326
Telephone No. (678) 381-8601
Facsimile No. (815) 364-0515
Email: rlmoss@mossgilmorelaw.com

By: _____ _with Express permission_
Jerome J. Froelich, Jr.
Georgia Bar No. 278150
Counsel for Plaintiffs - Relators

McKENNEY & FROELICH
1360 Peachtree Street
One Midtown Plaza, Suite 910
Atlanta, Georgia 30309
Telephone: (404) 881-1111
Email: JFroelich@mckfroeatlaw.com

---

[7] This document has been prepared in Times New Roman 14 point in accordance with LR 5.1B.

GAMD  Page 100

# EXHIBIT "A"
# To Complaint

## DEPARTMENT OF COMMUNITY HEALTH
## DIVISION OF MEDICAL ASSISTANCE

### STATEMENT OF PARTICIPATION

**THIS STATEMENT OF PARTICIPATION** between the State of Georgia, Department of Community Health, Division of Medical Assistance (the "Department") and the undersigned Provider becomes effective on the date of enrollment indicated by the Department.

**WHEREAS**, the Department is charged with the administration of the Georgia State Plan for Medical Assistance (the "Medicaid program") in accordance with the requirements of Title XIX of the Social Security Act of 1935, as amended, and O.C.G.A. § 49-4-1 *et seq.*, and seeks to enroll qualified health care providers ("Providers") to render services to eligible Medicaid recipients;

**WHEREAS**, Provider affirms that all prerequisites, certification and/or licensure requirements and other necessary qualifications have been met in Provider's area(s) of specialty as required by law in the State of Georgia to render health care services to patients; and,

**WHEREAS**, Provider desires to enroll in the Medicaid program to render Covered Services to eligible Medicaid recipients under certain category(ies) of service, and seeks reimbursement for rendering such services.

**NOW THEREFORE**, in consideration of the mutual covenants and promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree to the terms and conditions named herein as follows:

### 1. THE DEPARTMENT'S OBLIGATIONS

A. <u>Legal Compliance</u>. The Department shall adhere to all applicable provisions of federal and state laws and regulations, Rules of the Department, and all of the Department's Policies and Procedures manuals governing the Medicaid program, and any amendments thereto (collectively, the "Department's requirements").

B. <u>Reimbursement to Providers</u>. The Department shall reimburse Provider for claims that are submitted in compliance with the Department's requirements, and in such amounts allowed under the Medicaid program as administered by the Department.

C. <u>Modifications to Department's Policies and Procedures</u>. The Department shall notify Provider of modifications to the provisions contained in the Policies and Procedures manual(s) for the category(ies) of service in which the Provider is enrolled by disseminating such notices to the address(es) at which Provider is then registered with the Department. Public notice of significant changes in the Department's methods and standards for setting payment rates for Covered Services will be given in accordance with the Rules governing the Department.

### 2. PROVIDER'S OBLIGATIONS

A. <u>Legal Compliance</u>. Provider shall comply with all of the Department's requirements applicable to the category(ies) of service in which Provider participates under this Statement of Participation, including Part I, Part II and the applicable Part III manuals. The term "Provider" shall include those persons or entities performing services under the supervision or other direction of Provider, and all acts or omissions of such persons or entities shall be attributed to Provider.

B. <u>Provider Enrollment and Continued Participation</u>. Provider shall comply with the Department's requirements to enroll and continue participating as a Provider in the Medicaid program, including but not limited to completion of all enrollment forms, cooperation with site audits, and the following:

DMA-002
Rev. 04/03

1. Certification of Provider Information. Provider certifies that all statements and information furnished to the Department for enrollment and continued participation are true and complete, and recognizes that the Department will rely on such information to evaluate Provider's participation under the Medicaid program. Provider shall give the Department written updates to information previously submitted, and advance notice of changes when required by the Department in this Statement of Participation and the Department's requirements.

2. Disclosure.

   A. Business Transactions. Within thirty-five (35) days of a request, Provider shall submit to the U.S. Department of Health and Human Services or the Department full and complete information about (a) the ownership of any subcontractor with whom Provider has had business transactions totaling more than $25,000 during the twelve (12) month period ending on the date of the request; and (b) any significant business transactions between Provider and any wholly owned supplier or subcontractor during the five (5) year period ending on the date of the request. Failure to disclose information as requested will result in denial of reimbursement from the date after which the information is due until the day before it is supplied.

   B. General Disclosure. Provider authorizes the Department to request, copy, access, use and share Provider's records and other information as may be necessary for the Department to determine the appropriateness of Provider's participation in or termination from the Medicaid program, subject to any applicable state or federal laws which may deem such records or parts of such records privileged or confidential. Provider's records and information may be requested from or exchanged with any source, including but not limited to the Composite State Board of Medical Examiners, any federal or state governmental agency, accreditation agency, licensing agency, regulatory body, certifying agency, or any other person or entity, subject to any applicable state or federal law limiting the distribution of such information. Provider's authorization to request, copy, access, use and share records and other information includes but is not limited to disclosure of ownership or control interests, and of any criminal offenses related to any federal or state health care program. This disclosure provision shall exclude sanctions against Provider that are protected by private order of the issuing board or agency.

3. License/Certification. Provider shall possess and maintain in good standing and without restriction valid professional, occupational, facility or other license and/or certification that is necessary for rendering Covered Services in the selected category(ies) of service, and as required by the Department. Provider shall provide the Department with written copies of licenses and/or certifications upon request. Except where disclosure is protected by private order of the issuing board or agency, Provider shall inform the Department promptly in writing of any restriction or adverse action against Provider's license and/or certification.

4. Hold Harmless. Provider releases from liability and holds harmless the Department, its agents, and any and all individuals and entities who, in good faith, furnish or release information for any acts performed and statements made or released in connection with the evaluation of Provider under the Medicaid program including the services rendered by Provider, and other matters pertinent to Provider's status and duties in connection with this Statement of Participation. This provision shall survive termination or expiration of this Statement of Participation for any reason.

   A. Claims Submission; Certification of Claims. Provider shall submit claims for Covered Services rendered to eligible Medicaid recipients in the form and format designated by the Department. For each claim submitted by or on behalf of Provider, Provider shall certify each claim for truth, accuracy and completeness, and shall be responsible for research and correction of all billing discrepancies without cost to the Department. This provision shall survive termination or expiration of this Statement of Participation for any reason.

   B. Recipient Records. Provider shall maintain in an orderly manner and ensure the confidentiality of all original source documents, medical records, identifying recipient

data, and any copies thereof, as may be necessary to fully substantiate the nature and extent of all services provided. Records shall be retained for a minimum of five (5) years from the date of service, or longer as required by state or federal law. Upon request by the Department, its agent, and any authorized agency including but not limited to the U.S. Department of Health and Human Services, the Comptroller General, the State Auditor, State Attorney General's Office or office of any Georgia District Attorney and their authorized representatives, Provider shall disclose and provide legible copies to the requestor, or permit the requestor to copy, without cost, all Medicaid-related documents, records or data. This provision shall apply to all records regardless of the enrollment status of Provider, subject to any applicable state or federal laws that may deem such records or parts of such records privileged or confidential. Provider's failure to abide by this provision may constitute grounds for disallowance of all applicable charges, recoupment of corresponding payments, and/or termination of Provider's participation. This provision shall survive termination or expiration of this Statement of Participation for any reason.

C. Covered Services. Provider shall render Covered Services, as defined in the Department's Policies and Procedures manuals, to eligible Medicaid recipients that are medically necessary as defined by the Department, within the parameters permitted by Provider's license or certification, and within the category(ies) of service indicated in the Provider Enrollment documents. By submitting claims for reimbursement, Provider certifies that Covered Services were rendered in the amount, duration, scope and frequency indicated on the claims. Provider shall not discriminate against any recipient on the basis of race, color, national origin, religion, sex, marital status, age, disability, health status, or source of payment.

D. Reimbursement for Covered Services. Reimbursement for Covered Services performed shall be made in a form and format designated by the Department. Payment shall be made in conformity with the provisions of the Medicaid program, applicable federal and state laws, rules and regulations promulgated by the U.S. Department of Health and Human Services and the State of Georgia, and the Department's Policies and Procedures manuals in effect on the date the service was rendered. Such reimbursement shall constitute payment in full for Covered Services rendered, and Provider shall not bill, accept or seek payment from eligible Medicaid recipients, except for applicable co-payments, co-insurance or deductibles required by the Department. Without cost to the Department or its agents, Provider agrees to cooperate with refund and recoupment efforts to the Department, and shall assist in recovering any amounts for which a third party may be liable. Provider agrees that the Department shall not reimburse any claim, or portion thereof, for services rendered prior to the effective date of enrollment indicated by the Department or for which federal financial participation is not available.

Provider acknowledges that payment of claims submitted by or on behalf of Provider will be from federal and state funds, and the Department may withhold, recoup or recover payments as a result of Provider's failure to abide by the Department's requirements. This provision shall survive termination or expiration of this Statement of Participation for any reason.

E. Prohibition on Reassignment. Provider acknowledges and agrees that the payee or billing service designated by Provider to receive payments or to process claims is not an individual or organization, such as a collection agency or service bureau, that advances money based on future Medicaid payments (accounts receivable) due to Provider after agreeing to sell, transfer or assign such rights to payment to the individual or organization for an added fee or a percentage of the accounts receivable. Furthermore, payment to the payee or billing service for services rendered shall be related to the cost of processing, and shall not be based on the payments due to Provider or based upon the percentage of claims processed.

F. Indemnification. Provider shall indemnify and hold harmless the Department and its agents from all causes of action, claims, suits, judgments, or damages, including court costs and attorneys' fees, arising out of the misconduct, negligence or omissions of Provider in the course of participating in the Medicaid program, including but not limited

to the provision of services to an eligible Medicaid recipient or a person believed to be a recipient. If and to the extent such damage or loss (including costs and expenses) is covered by any funds established and maintained by the State of Georgia, Provider agrees to reimburse the funds for such monies paid out by such funds. This provision shall survive termination or expiration of this Statement of Participation for any reason.

## 3. TERM; TERMINATION

A. Term. Unless otherwise renewed and subject to the Department's requirements for continued participation, this Statement of Participation shall expire automatically at 11:59 p.m. on June 30 of each year. The Department, in its sole discretion, has the option to renew this Agreement for an additional fiscal year, and if exercised, the Department shall issue written notice to Provider prior to the end of the then-current fiscal year. The Department has the right to terminate this Agreement at any time with or without cause under applicable laws, rules or regulations.

B. Termination by Provider. Unless otherwise authorized by the Department or by law, Provider shall give ten (10) days prior written notice to the Department of voluntary termination.

C. Termination under Other Programs. The Department may terminate and take other action against Provider under the Medicaid program when adverse action is taken against Provider under any other plan or program, including but not limited to exclusions from or licensure restrictions or conditions by other federal or state authorities, plans or programs. The Department shall issue written notice of termination to Provider to be effective on the date indicated therein. The Department also may notify other state and federal authorities, plans or programs of Provider's enrollment status in the Medicaid program, including other plans or programs within the Department. Termination under the Medicaid program may result in Provider's termination under other federal and state plans or programs.

D. Termination for Unavailability of Funds. Notwithstanding any other provision hereof, in the event that funds are no longer appropriated for the Department, Division of Medical Assistance by the General Assembly of the State of Georgia or from the Congress of the United States of America, or in the event that the sum of all obligations of the Department incurred pursuant to the Medicaid program equals or exceeds the balance of such sources available to the Department for "Medical Assistance Benefits" for the fiscal year in which this Statement of Participation is effective less one hundred dollars ($100.00), then this Statement of Participation shall terminate immediately without further obligation to or by the Department. The certification by the Commissioner of the Department of the occurrence of either of the events stated above shall be conclusive. The Department will attempt to provide Provider with ten (10) days notice of the possible occurrence of events described in this provision.

## 4. GENERAL PROVISIONS

A. Notice. All mailed notices shall be issued to the Provider's address on record with the Department as of the date of such notice.

B. Waiver of Breach. Waiver of breach of any provision of this Statement of Participation shall not be deemed a waiver of any other breach of the same or different provision of this Statement of Participation.

C. Conflict of Interest. The parties certify that the provisions of O.C.G.A. § 45-10-20 et seq., as amended, and 41 U.S.C. § 423 regarding conflicts of interest have not and will not be violated in any respect.

D. Headings. The headings of sections and provisions contained herein are for reference purposes only and shall not affect in any way the meaning or interpretation of this Statement of Participation.

E. Governing Law. This Statement of Participation shall be governed by and construed in accordance with the laws of the State of Georgia.

DMA-002
Rev. 04/03

F.   Assignment.  Provider may not assign any right or obligation under this Agreement without the prior written consent of the Department.

G.   Amendments.  Except as otherwise specifically provided herein, amendments or modifications to this Statement of Participation shall be in writing and signed by each party.

H.   Provider-Patient Relationship.  Nothing in this Statement of Participation shall be construed to interfere with or in any way alter any Provider-patient relationship or interfere with the obligations of Provider to exercise independent medical judgment in rendering health care services to patients or in governing the level of care of a patient.

I.   Independent Relationship.  This Statement of Participation establishes the means and terms of reimbursement between the Department and Provider, but does not prescribe the conduct of any medical or other professional practice.  No provision in this Statement of Participation is intended to create or shall be deemed or construed to create any relationship between the Department and Provider other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Statement of Participation.  Neither the Department nor Provider is or shall be considered an employer, employee, agent, partner or joint venture of the other.

J.   Binding Authority.  Each party acknowledges that it has the full power and authority to enter into and perform this Statement of Participation and the person signing on behalf of each party has been properly authorized and empowered to enter into this Statement of Participation.

K.   Entire Agreement.  This Statement of Participation, together with the Department's Policies and Procedures manuals, all enrollment documents, and any amendments thereto, shall constitute the entire agreement between the parties with respect to the subject matter contained herein, and shall supersede all previous communications, representations, or agreements, either verbal or written, between the parties.

**IN WITNESS WHEREOF**, Provider executes this Statement of Participation in person, or as an authorized party on behalf of an entity, to become effective on the date indicated by the Department.

Accepted and authorized on this _____ day of _____, in the year _____

_____ (**"Provider"**)
(Printed Name of Enrolling Provider)

Provider's Signature: _____

_____
(Printed name and title of Authorized Agent (for non-individual practitioners only)

Authorized Agent's Signature: _____

**DEPARTMENT OF COMMUNITY HEALTH**
**DIVISION OF MEDICAL ASSISTANCE (the "Department")**

Accepted and authorized on this _____ day of _____, in the year _____

BY: _____
       DIRECTOR, DIVISION OF MEDICAL ASSISTANCE

DMA-002
Rev. 04/03

# EXHIBIT "B"
# To Complaint

COUNTY OF FULTON

## GEORGIA MEDICAL ASSISTANCE PROGRAM

### STATEMENT OF PARTICIPATION[1]

The undersigned is legally qualified to render the medical or remedial care or services authorized to be reimbursed under the category of participation provided for in the Georgia State Plan for Medical Assistance and identified on the computerized label attached and made a part of this instrument. The Department of Medical Assistance of the State of Georgia (hereinafter "Department") is charged with the administration of the Georgia State Plan for Medical Assistance in accordance with the requirements of the Title XIX of the Social Security Act of 1935, as amended, and Ga. Laws 1977, P. 384, et seq. The Georgia State Plan for Medical Assistance makes available reimbursement for certain covered services rendered by a qualified participant to an eligible recipient, in accordance with the following:

(1) The undersigned hereby does elect to participate in the portion(s) of the Georgia Medical Assistance Program as indicated on the computerized label attached and made a part of this instrument, for such claim forms as he may decide to submit for those certain covered services rendered between July 1, 1978 and June 30, 1979 to eligible Medicaid recipients. For such claims, the undersigned agrees to keep and make available to the Department such records and information necessary to comply with provisions of 42 U.S.C.A. 1396 (a) (27) as implemented through the provisions of the Georgia State Plan for Medical Assistance.

(2) In consideration for any services the undersigned elects to render pursuant to this Statement of Participation, the Department shall reimburse for such claims, and in such amounts, as meet the provisions of the Georgia State Plan for Medical Assistance, and attachments thereto, as implemented by the reimbursement policies and procedures of the Georgia Medical Assistance Program, adopted by the Board of Medical Assistance, as published in the appropriate Department's Policy and Procedures Manual, and in effect on the date the service is rendered.

(3) The Department shall make no reimbursement for any claim, or portion thereof, for which federal financial participation is not available.

(4) Notwithstanding any other provision hereof, in the event that either of the sources of reimbursement for medical assistance, appropriations from the General Assembly of the State of Georgia or the Congress of the United States of America, no longer exist, or in the event that the sum of all obligations of the Department incurred pursuant to this Statement of Participation and all other Statements of Participation entered into pursuant to the Georgia State Plan for Medical Assistance equals or exceeds the balance existing on the date this Statement of Participation is accepted, of such sources available from appropriations to the Department for "Medical Assistance Benefits" for the fiscal year in which this contract is effective less One Hundred Dollars ($100.00), then this Statement of Participation shall immediately terminate without further obligation of the Department as of that moment. The certification by the Commissioner of the Department of the occurrence of either of the events stated above shall be conclusive.

[1]This Statement of Participation establishes the means and terms of reimbursement between the Department and the undersigned. This Statement does not prescribe the conduct of any medical practice.

(5) The Department will attempt to provide the undersigned with ten (10) days' notice of the possible occurrence of events described in the preceding paragraph.

(6) Changes in the Georgia State Plan for Medical Assistance relating to participation in or, the manner or amount of reimbursement to participants which are determined to be material by the Commissioner of the Department must be adopted by the Board of Medical Assistance in accordance with the Rules Of Department Of Medical Assistance. The undersigned will be given written notice of any material changes adopted by the Board. Notice will include the effective date of the change and the authority by which the change is made.

(7) Unless earlier terminated, this Statement of Participation shall automatically terminate on June 30, 1979 provided, however, that the Department shall have annually the option to extend the term of the contract for any additional fiscal year if the Department exercises its option during the term of this contract, but in no event earlier than sixty (60) days prior to the beginning of the next fiscal year. The Department shall exercise its option by written notice to the undersigned.

(8) In the event the undersigned elects to discontinue any further participation in the Medical Assistance Program, he agrees to give ten (10) days' written notice to the Department of such election to discontinue participation.

(9) The complete text, as now or hereafter amended, of the Department's Policy and Procedures Manuals relating to the categories of service shown on the attached label are hereby incorporated by reference into this instrument. Otherwise, this Statement of Participation embodies the whole agreement between the Department and the participant. There are no promises, terms, conditions, or other obligations other than those contained herein, and this Statement of Participation shall supersede all previous communications, representations, or agreements, either verbal or written, between the Department and the participant.

(10) The provisions of Georgia Code Annotated 889-913 thru 918, pertaining to conflict of interest, have not been and will not be violated under this Statement of Participation.

THIS ___ DAY OF ___ , 1978

SIGNATURE _____

45

DEPARTMENT OF MEDICAL ASSISTANCE

BY: _____
COMMISSIONER

DATE: 5-11-78

# EXHIBIT "C"
# To Complaint

# PART I
# POLICIES
# AND
# PROCEDURES
# FOR
# MEDICAID/PEACHCARE FOR KIDS



**Georgia Department of Community Health**

**Division of Medicaid**

**Revised: April 1, 2013**

## PREFACE

This manual contains basic information concerning Georgia's Medicaid/PeachCare for Kids program and is intended for use by all participating providers. Along with the Statement of Participation, this manual encompasses the terms and conditions for receipt of reimbursement.

We urge you and your office staff to familiarize yourself with the contents of this manual and refer to it when questions arise. Use of the manual will assist in the elimination of misunderstandings concerning the coverage levels, eligibility, and billing procedures that can result in delays in payment, incorrect payment, or denial of payment.

Amendments to this manual will be necessary from time to time due to changes in federal and state laws and the Department of Community Health (the Department), Division of Medicaid's (Division) policies and procedures. When such amendments are made, they will be posted at www.mmis.georgia.gov, which shall constitute formal notice to providers. The amended provisions will be effective on the date of the notice or as specified by the notice itself, and all providers are responsible for complying with the amended manual provisions as of their effective dates.

Thank you for your participation and interest in Georgia's Medicaid/PeachCare for Kids program. Your service is greatly appreciated.

Part I

Rev. 01/06 **106.** **General Conditions of Participation**

As general conditions of participation, all enrolled providers must:

A) Be fully licensed without restriction and certified under all applicable state and federal laws to perform the services in the applicable category of service, maintain current (non-delinquent) licenses and certifications required for the provision of such services, and inform the Division in writing immediately upon the expiration, suspension, probation, limitation or revocation of any such license or certification.

Rev. 10/04

Rev. 01/06

Rev. 04/05
1) A restriction shall be defined as:
  - A public reprimand;
  - Any period of probation, regardless of whether said period of probation is subject to terms and conditions;

Rev. 01/06
  - The requirement of compliance with any terms and conditions, as administered by any licensing board, such that said compliance would allow the provider to practice in his or her trade;
  - A suspension of any license for any period;
  - A limit or restriction on any license, including, but not limited to, monitoring of the provider's work by a another professional and/or the submission of reports detailing job performance or mental/physical fitness for duty to any entity (a provisional license issued during license application is not considered a restriction for a home health provider);
  - A license revocation;

Rev. 07/05
  - The application of a penalty or the withholding of formal disposition based upon the provider's submission to the care, counseling, or treatment of physicians or other professional persons, and the completion of such care, counseling or treatment.

Rev. 04/05
2) As licensure relates to the operation of personal care homes that meet a business need for the Department, an initial provisional license without restriction issued as part of the application process for a license to operate a personal care home shall not be considered a restriction.

Rev. 10/05

Rev. 01/06
3) Ensure that all licensed professional personnel providing services to members through a provider's number are fully licensed without restriction as defined in §106(A)(1). All licensed professional personnel must meet all standards for full licensure in their respective field.

B) Comply with all State and Federal laws and regulations related to furnishing Medicaid/PeachCare for Kids services.

C) Provide services in compliance with Title VI of the Civil Rights Act of 1964 as amended which provides that no person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be

denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

D) Provide services in compliance with Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990. Section 504 provide that no otherwise qualified handicapped individual shall solely by reason of his or her handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

E) Not contact, provide gratuities or advertise "free" services to Medicaid or PeachCare for Kids members for the purpose of soliciting members' requests for services. Any activity such as obtaining a list of Medicaid or PeachCare for Kids members or canvassing neighborhoods for direct contact with Medicaid or PeachCare for Kids members is prohibited. Any offer or payment of remuneration, whether direct, indirect, overt, covert, in cash or in kind, in return for the referral of a Medicaid or PeachCare for Kids member is also prohibited. It is not the intent of this provision to interfere with the normal pattern of quality medical care that results in follow-up treatment. Direct contact of patients for follow-up visits is not considered solicitation, nor is an acknowledgment that the provider accepts Medicaid/PeachCare for Kids patients.

F) Allow Medicaid or PeachCare for Kids members the opportunity to choose freely among available enrolled providers. It is not the intent of this provision to preclude referrals to other enrolled providers when medically necessary.

G) Not engage in any act or omission that constitutes or results in over utilization of services.

H) Not intentionally or negligently damage or endanger the health, safety, or welfare of any Medicaid or PeachCare for Kids member.

Rev. 04/13

I) Not bill the Division for an amount greater than the lowest price regularly and routinely offered to any segment of the general public for the same service or item on the same date of service or accepted from other third party payers.

J) Neither bill the Division for any services not performed or delivered in accordance with all applicable policies, nor submit false or inaccurate information to the Division relating to provider costs, claims, or assigned certification numbers for services rendered.

K) Bill the Division for only those covered services that are medically necessary and within accepted professional standards of practice.

L) Accept responsibility for every claim submitted to the Division that bears the provider's name or Medicaid/PeachCare for Kids provider number. Submission of a claim by a provider or his agent, acceptance of a Remittance

GAMD  Page 114

Advice, or acceptance of claim payment constitutes verification that the services were performed by that provider (or under his direct supervision, if allowed by the Division) and that the provider authorized submission of the claim for reimbursement. Remittance Advices shall be deemed accepted if the provider does not notify the Division or its third party administrator to the contrary in writing within ninety (90) days after their issuance. Payments shall be deemed accepted when cashed, negotiated, or deposited, including those payments deposited electronically.

M) Refund any overpayments or Advance Payments to the Division within required time frames.

Rev. 07/04

N) Accept the Division's payment as payment-in-full for covered services to patients accepted as Medicaid or PeachCare for Kids members. In most cases, this does not prohibit the provider from receiving reimbursement for covered services from liable third parties or other insurance plan. See Section 303.5 for special rules that apply to tort cases.

O) Deduct all payments for covered services received from third parties or other insurance plans from the amount billed to the Division for covered service(s) rendered and notify the Division regarding the existence of any other insurance or third party resource unless billing for managed care co-payment.

Rev. 10/03

P) Agree not to seek or accept any payment whatsoever for covered services from the member or other interested party when the member was accepted as a Medicaid or PeachCare for Kids member. However, they are required to pay a co-payment for some services received. Further, no deposit may be required from the member or other interested party pending receipt of Division payment.

Rev. 04/13

Q) Not seek reimbursement from the member or other interested party from claims submitted to the Division for which payments subsequently are denied, reduced, recouped, or refunded due to the provider's failure to comply with Divisional policies and procedures (e.g., timely submission of claims, incorrect billing, determination that services were not medically necessary, etc.) or due to the provider's receipt of payment from a third party.

Rev. 10/04

R) Maintain such written records for Medicaid/PeachCare for Kids members as necessary to disclose fully the extent of services provided and the medical necessity for the provision of such services, for a minimum of five (5) years after the date of service. Providers should ensure that member records are forwarded to a member's new provider during a change of ownership, voluntary or involuntary termination, transfer of a member to a new provider or any other action that requires the review of member records to determine course of treatment. Member records must, at a minimum, reflect the date of service, member name and medical history, the service provided, the diagnosis and the prescribed drugs or treatment ordered, and the signature of

Rev. 10/06

Rev. 01/08        the treating provider. **The Department will accept secure electronic signatures as defined in the Definitions section of this Manual. Please refer to Part II for more stringent documentation and secure electronic signature requirements applicable to different categories of service.**

Rev. 10/04

S) Comply in a timely fashion with all requests for records, information, and documentation made by the Division, its authorized representatives and agents, and the Secretary of the U.S. Department of Health and Human Services, related to services provided under the Medicaid/PeachCare for Kids Program. No fee can be charged to the Division by the provider for records, information and/or documentation requested by the Division, its agents or the Department of Health and Human Services.

Rev. 10/04

T) Make available for on-site audits by the Division or its agents all records related to services for which claims are submitted to the Division (including private-pay invoices, other insurance remittance advices, denial letters and explanation of benefits for members with other insurance). Providers using computerized information systems for accounting or other purposes must make this information available in a suitable electronic format if requested by the Division or its agents. No fee can be charged to the Division by the provider for records, information and/or documentation requested by the Division, its agents or the Department of Health and Human Services.

Rev. 04/05

U) Adhere to all the applicable policies and procedures of the Department.

V) Not have been terminated from or refused enrollment by the Division in the Medical Assistance Program within one year prior to the date of application, or within a period otherwise specified by the Division.

Rev. 10/04

Rev. 04/07

Rev. 07/11

Rev. 04/09

W) **Not employ or contract with a person, provider, owner, managing employee, partnership, or corporation previously terminated or suspended from the Program, barred from enrollment, previously or currently placed on the Department of Health and Human Services, Office of the Inspector General's sanction or exclusions lists, General Service Administration's Excluded Parties List System (EPLS), the Social Security Administration's Death Master File or a person, owner, managing employee, partnership, or corporation that has ever been convicted of any offense as described in §404(J) of this Manual.** Medicaid payments cannot be made for any items or services directed or prescribed by an excluded physician or other authorized person when the individual or entity furnishing the services knew or should have known of the exclusion. This prohibition applies even when the Medicaid payment itself is made to another provider, practitioner or supplier that is not excluded. (42 CFR Section 1001.19019(b)). The exclusion includes administrators, billing agents, accountants, claims processors or utilization reviewers that are related to and reimbursed, directly or indirectly by a Medicaid program. Providers can

Rev. 07/11

search by individual names or entity name on the HHS-OIG, EPLS, and the Social Security Administration's Death Master File websites. Providers are required to search the HHS-OIG and EPLS websites monthly to capture exclusions and reinstatements that have occurred since the last search. Providers are required to report to the Department of Community Health Provider Enrollment Section immediately any exclusion information discovered among employees or contractors.

Rev. 07/05

Rev. 07/11

X) The Provider, owner, and managing employee cannot appear on the Department of Health and Human Services, Office of the Inspector General's (OIG) Exclusion List, General Service Administration's Excluded parties List System (EPLS), and the Social Security Administration's Death Master File. Providers required to have a NPI number must appear on the National Plan and Provider Enumeration System (NPPES).

Y) Provide services in compliance with the Age Discrimination Act of 1975 as regulated by 45 CFR, Part 91 which provides that "no person in the United States shall, on the basis of age, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."

Z) Furnish to the Division and to the Secretary of the U.S. Department of Health and Human Services, within thirty-five (35) days of the date of a request, full and complete information about the ownership of any subcontractor with whom the provider had business transactions totaling more than Twenty-Five Thousand Dollars ($25,000) during the twelve (12) month period ending on the date of the request, and any significant business transactions between the provider and wholly-owned supplier, or between the provider and any subcontractor, during the five (5) year period ending on the date of the request.

AA) Disclose fully and accurately to the Division, prior to execution or renewal of a Statement of Participation or upon written request by the Division, the identity of any person who has ownership or controlling interest in the provider organization or is an agent or managing employee of the provider and their criminal history, if any.

BB) Furnish services to a member regardless of a third party's potential liability for payment for the service.

Rev. 10/12

CC) Not bill or otherwise seek reimbursement from the member or other interested party for missed appointments, claims preparation, completion of forms, telephone consultations, after hours surcharges, reading or interpreting reports, supplying supporting documentation to the Division or its Third party administrator, or forwarding copies of a patient's medical records one time to other providers when requested by the patient or the patient's chosen provider. If a patient requests a provider to forward medical

records more than one time, the provider may charge the patient a reasonable cost for making the copies, not to exceed ten dollars ($10.00).

DD) Refund to the Division any prescription drug rebates obtained by the provider for prescription drugs furnished to members.

Rev 07/05

EE) Maintain current contracts with other State agencies if said contracts are necessary to continue operations.

Rev. 04/06

Rev. 10/06

FF) **Not alter patient records, even in an effort to correct an error. All errors shall be corrected according to currently accepted standards of medical practice (corrections shall evidence the error, the correction, the initials of the corrector and the date of the correction). Failure to comply with medical records requirements will subject providers to recoupment of payment.** *See* **§405.**

Rev. 10/06

Rev. 04/07

GG) **Register your National Provider Identifier with the Department prior to May 23, 2007.**

Rev. 01/08

HH) **Be responsible for the integrity and accuracy of its representations and the Division may reasonably rely upon the representations and certifications made by the Provider, without first making an independent investigation or verification.**

Rev. 01/08

II) **Be responsible for the integrity and accuracy of its audit reports, summaries, analyses, certifications, reviews, and work products and the Division may reasonable rely upon any audit report, summary, analysis, certification, review, or work product that the provider produces in accordance with its duties under its Statement of Participation, without first making an independent investigation or verification.**

Rev. 01/08

JJ) **Not employ, contract, or partner with any person employed with the Department or with any person employed by a subcontractor or vendor of the Department.**

Rev. 01/08

KK) **Comply with the Privacy Rule and the Security Rule of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), as set forth in federal regulations at 45 C.F.R. Parts 160 and 164, and maintain administrative, physical and technical safeguards of protected health information.**

Rev. 07/11

LL) **Consent to criminal background checks including fingerprinting.**

Rev. 04/13

MM) **Not intentionally or knowingly order, refer, or prescribe and item and/or service that allows a false or fraudulent claim to be presented for payment by Medicaid.**

Part I                                                                 I-23

Rev. 04/07

**106.1 Compliance with 42 U.S.C. §1396(a) (68)**

Rev. 01/08

Rev. 07/08

As further terms and conditions of participation, and in compliance with 42 U.S.C. §1396(a)(68), all entities that receive annual Medicaid payments of at least $5 million shall, as a condition of receiving such payments, establish written policies for all employees (including management), and of any contractor or agent of the entity, that include detailed information about the False Claims Act and the other provisions named in 42 U.S.C. §1396(a)(68)(A). **The entity must provide copies of its written policies to its employees (including management), and to any of its contractors and agents that perform billing or coding functions for the entity, or that furnish or authorize the furnishing of Medicaid health care items or services on behalf of the entity, or that are involved in monitoring of health care provided by the entity.**

**The entity's written policies and procedures must contain detailed information about the Federal laws identified in Section 6032(A) and about Georgia's laws imposing civil or criminal penalties for false claims and statements, and about whistleblower protections under such laws as found in the State False Medicaid Claims Act, Article 7B of Chapter 4 of Title 49 of the Official Code of Georgia.**

**The entity's written policies and procedures must also contain detailed information regarding its own policies and procedures to detect and prevent fraud, waste and abuse in Federal health care programs, including the Medicare and Medicaid Programs. Written policies may be on paper or in electronic form, but must be readily available to all employees, contractors, or agents.**

**The entity's written policies and procedures must be included in any employee handbook maintained by the entity. The entity need not create an employee handbook if one already exists.**

Rev. 01/08

**Affected entities shall execute an Attestation of Compliance (Appendix K) that will be maintained with the Department. Affected entities are those that meet the $5,000,000 annual threshold as measured from October 1 through September 30 of the previous Federal fiscal year.**

As further explanation, please note the following:

1) An "entity" includes a governmental agency, organization, unit, corporation, partnership, or other business arrangement (including any Medicaid managed care organization, irrespective of the form of

business structure or arrangement by which it exists), whether for-profit or not-for-profit, which receives or makes payments, under a State Plan approved under title XIX or under any waiver of such plan, totaling at least $5,000,000 annually.

2) An "employee" includes any officer or employee of the entity.

3) A "contractor" or "agent" includes any contractor, subcontractor, agent, or other person which or who, on behalf of the entity, furnishes, or otherwise authorizes the furnishing of, Medicaid health care items or services, performs billing or coding functions, or is involved in the monitoring of health care provided by the entity.

4) If an entity furnishes items or services at more than a single location or under more than one contractual or other payment arrangement, the provisions of section 1902(a)(68) apply if the aggregate payments to that entity meet the $5,000,000 annual threshold. This applies whether the entity submits claims for payments using one or more provider identification or tax identification numbers.

5) A governmental component providing Medicaid health care items or services for which Medicaid payments are made would qualify as an "entity" (e.g., a state mental health facility or school district providing school-based health services). A government agency which merely administers the Medicaid program, in whole or part (e.g., managing the claims processing system or determining beneficiary eligibility), is not, for these purposes, considered to be an entity.

Rev. 07/08

6) **An entity will have met the $5,000,000 annual threshold as of January 1, 2008, if it received or made payments in that amount in Federal fiscal year 2006 (October 1 to September 30). Future submissions of the Attestation based upon an entity's responsibility stemming from the requirements of section 1902(a)(68) are due by December 31 of each subsequent year, based upon the amount of payments an entity either received or made under the State Plan during the preceding Federal fiscal year. Entities meeting such criteria must submit their completed Attestation (Appendix K) and submit them to:**

**Department of Community Health**
**Legal Services Section**
**2 Peachtree Street**
**40th Floor**
**Atlanta, Georgia 30303**

**NOTE: Initial Attestations are due on July 15, 2008.**

Part I          I-25

| Subsequent yearly submissions are due December 31 |
|:---:|

Rev 04/08

**106.2   Georgia Tamper-Resistant Prescription Pad Program**

1) **As further terms and condition of participation, the Georgia Medicaid Fee-For-Service (FFS) Outpatient Pharmacy Program in accordance with Section 7002(b) of the U.S. Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act of 2007, and in an attempt to combat fraud and abuse, will require prescribers to use tamper-resistant prescription pads for any new prescription with fill dates on and after April 1, 2008. This requirement applies to hard copy prescription orders for any drug, device or product covered through the Medicaid FFS outpatient pharmacy program whether legend or over-the-counter. Prescribers should review their Part II, Policies and Procedures manuals for any additional requirements.**

2) **Effective April 1, 2008, a prescription pad must contain at least one of the following three characteristics:**

| • Required tamper-resistant characteristics include one or more industry-recognized features designed to: | | • Examples include but are not limited to: |
|:---:|:---|:---|
| • 1 | • Prevent unauthorized copying of a completed or blank prescription form | • **High security watermark on reverse side of blank**<br>• **Thermochromic ink technology**<br>• **Copied prescription blanks show the word "Copy," "Illegal," or "Void."** |
| • 2 | • Prevent erasure or modification of information written on the prescription by the prescriber | • **Tamper-resistant background ink shows erasures or attempts to change written information** |
| • 3 | • Prevent the use of counterfeit prescription forms | • **Duplicate or triplicate blanks** |

3) **Beginning April 1, 2008, any pharmacist receiving a hard copy prescription not written on a tamper-resistant prescription blank for**

Part I                                                          I-26

a Medicaid recipient subject to this rule must verify the prescription order with the prescriber's office by handwriting on the face of the original prescription the name of the person contacted at the prescriber's office, the date verified, the initials or name of the pharmacist or licensed pharmacy intern who verified the prescription, and the word "Verified".

4) In circumstances of other insurance coverage in addition to Medicaid, tamper-resistant prescription pads are required regardless of whether Medicaid FFS is the primary or subsequent payer.

5) A prescription order written on a tamper-resistant prescription blank does not automatically make the prescription order compliant or valid. The pharmacist must exercise professional judgment and take appropriate measures necessary to ensure the validity and integrity of any prescription received. As always, the pharmacist must comply with all Medicaid Policies, as well as, all laws and regulations applicable to the practice of pharmacy.

6) Effective for dates of service on and after October 1, 2008, all prescription pads utilized for Medicaid FFS member prescriptions must comply with all three of the characteristics in the table above.

7) A prescriber's or pharmacy's routine failure (as determined by the Division) to comply with the requirements of this term and condition of participation will subject it to sanctions up to and including termination from the Medicaid/PeachCare for Kids programs.

Rev 01/06    **107.    Member Eligibility**

The Division establishes eligibility criteria for Medicaid/PeachCare for Kids benefits based upon federal regulations. Eligibility criteria for major coverage groups are identified in Appendix B.

107.1   Verification of Eligibility

Rev. 07/03
Rev.01/11

It is the responsibility of the provider to verify Medicaid/PeachCare for Kids eligibility on each date of service.

Though members will be issued Medicaid/PeachCare for Kids identification cards (See Appendix C) which should be presented, providers must verify eligibility by contacting the Provider Contact Center at (770) 325-9600 or 1-800-766-4456 or by conducting a member eligibility verification on the third party administrator's website at www.mmis.georgia.gov.   Providers may request verification either

GAMD  Page 122

individually or in batch by submitting a HIPAA-compliant transaction, or by submitting a written request for eligibility verification to:

**HP Enterprises**
**P.O. Box 105200**
**Tucker, Georgia 30085-5200**

Written requests for eligibility verification must include the patient's full name, social security number if available, Medicaid/PeachCare for Kids number if available, home address, date of birth, gender, and date of service for which verification is sought.

Providers may also submit electronic requests for eligibility verification through their clearinghouse to the third party administrator's EDI gateway. More information about this submission may be obtained by contacting the EDI Unit at: 1-800-987-6715 or **www.mmis.georgia.gov**.

Providers may also confirm a member's Primary Care Provider through the Provider Contact Center, the third party administrator's website (www.mmis.georgia.gov) or eligibility vendors who provide access to eligibility information through the magnetic swipe and readers on the member identification cards.

Rev 07/05

Providers are barred from accepting Medicaid members if the Provider is not willing to accept a member who has been issued a temporary Medicaid card.

Rev. 10/06

**PLEASE NOTE THAT THE DIVISION DOES NOT GUARANTEE PAYMENT UNLESS THE PATIENT IS ACTUALLY ELIGIBLE AND FEDERAL FINANCIAL PARTICIPATION IS AVAILABLE.**

107.2 Verification of Eligibility for Disproportionate Share Hospitals

The Division facilitates Medicaid/PeachCare for Kids eligibility verification for the benefit of hospitals that serve a disproportionate share of low-income patients. The disproportionate share hospital (DSH) may access this verification service as provided in this policy. In order to enable DSH providers to efficiently access the extensive data necessary for this verification, the Division provides data access only through appropriately qualified contractors. The selection of contractors who will be authorized to provide the data will be based upon considerations that include whether:

A) The proposed service is consistent with the relevant goals and objectives of the Medicaid/PeachCare for Kids program.

B) The disproportionate share hospitals in the proposed market to be served have a need for the service.

C) Existing alternative access to the necessary eligibility verification by the DSH providers to be served is not cost efficient for those providers.

D) The service is reasonably financially and physically accessible to the DSH providers.

E) The proposed service fosters overall improvement in the system of reimbursement for health care services without a loss of quality of care.

F) The contractors are bound by the terms of a contract with DCH for eligibility verification services and by applicable laws and regulations, particularly those provisions governing confidentiality and privacy of information.

Providers may also submit electronic eligibility verification requests on the web through the department's third party administrator's website at www.mmis.georgia.gov. Batch eligibility requests can be submitted through the web in a HIPAA-compliant format. For more information, providers may contact the third party administrator's EDI gateway at 1-800-987-6715.

Rev 01/06

**108. Premium Payment and Continued Coverage**

Some Medicaid/PeachCare for Kids services require members to pay premiums. Unless stated to the contrary in Part II, premiums are due and payable on the first day of the month preceding the month of coverage (i.e. April 1st for May coverage). Late payment of premiums could result in a break in coverage. Premium amounts for different programs and the effect of their untimely payment are described in Appendix D.

Rev 01/06

**109. Limitations on Member Services**

The Division has developed certain service limitations in an attempt to deter members' over-utilization of services (e.g., office visits, prescriptions, examinations, etc.). Please refer to Part II for limitation information applicable to different categories of service. Inquires related to a member's utilization history should be directed to the Provider Contact Center by dialing 1-800-766-4456. Data provided will be for informational purposes only and should not be regarded as official records upon which reimbursement relies. The Division is not responsible for the payment of services exceeding any monthly, annual, or other period limitation.

109.1 Member Lock-In

Rev. 04/05
Rev. 01/10

## APPENDIX I
### PHYSICIAN'S STATEMENT
### FOR
### EMERGENCY MEDICAL ASSISTANCE

Patient's Name: _____ DOB: _____

Patient's Address: _____

Patient's Telephone #: _____

Individuals who do not meet Medicaid citizenship/alienage requirements may be eligible for Emergency Medical Assistance (EMA). EMA provides payment for the treatment of emergency when such care and services are necessary for the treatment of an emergency medical condition of the alien, provided such care and services are not related to either an organ transplant procedure or routine prenatal or postpartum care. An emergency is defined as:

**"Acute symptoms"** of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in:

- Placing the patient's health in serious jeopardy;
- Serious impairment to bodily functions; or
- Serious dysfunction of any bodily organ or part"

The individual will have to be determined eligible for Emergency Medical Assistance under one of the Department's existing regular Medicaid coverage groups:

- Aged, blind or disabled;
- Pregnant women;
- Children under 19 years of age; or
- Parents in families with very low income

This form should be completed and signed by the provider after the Emergency has occurred. Forms containing future dates of service are invalid.

_____

I provided EMERGENCY medical services on _____ through

(Date of onset)

_____ for the individual listed above.

(Not to exceed 30 days from condition onset date)

_____     _____
(Provider's Name)                        (Provider or Authorized Designee's Signature)

_____     _____
(Provider's Address)                     (Date)

DMA – Form 526 (Revised December 2005)                          Rev. 04/07

GAMD Page 125

# APPENDIX K

## Attestation of Compliance
### Section 6032 of the Federal Deficit Reduction Act (DRA)

Covered Entity: _____

Address: _____

Provider # _____ FEIN _____

Compliance Period: Calendar Year beginning January 1, ____.

I hereby attest that, as a condition for the above-identified Covered Entity to receive payments under the Georgia Medicaid/PeachCare for Kids Program, I have read Section 6032 of the Deficit Reduction Act of 2005 (the Act) and confirm that:

- The Covered Entity's written policies and procedures contain detailed information about the Federal laws identified in Section 6032(A) and about Georgia's laws imposing civil or criminal penalties for false claims and statements, and about whistleblower protections under such laws as found in the State False Medicaid Claims Act, Article 7B of Chapter 4 of Title 49 of the Official Code of Georgia; and

- The Covered Entity's written policies and procedures also contain detailed information regarding its own policies and procedures to detect and prevent fraud, waste and abuse in Federal health care programs, including the Medicare and Medicaid Programs; and

- The Covered Entity provides copies of its written policies to its employees (including management), and to any of its contractors and agents that perform billing or coding functions for the Covered Entity, or that furnish or authorize the furnishing of Medicaid health care items or services on behalf of the Covered Entity, or that are involved in monitoring of health care provided by the Covered Entity; and

- The Covered Entity's written policies and procedures are included in any employee handbook maintained by the Covered Entity.

I also confirm that the Covered Entity includes the Georgia Medicaid/PeachCare for Kids provider(s) identified on Attachment A.

I possess all necessary powers and authority to execute and make the representations contained in the Attestation of Compliance on behalf of the Covered Entity and any Georgia Medicaid/PeachCare for Kids provider identified on Attachment A.

_____    _____

Signature                                                                                  Date

_____

Print or Type Name and Title

Part I                                                                                              K-1

ATTACHMENT A
Identification of Georgia Medicaid/Peachcare for Kids Providers

The Covered Entity identified in the ***Attestation of Compliance with Section 6032 of the Federal Deficit Reduction Act*** includes the following Georgia Medicaid/PeachCare for Kids Providers:

| NAME | ADDRESS | Provider ID | FEIN |
| --- | --- | --- | --- |

Part I

K-2

# EXHIBIT "D"
# To Complaint

GEORGIA DEPARTMENT OF
COMMUNITY HEALTH

## 2012 Annual Hospital Questionnaire

## Part A : General Information

### 1. Identification

**UID:HOSP235**

**Facility Name:** St. Simons-By-The-Sea
**County:** Glynn
**Street Address:** 2927 Demere Road
**City:** St. Simons Island
**Zip:** 31522-1620
**Mailing Address:** 2927 Demere Road
**Mailing City:** Saint Simons Island
**Mailing Zip:** 31522-1620
**Medicaid Provider Number:** n/a
**Medicare Provider Number:** 114016

### 2. Report Period

Report Data for the full twelve month period- January 1, 2012 through December 31, 2012.
**Do not use a different report period.**

Check the box to the right if your facility was **not** operational for the entire year.  ☐
If your facility was **not** operational for the entire year, provide the dates the facility was operational.

## Part B : Survey Contact Information

*Person authorized to respond to inquiries about the responses to this survey.*

**Contact Name:** Lesli Jeter
**Contact Title:** CFO
**Phone:** 912-638-1999
**Fax:** 912-634-8127
**E-mail:** lesli.jeter@uhsinc.com

## Part C : Ownership, Operation and Management

### 1. Ownership, Operation and Management

As of the last day of the report period, indicate the operation/management status of the facility and provide the effective date. Using the drop-down menus, select the organization type. If the category is not applicable, the form requires you only to enter Not Applicable in the legal name field. You must enter something for each category.

#### A. Facility Owner

| Full Legal Name (Or Not Applicable) | Organization Type | Effective Date |
|---|---|---|
| HHC ST SIMONS, INC | For Profit | 06/01/2007 |

#### B. Owner's Parent Organization

| Full Legal Name (Or Not Applicable) | Organization Type | Effective Date |
|---|---|---|
| UNIVERSAL HEALTH SERVICES, INC | For Profit | 11/15/2010 |

#### C. Facility Operator

| Full Legal Name (Or Not Applicable) | Organization Type | Effective Date |
|---|---|---|
| HHC ST SIMONS, INC | For Profit | 06/01/2007 |

#### D. Operator's Parent Organization

| Full Legal Name (Or Not Applicable) | Organization Type | Effective Date |
|---|---|---|
| UNIVERSAL HEALTH SERVICES, INC | For Profit | 11/15/2010 |

#### E. Management Contractor

| Full Legal Name (Or Not Applicable) | Organization Type | Effective Date |
|---|---|---|
| N/A | Not Applicable | |

#### F. Management's Parent Organization

| Full Legal Name (Or Not Applicable) | Organization Type | Effective Date |
|---|---|---|
| N/A | Not Applicable | |

### 2. Changes in Ownership, Operation or Management

Check the box to the right if there were any changes in the ownership, operation, or management of the facility during the report period or since the last day of the Report Period. ⬜
If checked, please explain in the box below and include effective dates.

**3.** Check the box to the right if your facility is part of a health care system ⬜
**Name:**
**City:    State:**

**4.** Check the box to the right if your hospital is a division or subsidiary of a holding company. ⬜
**Name:**
**City:    State:**

**5.** Check the box to the right if the hospital itself operates subsidiary corporations  ☐
**Name:**
**City:    State:**

**6.** Check the box to the right if your hospital is a member of an alliance.  ☐
**Name:**
**City:    State:**

**7.** Check the box to the right if your hospital is a participant in a health care network  ☐
**Name:**
**City:    State:**

**8.** Check the box to the right if the hospital has a policy or policies and a peer review process related to medical errors.  ☑

**9.** Check the box to the right if the hospital owns or operates a primary care physician group practice.  ☐

### 10a. Managed Care Information: Formal Written Contract
Does the hospital have a formal written contract that specifies the obligations of each party with each of the following? (check the appropriate boxes)

1. Health Maintenance Organization(HMO)  ☑

2. Preferred Provider Organization(PPO)  ☑

3. Physician Hospital Organization(PH0)  ☐

4. Provider Service Organization(PSO)  ☐

5. Other Managed Care or Prepaid Plan  ☑

### 10b. Managed Care Information: Insurance Products
Check the appropriate boxes to indicate if any of the following insurance products have been developed by the hospital, health care system, network, or as a joint venture with an insurer:

| Type of Insurance Product | Hospital | Health Care System | Network | Joint Venture with Insurer |
|---|---|---|---|---|
| Health Maintenance Organization | ☐ | ☐ | ☐ | ☐ |
| Preferred Provider Organization | ☐ | ☐ | ☐ | ☐ |
| Indemnity Fee-for-Service Plan | ☐ | ☐ | ☐ | ☐ |
| Another Insurance Product Not Listed Above | ☐ | ☐ | ☐ | ☐ |

### 11. Owner or Owner Parent Based in Another State
If the owner or owner parent at Part C, Question 1(A&B) is an entity based in another state please report the location in which the entity is based. (City and State)

KING OF PRUSSIA, PA

## Part D : Inpatient Services

### 1. Utilization of Beds as Set Up and Staffed(SUS):

Please indicate the following information. Dod not include newborn and neonatal services. Do not include long-term care untits, such as Skilled Nursing Facility beds, if not licensed as hospital beds. If your facility is approved for LTCH beds report them below.

| Category | SUS Beds | Admissions | Inpatient Days | Discharges | Discharge Days |
|---|---|---|---|---|---|
| Obstetrics (no GYN, include LDRP) | 0 | 0 | 0 | 0 | 0 |
| Pediatrics (Non ICU) | 0 | 0 | 0 | 0 | 0 |
| Pediatric ICU | 0 | 0 | 0 | 0 | 0 |
| Gynecology (No OB) | 0 | 0 | 0 | 0 | 0 |
| General Medicine | 0 | 0 | 0 | 0 | 0 |
| General Surgery | 0 | 0 | 0 | 0 | 0 |
| Medical/Surgical | 0 | 0 | 0 | 0 | 0 |
| Intensive Care | 0 | 0 | 0 | 0 | 0 |
| Psychiatry | 67 | 1,701 | 14,832 | 1,731 | 15,098 |
| Substance Abuse | 34 | 708 | 7,756 | 732 | 7,578 |
| Adult Physical Rehabilitation (18 & Up) | 0 | 0 | 0 | 0 | 0 |
| Pediatric Physical Rehabilitation (0-17) | 0 | 0 | 0 | 0 | 0 |
| Burn Care | 0 | 0 | 0 | 0 | 0 |
| Swing Bed (Include All Utilization) | 0 | 0 | 0 | 0 | 0 |
| Long Term Care Hospital (LTCH) | 0 | 0 | 0 | 0 | 0 |
|  | 0 | 0 | 0 | 0 | 0 |
|  | 0 | 0 | 0 | 0 | 0 |
|  | 0 | 0 | 0 | 0 | 0 |
| **Total** | **101** | **2,409** | **22,588** | **2,463** | **22,676** |

## 2. Race/Ethnicity

Please report admissions and inpatient days for the hospital by the following race and ethnicity categories. Exclude newborn and neonatal.

| Race/Ethnicity | Admissions | Inpatient Days |
|---|---|---|
| American Indian/Alaska Native | 4 | 39 |
| Asian | 3 | 21 |
| Black/African American | 400 | 4,052 |
| Hispanic/Latino | 24 | 278 |
| Pacific Islander/Hawaiian | 0 | 0 |
| White | 1,969 | 18,101 |
| Multi-Racial | 9 | 97 |
| Total | 2,409 | 22,588 |

## 3. Gender

Please report admissions and inpatient days by gender. Exclude newborn and neonatal.

| Gender | Admissions | Inpatient Days |
|---|---|---|
| Male | 1,108 | 10,442 |
| Female | 1,301 | 12,146 |
| Total | 2,409 | 22,588 |

## 4. Payment Source

Please report admissions and inpatient days by primary payment source. Exclude newborn and neonatal.

| Primary Payment Source | Admissions | Inpatient Days |
|---|---|---|
| Medicare | 515 | 6,080 |
| Medicaid | 395 | 2,994 |
| Peachare | 0 | 0 |
| Third-Party | 1,443 | 12,939 |
| Self-Pay | 56 | 575 |
| Other | 0 | 0 |

## 5. Discharges to Death

Report the total number of inpatient admissions discharged during the reporting period due to death.

0

## 6. Charges for Selected Services

Please report the hospital's average charges as of 12-31-2012 (to the nearest whole dollar).

| Service | Charge |
|---|---|
| Private Room Rate | 1,350 |
| Semi-Private Room Rate | 0 |
| Operating Room: Average Charge for the First Hour | 0 |
| Average Total Charge for an Inpatient Day | 0 |

## Part E : Emergency Department and Outpatient Services

### 1. Emergency Visits
Please report the number of emergency visits only.

<u>0</u>

### 2. Inpatient Admissions from ER
Please report inpatient admssions to the Hospital from the ER for emergency cases ONLY.

<u>0</u>

### 3. Beds Available
Please report the number of beds available in ER as of the last day of the report period.

<u>0</u>

### 4. Utilization by Specific type of ER bed or room for the report period.

| Type of ER Bed or Room | Beds | Visits |
|---|---|---|
| Beds dedicated for Trauma | 0 | 0 |
| Beds or Rooms dedicated for Psychiatric /Substance Abuse cases | 0 | 0 |
| General Beds | 0 | 0 |
| | 0 | 0 |
| | 0 | 0 |
| | 0 | 0 |
| | 0 | 0 |

### 5. Transfers
Please provide the number of Transfers to another institution from the Emergency Department.

<u>0</u>

### 6. Non-Emergency Visits
Please provide the number of Outpatient/Clinic/All Other Non-Emergency visits to the hospital.

<u>0</u>

### 7. Observation Visits/Cases
Please provide the total number of Observation visits/cases for the entire report period.

<u>0</u>

### 8. Diverted Cases
Please provide the number of cases your ED diverted while on Ambulance Diversion for the entire report period.

<u>0</u>

### 9. Ambulance Diversion Hours
Please provide the total number of Ambulance Diversion hours for your ED for the entire report period

<u>0</u>

GAMD  Page 134

## 10. Untreated Cases

Please provide the number of patients who sought care in your ED but who left without or before being treated. Do not include patients who were transferred or cases that were diverted.

<u>0</u>

## Part F : Services and Facilities

### 1a. Services and Facilities

Please report services offered onsite for in-house and contract services as requested. Please reflect the status of the service during the report period. *(Use the blank lines to specify other services.)*

Site Codes
1 = In-House - Provided by the Hospital
2 = Contract - Provided by a contractor but onsite
3 = Not Applicable

Status Codes
1 = On-Going
2 = Newly Initiated
3 = Discontinued
4 = Not Applicable

| Service·Facilities | Site Code | Service Status |
|---|---|---|
| Podatric Services | 3 | 4 |
| Renal Dialysis | 3 | 4 |
| ESWL | 3 | 4 |
| Billiary Lithotropter | 3 | 4 |
| Kidney Transplants | 3 | 4 |
| Heart Transplants | 3 | 4 |
| Other-Organ/Tissues Transplants | 3 | 4 |
| Diagnostic X-Ray | 3 | 4 |
| Computerized Tomography Scanner (CTS) | 3 | 4 |
| Radioisotope, Diagnositic | 3 | 4 |
| Positron Emission Tomography (PET) | 3 | 4 |
| Radioisotope, Therapeutic | 3 | 4 |
| Magnetic Resonance Imaging  (MRI) | 3 | 4 |
| Chemotherapy | 3 | 4 |
| Respiratory Therapy | 3 | 4 |
| Occupational Therapy | 3 | 4 |
| Physical Therapy | 3 | 4 |
| Speech Pathology Therapy | 3 | 4 |
| Gamma Ray Knife | 3 | 4 |
| Audiology Services | 3 | 4 |
| HIV/AIDS Diagnostic Treatment/Services | 3 | 4 |
| Ambulance Services | 3 | 4 |
| Hospice | 3 | 4 |
| Respite Care Services | 3 | 4 |
| Ultrasound/Medical Sonography | 3 | 4 |
|  | 0 | 0 |
|  | 0 | 0 |
|  | 0 | 0 |

## 1b. Report Period Workload Totals

Please report the workload totals for in-house and contract services as requested. The number of units should equal the number of machines.

| Category | Total |
|---|---|
| Number of Podiatric Patients | 0 |
| Number of Dialysis Treatments | 0 |
| Number of ESWL Patients | 0 |
| Number of ESWL Procedures | 0 |
| Number of ESWL Units | 0 |
| Number of Biliary Lithotripter Procedures | 0 |
| Number of Biliary Lithotripter Units | 0 |
| Number of Kidney Transplants | 0 |
| Number of Heart Transplants | 0 |
| Number of Other-Organ/Tissues Treatments | 0 |
| Number of Diagnostic X-Ray Procedures | 0 |
| Number of CTS Units (machines) | 0 |
| Number of CTS Procedures | 0 |
| Number of Diagnostic Radioisotope Procedures | 0 |
| Number of PET Units (machines) | 0 |
| Number of PET Procedures | 0 |
| Number of Therapeautic Radioisotope Procedures | 0 |
| Number of Number of MRI Units | 0 |
| Number of Number of MRI Procedures | 0 |
| Number of Chemotherapy Treatments | 0 |
| Number of Respiratory Therapy Treatments | 0 |
| Number of Occupational Therapy Treatments | 0 |
| Number of Physical Therapy Treatments | 0 |
| Number of Speech Pathology Patients | 0 |
| Number of Gamma Ray Knife Procedures | 0 |
| Number of Gamma Ray Knife Units | 0 |
| Number of Audiology Patients | 0 |
| Number of HIV/AIDS Diagnostic Procedures | 0 |
| Number of HIV/AIDS Patients | 0 |
| Number of Ambulance Trips | 0 |
| Number of Hospice Patients | 0 |
| Number of Respite care Patients | 0 |
| Number of Ultrasound/Medical Sonography Units | 0 |
| Number of Ultrasound/Medical Sonography Procedures | 0 |
| Number of Treatments, Procedures, or Patients (Other 1) | 0 |
| Number of Treatments, Procedures, or Patients (Other 2) | 0 |
| Number of Treatments, Procedures, or Patients (Other 3) | 0 |

## 2. Medical Ventilators

Provide the number of computerized/mechanical Ventilator Machines that were in use or available

for immediate use as of the last day of the report period (12/31).

<u>0</u>

### 3. Robotic Surgery System
Please report the number of units, number of procedures, and type of unit(s).

| # Units | # Procedures | Type of Unit(s) |
|---------|--------------|-----------------|
| 0 | 0 | |

GAMD  Page 137

## Part G : Facility Workforce Information

### 1. Budgeted Staff

Please report the number of budgeted fulltime equivalents (FTEs) and the number of vacancies as of 12-31-2012. Also, include the number of contract or temporary staff (eg. agency nurses) filling budgeted vacancies as of 12-31-2012.

| Profession | Budgeted FTEs | Vacant Budgeted FTEs | Contract/Temporary Staff FTEs |
|---|---|---|---|
| Licensed Physicians | 4.0 | | |
| Physician Assistants Only (not including Licensed Physicians) | 0.0 | 0.0 | 0.0 |
| Registered Nurses (RNs-Advanced Practice*) | | | |
| Licensed Practical Nurses (LPNs) | | | |
| Pharmacists | 1.0 | 0.0 | 0.4 |
| Other Health Services Professionals* | | | |
| Administration and Support | | | 0.0 |
| All Other Hospital Personnel (not included above) | | | |

### 2. Filling Vacancies

Using the drop-down menus, please select the average time needed during the past six months to fill each type of vacant position.

| Type of Vacancy | Average Time Needed to Fill Vacancies |
|---|---|
| Physician's Assistants | Not Applicable |
| Registered Nurses (RNs-Advance Practice) | 30 Days or Less |
| Licensed Practical Nurses (LPNs) | 30 Days or Less |
| Pharmacists | |
| Other Health Services Professionals | 30 Days or Less |
| All Other Hospital Personnel (not included above) | 30 Days or Less |

### 3. Race/Ethnicity of Physicians

Please report the number of physicians with admitting privileges by race.

| Race/Ethnicity | Number of Physicians |
|---|---|
| American Indian/Alaska Native | 0 |
| Asian | 0 |
| Black/African American | 0 |
| Hispanic/Latino | 1 |
| Pacific Islander/Hawaiian | 1 |
| White | 6 |
| Multi-Racial | 1 |

### 4. Medical Staff

Please report the number of active and associate/provisional medical staff for the following specialty categories. Keep in mind that physicians may be counted in more than one specialty. Please

indicate whether the specialty group(s) is hospital-based. Also, indicate how many of each medical specialty are enrolled as providers in Georgia Medicaid/PeachCare for Kids and/or the Public Employee Health Benefit Plans (PEHB-State Health Benefit Plant and/or Board of Regents Benefit Plan).

| Medical Specialties | Number of Medical Staff | Check if Any are Hospital Based | Number Enrolled as Providers in Medicaid/PeachCare | Number Enrolled as Providers in PEHB Plan |
|---|---|---|---|---|
| General and Family Practice | 1 | ☐ | 1 | 1 |
| General Internal Medicine | 1 | ☐ | 1 | 1 |
| Pediatricians | 0 | ☐ | 0 | 0 |
| Other Medical Specialties | 9 | ☑ | 9 | 9 |

| Surgical Specialties | Number of Medical Staff | Check if Any are Hospital Based | Number Enrolled as Providers in Medicaid/PeachCare | Number Enrolled as Providers in PEHB Plan |
|---|---|---|---|---|
| Obstetrics | 0 | ☐ | 0 | 0 |
| Non-OB Physicians Providing OB Services | 0 | ☐ | 0 | 0 |
| Gynecology | 0 | ☐ | 0 | 0 |
| Ophthalmology Surgery | 0 | ☐ | 0 | 0 |
| Orthopedic Surgery | 0 | ☐ | 0 | 0 |
| Plastic Surgery | 0 | ☐ | 0 | 0 |
| General Surgery | 0 | ☐ | 0 | 0 |
| Thoracic Surgery | 0 | ☐ | 0 | 0 |
| Other Surgical Specialties | 0 | ☐ | 0 | 0 |

| Other Specialties | Number of Medical Staff | Check if Any are Hospital Based | Number Enrolled as Providers in Medicaid PeachCare | Number Enrolled as Providers in PEHB Plan |
|---|---|---|---|---|
| Anesthesiology | 0 | ☐ | 0 | 0 |
| Dermatology | 0 | ☐ | 0 | 0 |
| Emergency Medicine | 0 | ☐ | 0 | 0 |
| Nuclear Medicine | 0 | ☐ | 0 | 0 |
| Pathology | 0 | ☐ | 0 | 0 |
| Psychiatry | 8 | ☑ | 8 | 8 |
| Radiology | 0 | ☐ | 0 | 0 |
| Addictionology | 1 | ☑ | 1 | 1 |
| | 0 | ☐ | 0 | 0 |
| | 0 | ☐ | 0 | 0 |

GAMD Page 139

## 5a. Non-Physicians

Please report the number of professionals for the categories below. Exclude any hospital-based staff reported in Part G, Questions 1,2,3 and 4 above.

| Profession | Number |
|---|---|
| Dentists (include oral surgeions) with Admitting Privleges | 0 |
| Podiatrists | 0 |
| Certified Nurse Midwives with Clinical Privileges in the Hospital | 0 |
| All Other Staff Affiliates with Clinical Privileges in the Hospital | 6 |

## 5b. Name of Other Professions

Please provide the names of professions classified as "Other Staff Affiliates with Clinical Privileges" above.

Psychologist, Advance Nurse Practitioner, Clinical Nurse Specialist, FNP

## Comments and Suggestions:

## Part H : Physician Name and License Number

### 1. Physicians on Staff
Please report the full name and license number of each physician on staff. **(Due to the large number of entries, this section has been moved to a separate PDF file.)**

## Part I : Patient Origin Table

### 1. Patient Origin
Please report the county of origin for the inpatient admissions or discharges excluding newborns (except surgical services should include outpatients only).

Inpat=Inpatient Services
Surg=Outpatient Surgical
OB=Obstetric
P18+=Acute psychiatric adult 18 and over
P13-17=Acute psychiatric adolescent 13-17
P0-12=Acute psychiatric children 12 and under
Rehab=Inpatient Rehabilitation

S18+=Substance abuse adult 18 and over
S13-17=Substance abuse adolescent 13-17
E18+=Extended care adult 18 and over
E13-17=Extended care adolescent 13-17
E0-12=Extended care children 0-12
LTCH=Long Term Care Hospital

| County | Inpat | Surg | OB | P18+ | P13-17 | P0-12 | S18+ | S13-17 | E18+ | E13-17 | E0-12 | LTCH | Rehab |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alabama | 4 | 0 | 0 | 1 | 0 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 |
| Appling | 29 | 0 | 0 | 20 | 4 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 |
| Atkinson | 7 | 0 | 0 | 0 | 3 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bacon | 25 | 0 | 0 | 9 | 7 | 0 | 9 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ben Hill | 8 | 0 | 0 | 4 | 1 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Berrien | 9 | 0 | 0 | 4 | 2 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bibb | 10 | 0 | 0 | 2 | 0 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bleckley | 5 | 0 | 0 | 4 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Brantley | 71 | 0 | 0 | 31 | 17 | 0 | 23 | 0 | 0 | 0 | 0 | 0 | 0 |
| Brooks | 4 | 0 | 0 | 0 | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bryan | 38 | 0 | 0 | 18 | 13 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bulloch | 53 | 0 | 0 | 28 | 11 | 0 | 15 | 0 | 0 | 0 | 0 | 0 | 0 |
| Burke | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Camden | 316 | 0 | 0 | 148 | 122 | 0 | 45 | 1 | 0 | 0 | 0 | 0 | 0 |
| Candler | 12 | 0 | 0 | 6 | 2 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| Charlton | 30 | 0 | 0 | 21 | 3 | 0 | 6 | 0 | 0 | 0 | 0 | 0 | 0 |
| Chatham | 133 | 0 | 0 | 66 | 19 | 0 | 45 | 3 | 0 | 0 | 0 | 0 | 0 |
| Cherokee | 4 | 0 | 0 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Clarke | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Clay | 27 | 0 | 0 | 3 | 14 | 0 | 9 | 1 | 0 | 0 | 0 | 0 | 0 |
| Clinch | 4 | 0 | 0 | 3 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Cobb | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Coffee | 52 | 0 | 0 | 33 | 7 | 0 | 10 | 2 | 0 | 0 | 0 | 0 | 0 |
| Colquitt | 5 | 0 | 0 | 1 | 3 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Columbia | 2 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Cook | 5 | 0 | 0 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Coweta | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Crisp | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Dodge | 5 | 0 | 0 | 2 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Dougherty | 9 | 0 | 0 | 3 | 1 | 0 | 4 | 1 | 0 | 0 | 0 | 0 | 0 |
| Douglas | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Effingham | 23 | 0 | 0 | 11 | 4 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 |
| Emanuel | 6 | 0 | 0 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Evans | 14 | 0 | 0 | 11 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Fayette | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida | 157 | 0 | 0 | 52 | 39 | 0 | 61 | 5 | 0 | 0 | 0 | 0 | 0 |
| Forsyth | 2 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| Fulton | 8 | 0 | 0 | 3 | 2 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Glynn | 562 | 0 | 0 | 279 | 107 | 0 | 174 | 2 | 0 | 0 | 0 | 0 | 0 |
| Gwinnett | 2 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| Henry | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Houston | 14 | 0 | 0 | 9 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 |
| Irwin | 3 | 0 | 0 | 2 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Jasper | 2 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Jeff Davis | 24 | 0 | 0 | 16 | 4 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| Johnson | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Lanier | 4 | 0 | 0 | 3 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Laurens | 10 | 0 | 0 | 6 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| Liberty | 96 | 0 | 0 | 52 | 21 | 0 | 22 | 1 | 0 | 0 | 0 | 0 | 0 |
| Long | 20 | 0 | 0 | 8 | 7 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 |
| Lowndes | 17 | 0 | 0 | 5 | 4 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 |
| McIntosh | 61 | 0 | 0 | 38 | 14 | 0 | 9 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mitchell | 3 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Montgomery | 16 | 0 | 0 | 12 | 1 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina | 15 | 0 | 0 | 5 | 3 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Out of State | 15 | 0 | 0 | 8 | 2 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 |
| Paulding | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Peach | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pickens | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pierce | 53 | 0 | 0 | 28 | 7 | 0 | 18 | 0 | 0 | 0 | 0 | 0 | 0 |
| Polk | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pulaski | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Putnam | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Richmond | 5 | 0 | 0 | 1 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| Screven | 10 | 0 | 0 | 4 | 2 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 49 | 0 | 0 | 26 | 1 | 0 | 22 | 0 | 0 | 0 | 0 | 0 | 0 |
| Spalding | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sumter | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tattnall | 39 | 0 | 0 | 29 | 1 | 0 | 9 | 0 | 0 | 0 | 0 | 0 | 0 |
| Telfair | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee | 4 | 0 | 0 | 0 | 1 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Terrell | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Thomas | 11 | 0 | 0 | 1 | 9 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tift | 11 | 0 | 0 | 3 | 3 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 |
| Toombs | 45 | 0 | 0 | 26 | 8 | 0 | 11 | 0 | 0 | 0 | 0 | 0 | 0 |
| Towns | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Treutlen | 5 | 0 | 0 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Troup | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Turner | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Twiggs | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Walker | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Walton | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ware | 95 | 0 | 0 | 53 | 19 | 0 | 23 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wayne | 102 | 0 | 0 | 53 | 7 | 0 | 40 | 2 | 0 | 0 | 0 | 0 | 0 |
| Wheeler | 3 | 0 | 0 | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| White | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wilcox | 3 | 0 | 0 | 2 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wilkinson | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | **2,409** | **0** | **0** | **1,184** | **509** | **0** | **696** | **21** | **0** | **0** | **0** | **0** | **0** |

## Surgical Services Addendum

### Part A : Surgical Services Utilization

#### 1. Surgery Rooms in the OR Suite
Please report the Number of Surgery Rooms, (as of the end of the report period). Report only the rooms in CON-Approved Operating Room Suites pursuant to Rule 111-2-2-.40 and 290-9-7-.28 .

| Room Type | Dedicated Inpatient Rooms | Dedicated Outpatient Rooms | Shared Rooms |
|---|---|---|---|
| General Operating | 0 | 0 | 0 |
| Cystoscopy (OR Suite) | 0 | 0 | 0 |
| Endoscopy (OR Suite) | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| **Total** | **0** | **0** | **0** |

#### 2. Procedures by Type of Room
Please report the number of procedures by type of room.

| Room Type | Dedicated Inpatient Rooms | Dedicated Outpatient Rooms | Shared Inpatient Rooms | Shared Outpatient Rooms |
|---|---|---|---|---|
| General Operating | 0 | 0 | 0 | 0 |
| Cystoscopy | 0 | 0 | 0 | 0 |
| Endoscopy | 0 | 0 | 0 | 0 |
|  | 0 | 0 | 0 | 0 |
| **Total** | **0** | **0** | **0** | **0** |

#### 3. Patients by Type of Room
Please report the number of patients by type of room.

| Room Type | Dedicated Inpatient Rooms | Dedicated Outpatient Rooms | Shared Inpatient Rooms | Shared Outpatient Rooms |
|---|---|---|---|---|
| General Operating | 0 | 0 | 0 | 0 |
| Cystoscopy | 0 | 0 | 0 | 0 |
| Endoscopy | 0 | 0 | 0 | 0 |
|  | 0 | 0 | 0 | 0 |
| **Total** | **0** | **0** | **0** | **0** |

### Part B : Ambulatory Patient Race/Ethnicity, Age, Gender and Payment Source

#### 1. Race/Ethnicity of Ambulatory Patients
Please report the total number of ambulatory patients for both dedicated outpatient and shared room environment.

GAMD  Page 144

| Race/Ethnicity | Number of Ambulatory Patients |
|---|---|
| American Indian/Alaska Native | 0 |
| Asian | 0 |
| Black/African American | 0 |
| Hispanic/Latino | 0 |
| Pacific Islander/Hawaiian | 0 |
| White | 0 |
| Multi-Racial | 0 |
| **Total** | **0** |

## 2. Age Grouping
Please report the total number of ambulatory patients by age grouping.

| Age of Patient | Number of Ambulatory Patients |
|---|---|
| Ages 0-14 | 0 |
| Ages 15-64 | 0 |
| Ages 65-74 | 0 |
| Ages 75-85 | 0 |
| Ages 85 and Up | 0 |
| **Total** | **0** |

## 3. Gender
Please report the total number of ambulatory patients by gender.

| Gender | Number of Ambulatory Patients |
|---|---|
| Male | 0 |
| Female | 0 |
| **Total** | **0** |

## 4. Payment Source
Please report the total number of ambulatory patients by payment source.

| Primary Payment Source | Number of Patients |
|---|---|
| Medicare | 0 |
| Medicaid | 0 |
| Third-Party | 0 |
| Self-Pay | 0 |

## Perinatal Services Addendum

## Part A : Obstetrical Services Utilization

Please report the following obstetrical services information for the report period. Include all deliveries and births in any unit of th hospital or anywhere on its grounds.

## 1. Number of Delivery Rooms: 0

**2. Number of Birthing Rooms:** 0

**3. Number of LDR Rooms:** 0

**4. Number of LDRP Rooms:** 0

**5. Number of Cesarean Sections:** 0

**6. Total Live Births:** 0

**7. Total Births (Live and Late Fetal Deaths):** 0

**8. Total Deliveries (Births + Early Fetal Deaths and Induced Terminations):** 0

## Part B : Newborn and Neonatal Nursery Services

### 1. Nursery Services
Please Report the following newborn and neonatal nursery information for the report period.

| Type of Nursery | Set-Up and Staffed Beds/Station | Neonatal Admissions | Inpatient Days | Transfers within Hospital |
|---|---|---|---|---|
| Normal Newborn (Basic) | 0 | 0 | 0 | 0 |
| Specialty Care (Intermediate Neonatal Care) | 0 | 0 | 0 | 0 |
| Subspecialty Care (Intensive Neonatal Care) | 0 | 0 | 0 | 0 |

## Part C : Obstetrical Charges and Utilization by Mother's Race/Ethnicity and Age

### 1. Race/Ethnicity
Please provide the number of admissions and inpatient days for mothers by the mother's race using race/ethnicity classifications.

| Race/Ethnicity | Admissions by Mother's Race | Inpatient Days |
|---|---|---|
| American Indian/Alaska Native | 0 | 0 |
| Asian | 0 | 0 |
| Black/African American | 0 | 0 |
| Hispanic/Latino | 0 | 0 |
| Pacific Islander/Hawaiian | 0 | 0 |
| White | 0 | 0 |
| Multi-Racial | 0 | 0 |
| **Total** | **0** | **0** |

GAMD Page 146

## 2. Age Grouping
Please provide the number of admissions by the following age groupings.

| Age of Patient | Number of Admissions | Inpatient Days |
|---|---|---|
| Ages 0-14 | 0 | 0 |
| Ages 15-44 | 0 | 0 |
| Ages 45 and Up | 0 | 0 |
| Total | 0 | 0 |

## 3. Average Charge for an Uncomplicated Delivery
Please report the average hospital charge for an uncomplicated delivery(CPT 59400)

$0.00

## 4. Average Charge for a Premature Delivery
Please report the average hospital charge for a premature delivery.

$0.00

# LTCH Addendum

## Part A : General Information

**1a. Accreditation** Check the box to the right if your Long Term Care Hospital is accredited. ☐
If you checked the box for yes, please specify the agency that accredits your facility in the space below.

## 1b. Level/Status of Accreditation
Please provide your organization's level/status of accreditation.

## 2. Number of Licensed LTCH Beds: 0

## 3. Permit Effective Date:

## 4. Permit Designation:

## 5. Number of CON Beds: 0

## 6. Number of SUS Beds: 0

## 7. Total Patient Days: 0

## 8. Total Discharges: 0

## 9. Total LTCH Admissions: 0

## Part B : Utilization by Race, Age, Gender and Payment Source

### 1. Race/Ethnicity
Please provide the number of admissions and inpatient days using the following race/ethnicity classifications.

| Race/Ethnicity | Admissions | Inpatient Days |
|---|---|---|
| American Indian/Alaska Native | 0 | 0 |
| Asian | 0 | 0 |
| Black/African American | 0 | 0 |
| Hispanic/Latino | 0 | 0 |
| Pacific Islander/Hawaiian | 0 | 0 |
| White | 0 | 0 |
| Multi-Racial | 0 | 0 |
| **Total** | **0** | **0** |

## 2. Age of LTCH Patient

Please provide the number of admissions and inpatient days by the following age groupings.

| Age of Patient | Admissions | Inpatient Days |
|---|---|---|
| Ages 0-64 | 0 | 0 |
| Ages 65-74 | 0 | 0 |
| Ages 75-84 | 0 | 0 |
| Ages 85 and Up | 0 | 0 |
| **Total** | **0** | **0** |

## 3. Gender

Please provide the number of admissions and inpatient days by the following gender classifications.

| Gender of Patient | Admissions | Inpatient Days |
|---|---|---|
| Male | 0 | 0 |
| Female | 0 | 0 |
| **Total** | **0** | **0** |

## 4. Payment Source

Please indicate the number of patients by the payment source. Please note that individuals may have multiple payment sources.

| Primary Payment Source | Number of Patients | Inpatient Days |
|---|---|---|
| Medicare | 0 | 0 |
| Third-Party | 0 | 0 |
| Self-Pay | 0 | 0 |
| Other | 0 | 0 |

# Psychiatric/Substance Abuse Services Addendum

## Part A : Psychiatric and Substance Abuse Data by Program

## 1. Beds
Please report the number of beds as of the last day of the report period. Report beds only for officially recognized programs. Use the blank row to report combined beds. For combined bed programs, please report each of the combined bed programs and the number of combined beds. Indicate the combined programs using letters A through H, for example,"AB"

| Patient Type | Distribution of CON-Authorized Beds | Set-Up and Staffed Beds |
|---|---|---|
| A- General Acute Psychiatric Adults 18 and over | 39 | 39 |
| B- General Acute Psychiatric Adolescents 13-17 | 22 | 22 |
| C- General Acute Psychiatric Children 12 and under | 0 | 0 |
| D- Acute Substance Abuse Adults 18 and over | 34 | 34 |
| E- Acute Substance Abuse Adolescents 13-17 | 6 | 6 |
| F-Extended Care Adults 18 and over | 0 | 0 |
| G- Extended Care Adolescents 13-17 | 0 | 0 |
| H- Extended Care Adolescents 0-12 | 0 | 0 |
| | 0 | 0 |

## 2. Admissions, Days, Discharges, Accreditation
Please report the following utilization for the report period. Report only for officially recognized programs.

| Program Type | Admissions | Inpatient Days | Discharges | Discharge Days | Average Charge Per Patient Day | Check if the Program is JCAHO Accredited |
|---|---|---|---|---|---|---|
| General Acute Psychiatric Adults 18 and over | 1,183 | 10,121 | 1,213 | 10,100 | 1,350 | ☑ |
| General Acute Psychiatric Adolescents 13-17 | 509 | 4,516 | 524 | 4,698 | 1,350 | ☑ |
| General Acute Psychiatric Children 12 and Under | 0 | 0 | 0 | 0 | 0 | ☐ |
| Acute Substance Abuse Adults 18 and over | 696 | 7,752 | 703 | 7,665 | 1,350 | ☑ |
| Acute Substance Abuse Adolescents 13-17 | 21 | 199 | 23 | 213 | 1,350 | ☑ |
| Extended Care Adults 18 and over | 0 | 0 | 0 | 0 | 0 | ☐ |
| Extended Care Adolescents 13-17 | 0 | 0 | 0 | 0 | 0 | ☐ |
| Extended Care Adolescents 0-12 | 0 | 0 | 0 | 0 | 0 | ☐ |

GAMD Page 149

## Part B : Psych/SA Utilization by Race/Ethnicity, Gender, and Payment Source

### 1. Race/Ethnicity
Please provide the number of admissions and inpatient days using the following race/ethnicity classifications.

| Race/Ethnicity | Admissions | Inpatient Days |
|---|---|---|
| American Indian/Alaska Native | 4 | 39 |
| Asian | 3 | 21 |
| Black/African American | 400 | 4,052 |
| Hispanic/Latino | 24 | 278 |
| Pacific Islander/Hawaiian | 0 | 0 |
| White | 1,969 | 18,101 |
| Multi-Racial | 9 | 97 |
| **Total** | **2,409** | **22,588** |

### 2. Gender
Please provide the number of admissions and inpatient days by the following gender classifications.

| Gender of Patient | Admissions | Inpatient Days |
|---|---|---|
| Male | 1,108 | 10,442 |
| Female | 1,301 | 12,146 |
| **Total** | **2,409** | **22,588** |

### 3. Payment Source
Please indicate the number of patients by the following payment sources. Please note that individuals may have multiple payment sources.

| Primary Payment Source | Number of Patients | Inpatient Days |
|---|---|---|
| Medicare | 515 | 6,080 |
| Medicaid | 395 | 2,994 |
| Third Party | 1,443 | 12,939 |
| Self-Pay | 56 | 575 |
| PeachCare | 0 | 0 |

## Georgia Minority Health Advisory Council Addendum

Because of Georgia's racial and ethnic diversity, and a dramatic increase in segments of the population with Limited English Proficiency, the Georgia Minority Health Advisory Council is working with the Department of Community Health to assess our health systems' ability to provide Culturally and Linguistically Appropriate Services (CLAS) to all segments of our population. We appreciate your willingness to provide information on the following questions:

**1.** Do you have paid medical interpreters on staff? *(Check the box, if yes.)* ☐
**If you checked yes, how many?** 0.0 (FTE's)
What languages do they interpret?

**2.** When a paid medical interpreter is not available for a limited-English proficiency patient, what alternative mechanisms do you use to assure the provision of Linguistically Appropriate Services? *(Check all that apply)*

Bilingual Hospital Staff Member ☑    Bilingual Member of Patient's Family ☑
Community Volunteer Intrepreter ☐    Telephone Interpreter Service ☑
Refer Patient to Outside Agency ☐    Other (please describe): ☐

**3.** Please complete the following grid to show the proportion of patients you serve who prefer speaking various languages (name the 3 most common non-English languages spoken.)

| Top 3 most common non-English languages spoken by your patients | Percent of patients for whom this is their preferred language | # of physicians on staff who speak this language | # of nurses on staff who speak this language | # of other employed staff who speak this language |
|---|---|---|---|---|
| Spanish | .2 | 1 | 1 | 3 |
|  |  | 0 | 0 | 0 |
|  |  | 0 | 0 | 0 |

**4.** What **training** have you provided to your staff to assure cultural competency and the provision of **Culturally and Linguistically Appropriate Services (CLAS)** to your patients?

**5.** What is the most urgent tool or resource you need in order to increase your ability to provide **Culturally and Linguistically Appropriate Services (CLAS)** to your patients?

**6.** In what languages are the signs written that direct patients within your facility?

1. English          2.          3.          4.

**7.** If an uninsured patient visits your emergency department, is there a community health center, federally-qualified health center, free clinic, or other reduced-fee safety net clinic nearby to which you could refer that patient in order to provide him or her an affordable primary care medical home

GAMD  Page 151

regardless of ability to pay? *(Check the box, if yes)*  ☐
If you checked yes, what is the name and location of that health care center or clinic?

## Comprehensive Inpatient Physical Rehabilitation Addendum

### Part A : Rehab Utilization by Race/Ethnicity, Gender, and Payment Source

#### 1. Admissions and Days of Care by Race
Please report the number of inpatient physical rehabilitation admissions and inpatient days for the hospital by the following race and ethnicity categories.

| Race Ethnicity | Admissions | Inpatient Days |
|---|---|---|
| American Indian/Alaska Native | 0 | 0 |
| Asian | 0 | 0 |
| Black/African American | 0 | 0 |
| Hispanic/Latino | 0 | 0 |
| Pacific Islander/Hawaiian | 0 | 0 |
| White | 0 | 0 |
| Multi-Racial | 0 | 0 |

#### 2. Admissions and Days of care by Gender
Please report the number of inpatient physical rehabilitation admissions and inpatient days by gender.

| Gender | Admissions | Inpatient Days |
|---|---|---|
| Male | 0 | 0 |
| Female | 0 | 0 |

#### 3. Admissions and Days of Care by Age Cohort
Please report the number of inpatient physical rehabilitation admissions and inpatient days by age cohort.

| Gender | Admissions | Inpatient Days |
|---|---|---|
| 0-17 | 0 | 0 |
| 18-64 | 0 | 0 |
| 65-84 | 0 | 0 |
| 85 Up | 0 | 0 |

### Part B : Referral Source

#### 1. Referral Source
Please report the number of inpatient physical rehabilitation admissions during the report period from each of the following sources.

| Referral Source | Admissions |
|---|---|
| Acute Care Hospital/General Hospital | 0 |
| Long Term Care Hospital | 0 |
| Skilled Nursing Facility | 0 |
| Traumatic Brain Injury Facility | 0 |

GAMD  Page 153

## 1. Payers

Please report the number of inpatient physical rehabilitation admissions by each of the following payer categories.

| Primary Payment Source | Admissions |
|---|---|
| Medicare | 0 |
| Third Party/Commercial | 0 |
| Self Pay | 0 |
| Other | 0 |

## 2. Uncompensated Indigent and Charity Care

Please report the number of inpatietn physical rehabilitation patients qualifying as uncompensated indigent or charity care

0

## Part D : Admissions by Diagnosis Code

### 1. Admissions by Diagnosis Code

Please report the number of inpatient physical rehabilitation admissions by the "CMS 13" diagnosis of the patient listed below.

| Diagnosis | Admissions |
|---|---|
| 1. Stroke | 0 |
| 2. Brain Injury | 0 |
| 3. Amputation | 0 |
| 4. Spinal Cord | 0 |
| 5. Fracture of the femur | 0 |
| 6. Neurological disorders | 0 |
| 7. Multiple Trauma | 0 |
| 8. Congenital deformity | 0 |
| 9. Burns | 0 |
| 10. Osteoarthritis | 0 |
| 11. Rheumatoid arthritis | 0 |
| 12. Systemic vasculidities | 0 |
| 13. Joint replacement | 0 |
| All Other | 0 |

## Electronic Signature

Please note that the survey WILL NOT BE ACCEPTED without the authorized signature of the Chief Executive Officer or Executive Director (principal officer) of the facility. The signature can be completed only AFTER all survey data has been finalized. By law, the signatory is attesting under penalty of law that the information is accurate and complete.

*I state, certify and attest that to the best of my knowledge upon conducting due diligence to assure the accuracy and*

GAMD Page 154

*completeness of all data, and based upon my affirmative review of the entire completed survey, this completed survey contains no untrue statement, or incaccurate data, nor omits requested material information or data. I further state, certify and attest that I have reviewed the entire contents of the completed survey with all appropriate staff of the facility. I further understand that inaccurate, incomplete or omitted data could lead to sanctions against me or my facility. I further understand that a typed version of my name is being accepted as my original signature pursuant to the Georgia Electronic Records and Signature Act.*

**Authorized Signature:** Monica Cook

**Date:** 03/18/2013

**Title:** Interim CEO

**Comments:**

Monica Cook is the interim CEO.   The letter is addressed to Stephen Glazier who is no longer with the facility.
 Thank you.

# EXHIBIT "E"
# To Complaint

GEORGIA DEPARTMENT OF
COMMUNITY HEALTH

## 2011 Hospital Financial Survey

**Part A : General Information**

### 1. Identification

**UID:HOSP235**

**Facility Name:** St. Simons-By-The-Sea
**County:** Glynn
**Street Address:** 2927 Demere Road
**City:** St Simons Island
**Zip:** 31522
**Mailing Address:** 2927 Demere Road
**Mailing City:** St Simons Island
**Mailing Zip:** 31522

### 2. Report Period

Please report data for the hospital fiscal year ending during calender year 2011 only.
***Do not use a different report period.***

**Please indicate your hospital fiscal year.**
 From: 01/01/2011  To:12/31/2011

**Please indicate your cost report year.**
 From: 01/01/2011  To:12/31/2011

Check the box to the right if your facility was **not** operational for the entire year.   ⌐
If your facility was **not** operational for the entire year, provide the dates the facility was operational.

**Part B : Survey Contact Information**

*Person authorized to respond to inquiries about the responses to this survey.*

**Contact Name:** Lesli Jeter
**Contact Title:** Chief Financial Officer
**Phone:** 912-634-2278
**Fax:** 912-634-8127
**E-mail:** lesli.jeter@uhsinc.com

## Part C : Financial Data and Indigent and Charity Care

### 1. Financial Table

Please report the following data elements. Data reported here must balance in other parts of the HFS.

| Revenue or Expense | Amount |
|---|---|
| Inpatient Gross Patient Revenue | 31,312,947 |
| Total Inpatient Admissions accounting for Inpatient Revenue | 2,552 |
| Outpatient Gross Patient Revenue | 0 |
| Total Outpatient Visits accounting for Outpatient Revenue | 0 |
| Medicare Contractual Adjustments | 4,227,241 |
| Medicaid Contractual Adjustments | 2,431,857 |
| Other Contractual Adjustments: | 8,892,949 |
| Hill Burton Obligations: | 0 |
| Bad Debt (net of recoveries): | 460,324 |
| Uncompensated Indigent Care (net): | 0 |
| Uncompensated Charity Care (net ): | 772,314 |
| Other Free Care: | 1,086,612 |
| Other Revenue/Gains: | 26,066 |
| Total Expenses: | 15,321,299 |

### 2. PPAA Allocation Received and Assessment Paid

Please report the total amounts received and expended pursuant to the Provider Payment Agreement Act (O.C.G.A. § 31-8-179) during the hospital fiscal year.
*If amounts are not available leave blank and explain in the comments section.*

| Total PPA Allocation Received | Total PPA Assessment Paid |
|---|---|
| 0 | 0 |

**Please explain if the PPAA data is not available:**

## Part D : Indigent/Charity Care Policies and Agreements

### 1. Formal Written Policy

Did the hospital have a formal written policy or written policies concerning the provision of indigent and/or charity care during 2011? *(Check box if yes.)* ☑

### 2. Effective Date

What was the effective date of the policy or policies in effect during 2011?

12/31/2006

### 3. Person Responsible

Please indicate the title or position held by the person most responsible for adherence to or interpretation of the policy or policies you will provide the department.?

Chief Financial Officer

GAMD Page 158

### 4. Charity Care Provisions

Did the policy or policies include provisions for the care that is defined as charity pursuant to HFMA guidelines and the definitions contained in the Glossary that accompanies this survey (i.e., a sliding fee scale or the accomodation to provide care without the expectation of compensation for patients whose individual or family income exceeds 125% of federal poverty level guidelines)? *(Check box if yes.)*  ☑

### 5. Maximum Income Level

If you had a provision for charity care in your policy, as reflected by responding yes to item 4, what was the maximum income level, expressed as a percentage of the federal poverty guidelines, for a patient to be considered for charity care (e.g., 185%, 200%, 235%, etc.)?

not specified

## 6. Agreements Concerning the Receipt of Government Funds

Did the hospital have an agreement or agreements with any city or county concerning the receipt of government funds for indigent and/or charity care during 2011? *(Check box if yes.)* ☐

## Part E : Indigent And Charity Care

## 1. Gross Indigent and Charity Care Charges

Please indicate the totals for indigent and charity care for the categories provided below. If the hospital used a sliding fee scale for certain charity patients, only the net charges to charity should be reported (i.e., gross patient charges less any payments received from or billed to the patient.) Total Uncompensated I/C Care must balance to totals reported in Part C.

| Patient Type | Indigent Care | Charity Care | Total |
|---|---|---|---|
| Inpatient | 0 | 772,314 | 772,314 |
| Outpatient | 0 | 0 | 0 |
| **Total** | **0** | **772,314** | **772,314** |

## 2. Sources of Indigent and Charity Care Funding

Please indicate the source of funding for indigent and/or charity care in the table below.

| Source of Funding | Amount |
|---|---|
| Home County | 0 |
| Other Counties | 0 |
| City Or Cities | 0 |
| Hospital Authority | 0 |
| State Programs And Any Other State Funds | 0 |
| (Do Not Include Indigent Care Trust Funds) | |
| Federal Government | 0 |
| Non-Government Sources | 0 |
| Charitable Contributions | 0 |
| Trust Fund From Sale Of Public Hospital | 0 |
| All Other | 0 |
| **Total** | **0** |

## 3. Net Uncompensated Indigent and Charity Care Charges

Total net indigent care must balance to Part C net indigent care and total net charity care must balance to Part C net charity care.

| Patient Type | Indigent Care | Charity Care | Total |
|---|---|---|---|
| Inpatient | 0 | 772,314 | 772,314 |
| Outpatient | 0 | 0 | 0 |
| **Total** | **0** | **772,314** | **772,314** |

GAMD Page 160

## Part F : Patient Origin

### 1. Total Gross Indigent/Charity Care By Charges County

Please report Indigent/Charity Care by County in the following categories. For non Georgia use
Alabama, Florida, North Carolina, South Carolina, Tennessee, or Other-Out-of-State.
To add a row press the button. To delete a row press the minus button at the end of the row.
*(You may enter the data on the web form or upload the data to the web form using the .csv file.)*

Inp Ad-I = Inpatient Admissions (Indigent Care)
Inp Ch-I = Inpatient Charges (Indigent Care)
Out Vis-I = Outpatient Visits (Indigent Care)
Out Ch-I = Outpatient Charges (Indigent Care)

Inp Ad-C = Inpatient Admissions (Charity Care)
Inp Ch-C = Inpatient Charges (Charity Care)
Out Vis-C = Outpatient Visits (Charity Care)
Out Ch-C = Outpatient Charges (Charity Care)

| County | Inp Ad-I | Inp Ch-I | Out Vis-I | Out Ch-I | Inp Ad-C | Inp Ch-C | Out Vis-C | Out Ch-C |
|--------|----------|----------|-----------|----------|----------|----------|-----------|----------|
| Alabama | 0 | 0 | 0 | 0 | 1 | 22,617 | 0 | 0 |
| Appling | 0 | 0 | 0 | 0 | 11 | 23,349 | 0 | 0 |
| Atkinson | 0 | 0 | 0 | 0 | 1 | 6,230 | 0 | 0 |
| Bacon | 0 | 0 | 0 | 0 | 5 | 2,106 | 0 | 0 |
| Baldwin | 0 | 0 | 0 | 0 | 2 | 656 | 0 | 0 |
| Ben Hill | 0 | 0 | 0 | 0 | 1 | 500 | 0 | 0 |
| Bibb | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 |
| Brantley | 0 | 0 | 0 | 0 | 22 | 30,493 | 0 | 0 |
| Bryan | 0 | 0 | 0 | 0 | 2 | 5,138 | 0 | 0 |
| Bulloch | 0 | 0 | 0 | 0 | 28 | 64,240 | 0 | 0 |
| Camden | 0 | 0 | 0 | 0 | 85 | 128,162 | 0 | 0 |
| Candler | 0 | 0 | 0 | 0 | 1 | 12 | 0 | 0 |
| Charlton | 0 | 0 | 0 | 0 | 4 | 5,014 | 0 | 0 |
| Chatham | 0 | 0 | 0 | 0 | 26 | 33,422 | 0 | 0 |
| Clay | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 |
| Coffee | 0 | 0 | 0 | 0 | 11 | 35,899 | 0 | 0 |
| Colquitt | 0 | 0 | 0 | 0 | 2 | 2,233 | 0 | 0 |
| Columbia | 0 | 0 | 0 | 0 | 1 | 1,357 | 0 | 0 |
| Coweta | 0 | 0 | 0 | 0 | 1 | 3,208 | 0 | 0 |
| Effingham | 0 | 0 | 0 | 0 | 7 | 11,775 | 0 | 0 |
| Emanuel | 0 | 0 | 0 | 0 | 6 | 7,457 | 0 | 0 |
| Evans | 0 | 0 | 0 | 0 | 7 | 3,725 | 0 | 0 |
| Florida | 0 | 0 | 0 | 0 | 44 | 29,575 | 0 | 0 |
| Glynn | 0 | 0 | 0 | 0 | 115 | 150,303 | 0 | 0 |
| Habersham | 0 | 0 | 0 | 0 | 1 | 750 | 0 | 0 |
| Houston | 0 | 0 | 0 | 0 | 1 | 306 | 0 | 0 |
| Jackson | 0 | 0 | 0 | 0 | 1 | 1,500 | 0 | 0 |
| Jeff Davis | 0 | 0 | 0 | 0 | 12 | 25,267 | 0 | 0 |
| Lanier | 0 | 0 | 0 | 0 | 2 | 20,055 | 0 | 0 |
| Laurens | 0 | 0 | 0 | 0 | 4 | 5,053 | 0 | 0 |
| Liberty | 0 | 0 | 0 | 0 | 34 | 14,813 | 0 | 0 |
| Long | 0 | 0 | 0 | 0 | 2 | 28,948 | 0 | 0 |

GAMD  Page 161

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Lowndes | 0 | 0 | 0 | 0 | 3 | 2,019 | 0 | 0 |
| McIntosh | 0 | 0 | 0 | 0 | 13 | 10,166 | 0 | 0 |
| Mitchell | 0 | 0 | 0 | 0 | 3 | 575 | 0 | 0 |
| Montgomery | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 |
| Newton | 0 | 0 | 0 | 0 | 2 | 1,086 | 0 | 0 |
| North Carolina | 0 | 0 | 0 | 0 | 1 | 2,480 | 0 | 0 |
| Other Out of State | 0 | 0 | 0 | 0 | 4 | 6,636 | 0 | 0 |
| Pierce | 0 | 0 | 0 | 0 | 19 | 12,903 | 0 | 0 |
| Pulaski | 0 | 0 | 0 | 0 | 3 | 1,060 | 0 | 0 |
| Putnam | 0 | 0 | 0 | 0 | 1 | 250 | 0 | 0 |
| Richmond | 0 | 0 | 0 | 0 | 2 | 200 | 0 | 0 |
| Screven | 0 | 0 | 0 | 0 | 3 | 1,701 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 2 | 2,150 | 0 | 0 |
| Tattnall | 0 | 0 | 0 | 0 | 13 | 9,869 | 0 | 0 |
| Thomas | 0 | 0 | 0 | 0 | 1 | 3,012 | 0 | 0 |
| Tift | 0 | 0 | 0 | 0 | 6 | 6,285 | 0 | 0 |
| Toombs | 0 | 0 | 0 | 0 | 15 | 8,876 | 0 | 0 |
| Ware | 0 | 0 | 0 | 0 | 24 | 14,149 | 0 | 0 |
| Wayne | 0 | 0 | 0 | 0 | 37 | 24,734 | 0 | 0 |
| **Total** | **0** | **0** | **0** | **0** | **600** | **772,314** | **0** | **0** |

GAMD  Page 162

## Indigent Care Trust Fund Addendum

### 1. Indigent Care Trust Fund
Did your hospital receive funds from the Indigent Care Trust Fund during its Fiscal Year 2011?
*(Check box if yes.)*  ☐

### 2. Amount Charged to ICTF
Indicate the amount charged to the ICTF by each State Fiscal Year (SFY) and for each of the patient categories indicated below during Hospital Fiscal Year 2011.

| Patient Category | SFY 2010 7/1/09-6/30/10 | SFY2011 7/1/10-6/30/11 | SFY2012 7/1/11-6/30/12 |
|---|---|---|---|
| A. Qualified Medically Indigent Patients with incomes up to 125% of the Federal Poverty Level Guidelines and served without charge. | 0 | 0 | 0 |
| B. Medically Indigent Patients with incomes between 125% and 200% of the Federal Poverty Level Guidelines where adjustments were made to patient amounts due in accordance with an established sliding scale. | 0 | 0 | 0 |
| C. Other Patients in accordance with the department approved policy. | 0 | 0 | 0 |

### 3. Patients Served
Indicate the number of patients served by SFY.

| SFY 2010 7/1/09-6/30/10 | SFY2011 7/1/10-6/30/11 | SFY2012 7/1/11-6/30/12 |
|---|---|---|
| 0 | 0 | 0 |

## Reconciliation Addendum

**This section is printed in landscape format on a separate PDF file.**

GAMD  Page 163

**Electronic Signature**

Please note that the survey WILL NOT BE ACCEPTED without the authorized signature of the Chief Executive Officer or Executive Director (principal officer) of the facility. The signature can be completed only AFTER all survey data has been finalized. By law, the signatory is attesting under penalty of law that the information is accurate and complete.

*I state, certify and attest that to the best of my knowledge upon conducting due diligence to assure the accuracy and completeness of all data, and based upon my affirmative review of the entire completed survey, this completed survey contains no untrue statement, or incaccurate data, nor omits requested material information or data. I further state, certify and attest that I have reviewed the entire contents of the completed survey with all appropriate staff of the facility. I further understand that inaccurate, incomplete or omitted data could lead to sanctions against me or my facility. I further understand that a typed version of my name is being accepted as my original signature pursuant to the Georgia Electronic Records and Signature Act.*

**Signature of Chief Executive:** Stephen Glazier

**Date:** 08/13/2012

**Title:** CEO

I hereby certify that I am the financial officer authorized to sign this form and that the information is true and accurate. I further understand that a typed version of my name is being accepted as my original signature pursuant to the Georgia Electronic Records and Signature Act.
**Signature of Financial Officer:** Lesli Jeter

**Date:** 08/13/2012

**Title:** CFO

**Comments:**

# EXHIBIT "F"
# To Complaint

**From:** Cook, Monica
**Sent:** Tuesday, April 30, 2013 1:38 PM
**To:** Buffington, Dee; Brinson, June; Gulyas, Linda; Jeter, Lesli; Reilly, Meredith; Thompson, Beth S; Torras, Lisa; Myslewicz-weese, Maria
**Cc:** Eckerd, Gayle
**Subject:** April's projetion

Hello to all. I need to update you all on our projection for April. We will not make the budget for April. It is projected that we will miss our mark by about $65,000. This completely wipes out our overage for the year (approximately $55,000). We managed our finances January – March, and we were able to squeeze by and make our budget This was in spite of not meeting our budgeted ADC or LOS. This is great, but unfortunately it is not good enough for April. Okay guys, we have got to pull this together. We can do this. We need to work as a team and build up the census.

1. We will need to continue to need to manage our expenses. Our largest expense is salaries. I need each of you to know that it is a requirement that you staff to your daily grid. You must not exceed your daily grid's hours for staffing. THERE ARE NO EXCEPTIONS!

2. Denials – If the patient is in denial, they have to go or self-pay for their stay. On the front end, we need to plan for the managed Medicaid patients and managed care patients to go home if the insurance is not paying. This means discharge planning from day one. We MUST pay close attention to this in treatment team and start immediately. I have talked with the doctors. For the most part, the doctors will d/c a patient (if not suicidal, homicidal, or experiencing life-threatening withdrawals) if there is an adequate d/c plan.

3. LOS – If the patient is not ready to go, we need to advocate for the patient. Documentation is essential. If you observe behaviors with a patient, write it in the medical record. Documentation of the patient's criteria is a MUST. If you do not write it, it never happened!!!!! Take credit for your work. If you do not document your

2

plans, there is no way to communicate this to the doctor, nurse, therapist, insurance company, etc.

4. Census – Bring them in! I'm sure that you all have heard me tell Lisa to bring in 15 every day. I'm not joking. If we bring in 10 patients per day, that is approximately 300 – 310 admissions per month. Increasing the volume of admissions will definitely assist in this process.

This is serious. We have met and exceeded our budget by managing, but this is not enough. We already know that the microscope is on the facility. Now that we have not met our budget, the attention on the facility will increase.

I believe that we can do this, but we must work together. We need to encourage one another, and work together towards this common goal. If you know that there is more that you can do, do it! Now is the time to act. We cannot continue to not meet our budget.

Again, we can do this! Let me know if I can do anything to help you. I am willing to help in any way. I want our hospital to be successful! I believe that we can be.

Thank you for your prompt attention to this matter.

Monica

Monica Cook, RN
Chief Nursing Officer
Saint Simons by the Sea
2927 Demere Road
Saint Simons Island, GA 31522
912-634-2267 (direct line)
912-222-3494 (cell)

UHS of Delaware, Inc. Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of this information is prohibited, and may be punishable by law. If this was sent to you in error, please notify the sender by reply e-mail and destroy all copies of the original message.

# EXHIBIT "G"
# To Complaint

**EXHIBIT "G"**

**SELECTED LIST OF SUBSTANCE ABUSE PATIENTS ADMITTED TO ST. SIMONS BY-THE-SEA AND TREATED ON THE DUAL DIAGNOSIS UNIT BUT WHO WERE ADMITTED WITH A PSYCHIATRIC DIAGNOSIS.**

|    | Patient Number | Insurance | Admit Date | |
|----|------|------|------|---|
| 1  | P37  | Tricare Prime | | |
| 2  | P340 | Amerigroup | 7/20/2012 | |
| 3  | P316 | BX Fed | 7/5/2011 | |
| 4  | P333 | Wellcare | 7/6/2011 | |
| 5  | P11  | Wellcare | 7/7/2011 | |
| 6  | P350 | Centpatient PSAP | 7/12/2011 | |
| 7  | P379 | Wellcare | 8/1/2011 | |
| 8  | P163 | Wellcare | 8/16/2011 | |
| 9  | P423 | Wellcare | 8/11/2011 | |
| 10 | P285 | Wellcare | 8/22/2011 | |
| 11 | P437 | ?? | 8/25/2011 | |
| 12 | P226 | Wellcare | 7/1/2012 | |
| 13 | P43  | Tricare | 9/11/2011 | |
| 14 | P229 | BX Fed | 10/4/2011 | |
| 15 | P388 | Wellcare | 10/31/2011 | |
| 16 | P405 | Tricare | 10/11/2011 | |
| 17 | P13  | Tricare | 11/22/2011 | |
| 18 | P213 | Tricare | 12/13/2011 | |
| 19 | P215 | Amerigroup | 12/22/2011 | |
| 20 | P103 | Tricare | 12/24/2011 | |
| 21 | P78  | Wellcare | 12/21/2011 | |
| 22 | P286 | Tricare | 1/9/2012 | |
| 23 | P129 | Wellcare | 1/25/2012 | |
| 24 | P123 | BX Fed | 1/22/2012 | |
| 25 | P244 | AMO Medicare | 2/2/2012 | |
| 26 | P268 | BX Fed | 2/23/2012 | |
| 27 | P28  | Wellcare | 3/2/2012 | |
| 28 | P251 | Wellcare | 3/4/2012 | |
| 29 | P341 | Tricare | 2/29/2012 | |
| 30 | P43  | Tricare | 3/6/2012 | |
| 31 | P111 | Tricare | 3/8/2012 | |
| 32 | P27  | Tricare | 3/27/2012 | |
| 33 | P230 | Wellcare | 3/28/2012 | |
| 34 | P33  | Wellcare | 4/9/2012 | |
| 35 | P246 | Tricare | 4/9/2012 | |
| 36 | P4   | Wellcare | 4/10/2012 | |
| 37 | P44  | ChampVA | 4/18/2012 | |

1

| | | EXHIBIT "G" | | |
|---|---|---|---|---|
| | | | | |

**SELECTED LIST OF SUBSTANCE ABUSE PATIENTS ADMITTED TO ST. SIMONS BY-THE-SEA AND TREATED ON THE DUAL DIAGNOSIS UNIT BUT WHO WERE ADMITTED WITH A PSYCHIATRIC DIAGNOSIS.**

| | Patient Number | Insurance | Admit Date | |
|---|---|---|---|---|
| 38 | P33 | Wellcare | 4/26/2012 | |
| 39 | P24 | Wellcare | 5/13/2012 | |
| 40 | P345 | Tricare | 5/18/2012 | |
| 41 | P93 | BX Fed | 6/13/2012 | |
| 42 | P188 | Wellcare | 6/15/2012 | |
| 43 | P84 | Tricare | 8/20/2012 | |
| 44 | P97 | Wellcare | 9/9/2012 | |
| 45 | P32 | UBH MCO | 6/13/2012 | |
| 46 | P420 | UBH HO | 6/30/2012 | |
| 47 | P385 | UBH HMO | 8/29/2012 | |
| 48 | P202 | Tricare | 7/13/2012 | |
| 49 | P340 | Amerigroup | 7/17/2012 | |
| 50 | P66 | UBH MCO | 7/18/2012 | |
| 51 | P202 | Tricare | 7/13/2012 | |
| 52 | P422 | Wellcare | 8/11/2011 | |
| 53 | P292 | BX Fed | 6/16/2011 | |
| 54 | P7 | Amerigroup | 6/17/2011 | |
| 55 | P32 | UBH MCO | 6/13/2011 | |
| 56 | P93 | BX Fed | 6/13/2011 | |
| 57 | P241 | Humana MCO | 6/14/2011 | |
| 58 | P345 | Tricare | 5/18/2012 | |
| 59 | P44 | Champ VA | 4/18/2012 | |

2

# EXHIBIT "H"
## To Complaint

## EXHIBIT "H"

**Selected admitted Psych Patients who were placed in Substance Abuse Unit whose medical files and documentation would support the substance abuse they are actually being treated for.**

|    | Patient Number | Admit | Length | | | | |
|----|----------------|-------|--------|--|--|--|--|
| 1  | P53   | 06.14.11 | 24 | | | | |
| 2  | P367  | 08.25.11 | | | | | |
| 3  | P59   | 08.24.11 | 9 | | | | |
| 4  | P134  | 10.07.11 | | | | | |
| 5  | P172  | 10.05.11 | | | | | |
| 6  | P358  | 10.10.11 | | | | | |
| 7  | P214  | Admitted as rehab | | | | | |
| 8  | P146  | 10.25.11 | | | | | |
| 9  | P375  | 11.03.11 | | | | | |
| 10 | P169  | 11.5.11 | Rehab first part of stay then mental health | | | | |
| 11 | P395  | 12.20.11 | | | | | |
| 12 | P211  | 12.19.11 | | | | | |
| 13 | P334  | 01.01.12 | | | | | |
| 14 | P366  | 01.12.12 | | | | | |
| 15 | P224  | 02.08.12 | | | | | |
| 16 | P457  | 05.22.12 | | | | | |
| 17 | P407  | 06.14.12 | also admitted to rehab | | | | |
| 18 | P453  | 07.21.12 | | | | | |
| 19 | P266  | 08.22.11 | | | | | |

\* = known substance abusers with mental health issues as primary diagnosis.

# EXHIBIT "I"
# To Complaint

## EXHIBIT "I"

**Patients that were admitted during the beginning or middle of a month and held until they received their Social Security benefits for the following month when no further treatment was needed before the 1st of the month. All of these patients have Medicare insurance.**

|   | Patient Number |
|---|---|
| 1 | P81 |
| 2 | P297 |
| 3 | P118 |
| 4 | P365 |
| 5 | P223 |
| 6 | P449 |
| 7 | P309 |

**The following patient was admitted at least once for running out of heart medication and inability to obtain a refill during the week while at home:**

|   | Patient Number |
|---|---|
| 1 | P309 |

# EXHIBIT "J"
# To Complaint

| | | | EXHIBIT "J" | | | |
|---|---|---|---|---|---|---|
| | | | SAMPLE LISTING OF "FREQUENT FLYERS" | | | |
| | Patient Number | Date of Admission | Date of Discharge* | No. of Days** | Insurance | Frequent Flyer Code 77*** |
| 1 | P348 | 06/19/11 | | 24 | MCARE | |
| 2 | P81 | 06/10/11 | | 21 | MC | Yes |
| 3 | P61 | 06/11/11 | | 20 | MC | |
| 4 | P269 | 07/01/11 | | 20+ | MC | |
| 5 | P460 | 07/10/11 | | 24 | MC | Yes |
| 6 | P220 | 07/18/11 | | 18 | MC | |
| 7 | P161 | 07/30/11 | | 17 | MC | |
| 8 | P277 | 08/08/11 | (8/22/2011) D/C Unknown | 14+ | MC | |
| 9 | P2 | 07/26/11 | | 14+ | MC | |
| 10 | P17 | 08/11/11 | 8/26/2011 D/C Unknown | 15+ | MC | |
| 11 | P391 | 08/17/11 | D/C Unknown | 26+ | MC | |
| 12 | P338 | 09/05/11 | 09/22/11 | 17 | MC | |
| 13 | P81 | 09/07/11 | | 20+ | MC | Yes |
| 14 | P297 | 09/11/11 | | 16+ | MC | Yes |
| 15 | P239 | 09/12/11 | | 24+ | UMR & MC | Yes |
| 16 | P359 | 09/17/11 | (10/5/11) D/C Unknown | 18+ | MC | |
| 17 | P391 | 09/15/11 | (10/5/11) D/C Unknown | 20+ | MC | |
| 18 | P200 | 10/06/11 | (11/14/11) D/C Unknown | 40 | MC | Yes |
| 19 | P177 | 10/06/11 | | 23 | MC | |
| 20 | P146 | 10/25/11 | | 17+ | MC | |
| 21 | P23 | 11/11/11 | | D/C Unknown | MC | Yes |
| 22 | P446 | 11/13/11 | | D/C Unknown | MC | Yes |
| 23 | P357 | 11/17/11 | | 11+ D/C | MC | Yes |
| 24 | P133 | 11/16/11 | | 19+ | MC | |
| 25 | P118 | 12/05/11 | | 15 | MC | |
| 26 | P443 | 12/06/11 | | 7+ | MC | Yes |
| 27 | P401 | 12/05/11 | | 38+ | MC | |
| 28 | P23 | 12/09/11 | 12/12/11 | 3 | MC | Yes |
| 29 | P209 | 12/27/11 | D/C Unknown | 22+ | MC | Yes |
| 30 | P205 | 12/15/11 | D/C Unknown | 26+ | MC | |
| 31 | P460 | 01/06/12 | D/C Unknown | 5+ | MC | Yes |
| 32 | P105 | 01/03/12 | D/C Unknown | 15+ | MC | |
| 33 | P365 | 01/08/12 | 02/06/12 | 29 | MC | Yes |
| 34 | P449 | 01/23/12 | 02/16/12 | 24 | MC | |
| 35 | P105 | 01/23/12 | 02/08/12 | 16 | MC | |
| 36 | P35 | 01/30/12 | 02/24/12 | 25 | MC | |
| 37 | P162 | 02/10/12 | 02/22/12 | 12 | MC | |
| 38 | P297 | 02/10/12 | D/C Unknown | 14+ | MC | |
| 39 | P223 | 02/06/12 | 02/20/12 | 14 | MC HMO | |
| 40 | P393 | 02/15/12 | 02/24/12 | 9 | MC | |
| 41 | P416 | 02/12/12 | 03/07/12 | 24 | MC | |
| 42 | P357 | 02/23/12 | 03/06/12 | 12 | MC | Yes |

| | | **EXHIBIT "J"** | | | |
|---|---|---|---|---|---|
| | | **SAMPLE LISTING OF "FREQUENT FLYERS"** | | | |
| | **Patient Number** | **Date of Admission** | **Date of Discharge\*** | **No. of Days\*\*** | **Insurance** | **Frequent Flyer Code 77\*\*\*** |
| 43 | P162 | 02/24/12 | D/C Unknown | 14+ | MC | |
| 44 | P74 | 02/24/12 | D/C Unknown | 14+ | MC | Yes |
| 45 | P453 | 02/21/12 | 03/05/12 | 13 | MC | Yes |
| 46 | P387 | 02/22/12 | 03/22/12 | 29 | MC | Yes |
| 47 | P42 | 02/14/12 | 03/08/12 | 23 | MC | |
| 48 | P328 | 02/22/12 | 03/08/12 | 15 | MC | Yes |
| 49 | P393 | 03/13/12 | 03/20/12 | 7 | MC | Yes |
| 50 | P328 | 03/15/12 | 04/02/12 | 18 | MC | Yes |
| 51 | P74 | 03/17/12 | 03/28/12 | 11 | MC | Yes |
| 52 | P125 | 03/05/12 | 03/26/12 | 21 | MC | Yes |
| 53 | P449 | 03/22/12 | 04/02/12 | 11 | MC | |
| 54 | P125 | 03/28/12 | 04/04/12 | 7 | MC | |
| 55 | P180 | 03/14/12 | 03/30/12 | 16 | MC | |
| 56 | P72 | 03/11/12 | 03/30/12 | 19 | MC | |
| 57 | P206 | 03/09/12 | 04/05/12 | 27 | MC | |
| 58 | P178 | 03/19/12 | 04/09/12 | 21 | MC | |
| 59 | P200 | 04/04/12 | 04/11/12 | 7 | MC | Yes |
| 60 | P290 | 04/03/12 | 04/20/12 | 17 | MC | |
| 61 | P399 | 04/03/12 | 04/27/12 | 24 | MC | |
| 62 | P118 | 04/23/12 | D/C Unknown | 8+ | MC | |
| 63 | P310 | 04/01/12 | D/C Unknown | 15+ | MC | |
| 64 | P108 | 04/11/12 | D/C Unknown | 5+ | MC | |
| 65 | P310 | 05/07/12 | 05/17/12 | 10 | MC | |
| 66 | P6 | 05/16/12 | 05/26/12 | 10 | MC | Yes |
| 67 | P12 | 05/11/12 | D/C Unknown | 26+ | MC | |
| 68 | P365 | 06/13/12 | D/C Unknown | | MC | |
| 69 | P309 | 03/10/12 | has several admissions between 2012 and 2013 | | MC | |
| | The following is a list of Frequent Flyers with Medicare | | | | | |
| | P357 | | | | | |
| | P309 | | | | | |
| | P51 | | | | | |
| | P81 | | | | | |
| | P209 | | | | | |
| | P87 | | | | | |
| | P108 | | | | | |
| | P449 | | | | | |
| | P365 | | | | | |
| | P35 | | | | | |
| | P223 | | | | | |
| | P297 | | | | | |
| | P455 | | | | | |
| | P393 | | | | | |
| | P446 | | | | | |
| | P74 | | | | | |
| | P310 | | | | | |

2

**EXHIBIT "J"**

**SAMPLE LISTING OF "FREQUENT FLYERS"**

| Patient Number | Date of Admission | Date of Discharge* | No. of Days** | Insurance | Frequent Flyer Code 77*** |
|---|---|---|---|---|---|
| P118 | | | | | |
| P200 | | | | | |
| P401 | | | | | |
| P387 | | | | | |
| P162 | | | | | |
| P74 | | | | | |
| P173 | | | | | |

**Explaination to Entries**

* D/C - unknown - discharge date is unknown

** Plus sign (+) means that patient was in treatment for that many days plus a few more)

*** means Frequent Flyer; patient has had several admissions (Code 77)

3

# EXHIBIT "K"
# To Complaint

ST. SIMONS BY THE SEA

2927 DEMERE ROAD

ST. SIMONS, GA 31522

MAIN PHONE 912.638.1999   MAIN FAX 912.634.2112

APU/FOUNDATIONS 273/152 / 634.2273

DUAL 237/238

DUAL MED. ROOM 212

ADOLESCENT 184/274 / 634.2274

INTAKE 121/132/149/260/275 / 634.9555

FAX NUMBERS – MEDICAL RECORDS 912.634.9890 / HR 912.634.8519 / NEEDS ASSESSMENT 912.638.6897

DR. SCHUENEMAN – 281, (FAX) 912.638.6866   MAINTENANCE – TY HILL (912.266 7770)

TRANSPORT – ISLAND CAB 912.634.0113 / CENTRAL EMS 912.234 7911

| | | | | | | |
|---|---|---|---|---|---|---|
| ADOL. DR. OFFICE | 146 | | EILEEN MONTEVIDONI | 226 | | COLLECTOR |
| ADRIENNE REYNOLDS | 275 | NEEDS ASSESSMENT | EMILY F. VANCE | 912 223.8996 | | MARKETING REP. |
| ANDRA DEVIESE | 231 | DIETICIAN | GLENDA PICKREN | 155 | | UR |
| APRIL DASHER | 121 | NEEDS ASSESSMENT | HUMAN RESOURCES FAX | 912.634.8519 | | |
| APU DR. OFFICE | 270 | | INEZ WARRICK | 288 | | COLL/BILLING (L-Z) |
| APU PATIENT PHONE | 373 | | INTAKE | 634.9555 | | 121/132/149/260/275 |
| APU PATIENT PHONE | 374 | | JAMIE BURRISS | 151 | | PAYROLL/AP/PURCH. |
| ASHLEY RICH | 904.416.9620 | MARKETING REP. | JIM JAEGER | 202 | | MAINTENANCE |
| ASHLEY SEABOLT | 404.384.5283 | MARKETING REP. | JUNE BRINSON | 232 | | BUSINESS OFFICE DIR. |
| BARBARA BURKE | 168 | FIN. COUNSELOR | KITCHEN | 158 | | |
| BETH THOMPSON | 143 | HR DIRECTOR 634.2260 | LABCORP NUMBER | 877.522.4677 | | |
| BETSY HOLM | 293 | THERAPIST-ADOL UNIT | LABCORP ACCOUNT # | 10308095 | | LABCORP ACCOUNT # |
| BREAK ROOM | 154 | | LESLI JETER | 147 | | CFO |
| BETTY WILLIAMS | | THERAPIST / PRN | LINDA GULYAS / 634.2261 | 137 | | UR DEPT MANAGER |
| BRIAN GOODWIN | 122 | THERAPIST-APU | LISA TORRAS | 260 | | DIR OF ADMISSIONS |
| BUTCH GRIFFIN | 158 | THERAPIST / PRN | MARIA MYSLEWICZ-WEESE | 281 | | DIR OF CLINICAL SERV. |
| CAROL EDWARDS | 196 | CODER - MED REC | MEDICAL RECORDS FAX | 634.9890 | | |
| CASEY HARPER | 267 | INF CONTROL-STAFF DEV-EMP HEALTH | MEREDITH REILLY 990 2763 | 294 | | DIR OF BUS DEV/MKTG |
| CENTRAL EMS | 912.234.7911 | | MONICA COOK / 634.2267 | 124 | | INTERIM CEO |
| CHAD WATERS | 182 | THERAPIST DUAL UNIT | NEEDS ASSESSMENT FAX | 638.6897 | | |
| CHRIS FRAYNE | 179 | MEDICAL RECORDS | RECREATION THERAPY | 177 / 180 | | JESSICA, SARAH, & TRINI |
| CHRISTY MOSELEY | 268 | MED. RECORDS MGR. | SARAH MOREHOUSE | 173 | | THERAPIST-APU |
| CLEVE TYRE | 207 | PHARMACIST | SEGRMC - MAIN | 466.7000 | | |
| CONFERENCE ROOM | 129 | LARGE CONF. ROOM | SEGRMC - ER | 466.2001 | | |
| CONF. ROOM – ADMIN | 165 | ADMIN. CONF. ROOM | SEGRMC - ER FAX | 466.2013 | | |
| CYNTHIA WILEY | 214 | DIETARY MANAGER | SEGRMC - ISL. IMMEDIATE | 466.5900 | | |
| DALE TUSHMAN | 126 | THERAPIST | SEGRMC - CAMDEN | 576.6200 | | |
| DARNELLE BURANDT | 153 | THERAPIST-ADOL UNIT | SHANNON SMITH | 150 | | LEAD HOUSEKEEPER |
| DEDRICK FRAZIER | 195 | MEDICAL RECORDS | SHARON MILLER | 132 | | NEEDS ASSESSMENT |
| DEE BUFFINGTON | 183 | ADON / PT ADVOCATE | SHARRON TESTON | 132 | | NEEDS ASSESSMENT |
| DELL PLEAS / 634-2285 | 138 | STAFFING COORD | SYLVIA COPELAND | 284 | | THERAPIST / PRN |
| DENAY GIRADO | 284 | THERAPIST / PRN | TAMI JOYCE | 138 | | THERAPIST-DUAL UNIT |
| DODIE MITCHELL | 141 | QI/RM/COMPLIANCE | TERI LAND | | | THERAPIST / PRN |
| DR. BRYAN | 140 | | THELMA NELSON | | | NEEDS ASSESSMENT |
| DR COX | 169 | | TRACY HEHR | 262 | | UR |
| DR. MCLAULIN | 263 | | TRANSPORT | 634 0113 | | ISLAND CAB |
| DR. SCHUENEMAN | 281 | FAX 912.638.6866 | TY HILL | 280 | | PLANT OPS DIRECTOR |
| DUAL PATIENT PHONE | 371 | | UR FAX | | | 634.1336 |
| DUAL PATIENT PHONE | 372 | | REVISED AS OF 6/17/13 | | 6/17/13 | |

GAMD  Page 180

# EXHIBIT "L"
# To Complaint

| EXHIBIT "L" | | | | | | |
|---|---|---|---|---|---|---|
| Sample Listing of Patients and Dates Who Defendants' Billing Records Show Were Seen by Dr. Martelli | | | | | | |
| DATE | PATIENT NO. | PRO | ADMIT DATE | FIN CLASS | INSURANCE | PATIENT TOTAL |
| 7/21/2011 | P199 | ADOL | 7/9/2011 | TRICARE | TRICARE- PRIME | |
| 7/21/2011 | P64 | ADOL | 7/11/2011 | MCO | AMERIGROUP | |
| 7/21/2011 | P368 | ADOL | 7/12/2011 | PPO | UBH | |
| 7/21/2011 | P190 | ADOL | 7/12/2011 | TRICARE | TRICARE | |
| 7/21/2011 | P258 | ADOL | 7/13/2011 | BX | BXBS Mass. | |
| 7/21/2011 | P413 | ADOL | 7/15/2011 | MCO | AMERIGROUP | |
| 7/21/2011 | P331 | ADOL | 7/16/2011 | PPO | UBH | |
| 7/21/2011 | P204 | ADOL | 7/16/2011 | PPO | UBH | |
| 7/21/2011 | P409 | ADOL | 7/18/2011 | BX | BXBS AL. | |
| 7/21/2011 | P450 | ADOL | 7/18/2011 | TRICARE | TRICARE | |
| 7/21/2011 | P34 | ADOL | 7/18/2011 | MCO | AMERIGROUP | |
| 7/21/2011 | P466 | ADOL | 7/20/2011 | BX | BXBS | |
| 7/21/2011 | P166 | ADOL | 7/20/2011 | MCO | AMERIGROUP | |
| 7/21/2011 | P363 | ADOL | 7/20/2011 | BX | BXBS | 14 |
| | | | | | | |
| 7/25/2011 | P199 | ADOL | 7/9/2011 | TRICARE | TRICARE- PRIME | |
| 7/25/2011 | P64 | ADOL | 7/11/2011 | MCO | AMERIGROUP | |
| 7/25/2011 | P368 | ADOL | 7/12/2011 | PPO | UBH | |
| 7/25/2011 | P190 | ADOL | 7/12/2011 | TRICARE | TRICARE | |
| 7/25/2011 | P258 | ADOL | 7/13/2011 | BX | BXBS Mass. | |
| 7/25/2011 | P331 | ADOL | 7/16/2011 | PPO | UBH | |
| 7/25/2011 | P204 | ADOL | 7/16/2011 | PPO | UBH | |
| 7/25/2011 | P409 | ADOL | 7/18/2011 | BX | BXBS AL. | |
| 7/25/2011 | P450 | ADOL | 7/18/2011 | TRICARE | TRICARE | |
| 7/25/2011 | P34 | ADOL | 7/18/2011 | MCO | AMERIGROUP | |
| 7/25/2011 | P466 | ADOL | 7/20/2011 | BX | BXBS | |
| 7/25/2011 | P166 | ADOL | 7/20/2011 | MCO | AMERIGROUP | |
| 7/25/2011 | P363 | ADOL | 7/20/2011 | BX | BXBS | |
| 7/25/2011 | P327 | ADOL | 7/23/2011 | BX | FEDERAL | |
| 7/25/2011 | P45 | ADOL | 7/23/2011 | BX | ANTHEM | 15 |
| | | | | | | |
| 8/31/2011 | P331 | ADOL | 7/16/2011 | PPO | UBH | |
| 8/31/2011 | P326 | ADOL | 8/18/2011 | PPO | UBH | |
| 8/31/2011 | P50 | ADOL | 8/19/2011 | MCO | WELLCARE | |
| 8/31/2011 | P1 | ADOL | 8/19/2011 | MCO | AMERIGROUP | |
| 8/31/2011 | P135 | ADOL | 8/23/2011 | MCO | WELLCARE | |
| 8/31/2011 | P107 | ADOL | 8/24/2011 | TRICARE | TRICARE | |
| 8/31/2011 | P403 | ADOL | 8/24/2011 | TRICARE | TRICARE- WEST | |
| 8/31/2011 | P38 | ADOL | 8/25/2011 | MCO | AMERIGROUP | |
| 8/31/2011 | P349 | ADOL | 8/25/2011 | TRICARE | TRICARE | |
| 8/31/2011 | P284 | ADOL | 8/27/2011 | MCO | WELLCARE | |
| 8/31/2011 | P272 | ADOL | 8/28/2011 | SELF | SELF PAY x 1 week | |
| 8/31/2011 | P63 | ADOL | 8/29/2011 | TRICARE | TRICARE | |
| 8/31/2011 | P225 | ADOL | 8/30/2011 | BX | FEDERAL | |
| 8/31/2011 | P288 | ADOL | 8/30/2011 | PPO | UBH | |
| 8/31/2011 | P352 | ADOL | 8/31/2011 | PPO | MERITAIN | 15 |
| | | | | | | |
| 9/3/2011 | P115 | ADOL | 9/6/2011 | TRICARE | TRICARE | |
| 9/3/2011 | P199 | ADOL | 9/10/2011 | TRICARE | TRICARE | |

1

| | | | | | | |
|---|---|---|---|---|---|---|
| **EXHIBIT "L"** | | | | | | |
| Sample Listing of Patients and Dates Who Defendants' Billing Records Show Were Seen by Dr. Martelli | | | | | | |
| **DATE** | **PATIENT NO.** | **PRO** | **ADMIT DATE** | **FIN CLASS** | **INSURANCE** | **PATIENT TOTAL** |
| 9/3/2011 | P247 | ADOL | 9/14/2011 | BX | BXBS AL. | |
| 9/3/2011 | P203 | ADOL | 9/14/2011 | PPO | UBH | |
| 9/3/2011 | P384 | ADOL | 9/15/2011 | MCO | MAGELLAN | |
| 9/3/2011 | P237 | ADOL | 9/15/2011 | BX | BXBS OF GA | |
| 9/3/2011 | P386 | ADOL | 9/16/2011 | PPO | UBH | |
| 9/3/2011 | P311 | ADOL | 9/18/2011 | MCO | WELLCARE | |
| 9/3/2011 | P267 | ADOL | 9/19/2011 | TRICARE | TRICARE | |
| 9/3/2011 | P439 | ADOL | 9/19/2011 | PPO | UBH | |
| 9/3/2011 | P64 | ADOL | 9/20/2011 | MCO | AMERIGROUP | |
| 9/3/2011 | P429 | ADOL | 9/21/2011 | MCO | WELLCARE | |
| 9/3/2011 | P301 | ADOL | 9/21/2011 | MCO | WELLCARE | |
| 9/3/2011 | P415 | ADOL | 9/21/2011 | PO | UBH | |
| 9/3/2011 | P201 | ADOL | ADMIT | BX | BXBS GA | 15 |
| | | | | | | |
| 9/26/2011 | P199 | ADOL | 9/10/2011 | TRICARE | TRICARE | |
| 9/26/2011 | P247 | ADOL | 9/14/2011 | BX | BXBS AL. | |
| 9/26/2011 | P384 | ADOL | 9/15/2011 | MCO | WELLCARE | |
| 9/26/2011 | P237 | ADOL | 9/15/2011 | BC | BXBS OF GA | |
| 9/26/2011 | P439 | ADOL | 9/19/2011 | PPO | UBH | |
| 9/26/2011 | P64 | ADOL | 9/20/2011 | MCO | AMERIGROUP | |
| 9/26/2011 | P429 | ADOL | 9/21/2011 | MCO | WELLCARE | |
| 9/26/2011 | P301 | ADOL | 9/21/2011 | MCO | WELLCARE | |
| 9/26/2011 | P415 | ADOL | 9/21/2011 | PPO | UBH | |
| 9/26/2011 | P201 | ADOL | 9/22/2011 | BX | BXBS GA | |
| 9/26/2011 | P167 | ADOL | 9/22/2011 | MCO | CENPATICO | |
| 9/26/2011 | P47 | ADOL | 9/22/2011 | MCO | WELLCARE | |
| 9/26/2011 | P58 | ADOL | 9/22/2011 | MCO | WELLCARE | |
| 9/26/2011 | P121 | ADOL | 9/23/2011 | PPO | BXBS GA | |
| 9/26/2011 | P88 | ADOL | 9/23/2011 | PPO | UBH | |
| 9/26/2011 | P102 | ADOL | 9/23/2011 | MCO | WELLCARE | |
| 9/26/2011 | P306 | ADOL | 9/24/2011 | TRICARE | TRICARE | |
| 9/26/2011 | P323 | ADOL | ADMIT | BX | BXBS | 18 |
| | | | | | | |
| 9/27/2011 | P247 | ADOL | 9/10/2011 | TRICARE | TRICARE | |
| 9/27/2011 | P384 | ADOL | 9/14/2011 | BX | BXBS AL. | |
| 9/27/2011 | P237 | ADOL | 9/15/2011 | MCO | WELLCARE | |
| 9/27/2011 | P439 | ADOL | 9/15/2011 | BC | BXBS OF GA | |
| 9/27/2011 | P64 | ADOL | 9/19/2011 | PPO | UBH | |
| 9/27/2011 | P429 | ADOL | 9/20/2011 | MCO | AMERIGROUP | |
| 9/27/2011 | P301 | ADOL | 9/21/2011 | MCO | WELLCARE | |
| 9/27/2011 | P415 | ADOL | 9/21/2011 | MCO | WELLCARE | |
| 9/27/2011 | P201 | ADOL | 9/21/2011 | PPO | UBH | |
| 9/27/2011 | P167 | ADOL | 9/22/2011 | BX | BXBS GA | |
| 9/27/2011 | P47 | ADOL | 9/22/2011 | MCO | CENPATICO | |
| 9/27/2011 | P58 | ADOL | 9/22/2011 | MCO | WELLCARE | |
| 9/27/2011 | P121 | ADOL | 9/22/2011 | MCO | WELLCARE | |
| 9/27/2011 | P88 | ADOL | 9/23/2011 | PPO | BXBS GA | |
| 9/27/2011 | P102 | ADOL | 9/23/2011 | PPO | UBH | |
| 9/27/2011 | P306 | ADOL | 9/23/2011 | MCO | WELLCARE | |

2

| | | | EXHIBIT "L" | | | |
|---|---|---|---|---|---|---|
| | | | Sample Listing of Patients and Dates Who Defendants' Billing Records Show Were Seen by Dr. Martelli | | | |
| DATE | PATIENT NO. | PRO | ADMIT DATE | FIN CLASS | INSURANCE | PATIENT TOTAL |
| 9/27/2011 | P323 | ADOL | 9/26/2011 | TRICARE | TRICARE | |
| 9/27/2011 | P212 | ADOL | 9/26/2011 | PPO | UBH | |
| 9/27/2011 | P263 | ADOL | 9/26/2011 | BX | BXBS FL. | 19 |
| | | | | | | |
| 10/4/2011 | P64 | ADOL | 9/20/2011 | MCO | AMERIGROUP | |
| 10/4/2011 | P429 | ADOL | 9/21/2011 | MCO | WELLCARE | |
| 10/4/2011 | P167 | ADOL | 9/22/2011 | MCO | CENPATICO | |
| 10/4/2011 | P47 | ADOL | 9/22/2011 | MCO | WELLCARE | |
| 10/4/2011 | P121 | ADOL | 9/23/2011 | PPO | BXBS GA | |
| 10/4/2011 | P212 | ADOL | 9/26/2011 | PPO | UBH | |
| 10/4/2011 | P263 | ADOL | 9/26/2011 | BX | BXBS FL | |
| 10/4/2011 | P38 | ADOL | 9/27/2011 | MCO | AMERIGROUP | |
| 10/4/2011 | P153 | ADOL | 9/27/2011 | MCO | WELLCARE | |
| 10/4/2011 | P355 | ADOL | 9/28/2011 | BX | FEDERAL | |
| 10/4/2011 | P49 | ADOL | 9/28/2011 | BX | FEDERAL | |
| 10/4/2011 | P31 | ADOL | 9/28/2011 | PPO | CIGNA | |
| 10/4/2011 | P10 | ADOL | 9/29/2011 | MCO | MAGELLAN | |
| 10/4/2011 | P148 | ADOL | 9/29/2011 | MCO | AMERIGROUP | |
| 10/4/2011 | P253 | ADOL | 9/29/2011 | MCO | AMERIGROUP | |
| 10/4/2011 | P137 | ADOL | 10/4/2011 | TRICARE | TRICARE | |
| 10/4/2011 | P143 | ADOL | 10/4/2011 | AMERIGROUP | AMERIGROUP | |
| 10/4/2011 | P221 | ADOL | 10/4/2011 | WELLCARE | WELLCARE | 18 |
| | | | | | | |
| 10/10/2011 | P64 | ADOL | 9/20/2011 | MCO | AMERIGROUP | |
| 10/10/2011 | P429 | ADOL | 9/21/2011 | MCO | WELLCARE | |
| 10/10/2011 | P167 | ADOL | 9/22/2011 | MCO | CENPATICO | |
| 10/10/2011 | P47 | ADOL | 9/22/2011 | MCO | WELLCARE | |
| 10/10/2011 | P58 | ADOL | 9/22/2011 | MCO | WELLCARE | |
| 10/10/2011 | P121 | ADOL | 9/23/2011 | PPO | BXBS GA | |
| 10/10/2011 | P88 | ADOL | 9/23/2011 | PPO | UBH | |
| 10/10/2011 | P306 | ADOL | 9/24/2011 | TRICARE | TRICARE | |
| 10/10/2011 | P323 | ADOL | 9/26/2011 | BX | BXBS | |
| 10/10/2011 | P212 | ADOL | 9/26/2011 | PPO | UBH | |
| 10/10/2011 | P263 | ADOL | 9/26/2011 | BC | BXBS FL | |
| 10/10/2011 | P299 | ADOL | 9/27/2011 | MCO | WELLCARE | |
| 10/10/2011 | P38 | ADOL | 9/27/2011 | MCO | AMERIGROUP | |
| 10/10/2011 | P153 | ADOL | 9/27/2011 | MCO | WELLCARE | |
| 10/10/2011 | P355 | ADOL | 9/28/2011 | BX | FEDERAL | |
| 10/10/2011 | P49 | ADOL | 9/28/2011 | BX | FEDERAL | |
| 10/10/2011 | P31 | ADOL | 9/28/2011 | PPO | CIGNA | |
| 10/10/2011 | P10 | ADOL | 9/29/2011 | MCO | MAGELLAN | |
| 10/10/2011 | P148 | ADOL | 9/29/2011 | MCO | AMERIGROUP | |
| 10/10/2011 | P253 | ADOL | 9/29/2011 | MCO | AMERIGROUP | 20 |
| | | | | | | |
| 10/18/2011 | P152 | APU | 9/26/2011 | TRICARE | TRICARE | |
| 10/18/2011 | P177 | APU | 10/6/2011 | MCARE | MCARE | |
| 10/18/2011 | P408 | APU | 10/10/2011 | PPO | UBH | |
| 10/18/2011 | P108 | APU | 10/10/2011 | MCARE | MCARE 077/48 | |
| 10/18/2011 | P280 | APU | 10/11/2011 | PPO | AETNA | |

3

| EXHIBIT "L" | | | | | | |
|---|---|---|---|---|---|---|
| Sample Listing of Patients and Dates Who Defendants' Billing Records Show Were Seen by Dr. Martelli | | | | | | |
| DATE | PATIENT NO. | PRO | ADMIT DATE | FIN CLASS | INSURANCE | PATIENT TOTAL |
| 10/18/2011 | P330 | APU | 10/12/2011 | BX | BXBS AR | |
| 10/18/2011 | P176 | APU | 10/16/2011 | BX | 1- BXBS FL/2-MCARE 190/60 | |
| 10/18/2011 | P130 | APU | 10/17/2011 | PPO | VA BENEFITS | |
| 10/18/2011 | P5 | APU | 10/18/2011 | BX | FEDERAL | |
| 10/18/2011 | P410 | APU | 10/18/2011 | MCARE | MCARE 190/60 | |
| 10/18/2011 | P18 | ADOL | 10/9/2011 | MCO | AMERIGROUP | |
| 10/18/2011 | P184 | ADOL | 10/9/2011 | MCO | AMERIGROUP | |
| 10/18/2011 | P252 | ADOL | 10/12/2011 | BX | 1-ANTHEM /2- MCAID | |
| 10/18/2011 | P442 | ADOL | 10/12/2011 | PPO | EDI #29076 (Super Med Ntwk) | |
| 10/18/2011 | P71 | ADOL | 10/13/2011 | TRICARE | TRICARE | |
| 10/18/2011 | P157 | ADOL | 10/13/2011 | PPO | BX OF GA | |
| 10/18/2011 | P197 | ADOL | 10/13/2011 | PPO | UBH | |
| 10/18/2011 | P29 | ADOL | 10/14/2011 | BX | BX OF GA | |
| 10/18/2011 | P240 | ADOL | 10/14/2011 | MCO | AMERIGROUP | |
| 10/18/2011 | P314 | ADOL | 10/17/2011 | MCO | WELLCARE | |
| 10/18/2011 | P144 | ADOL | 10/17/2011 | BX | BXBS HORIZON | |
| 10/18/2011 | P294 | ADOL | 10/17/2011 | BX | BXBS | |
| 10/18/2011 | P291 | ADOL | 10/17/2011 | PPO | Mayo Medical (MMSI) | |
| 10/18/2011 | P143 | ADOL | 10/17/2011 | MCO | AMERIGROUP | |
| 10/18/2011 | P95 | ADOL | 10/17/2011 | MCO | WELLCARE | |
| 10/18/2011 | P356 | ADOL | 10/18/2011 | PPO | UBH | |
| 10/18/2011 | P376 | ADOL | 10/18/2011 | MCO | WELLCARE | |
| 10/18/2011 | P217 | ADOL | 10/18/2011 | PPO | CIGNA | 28 |
| | | | | | | |
| 10/26/2011 | P177 | APU | 10/6/2011 | MCARE | MCARE | |
| 10/26/2011 | P176 | APU | 10/16/2011 | BX | 1-BXBS FL/2-MCARE 190/60 | |
| 10/26/2011 | P130 | APU | 10/17/2011 | PPO | VA BENEFITS | |
| 10/26/2011 | P5 | APU | 10/18/2011 | BX | FEDERAL | |
| 10/26/2011 | P89 | APU | 10/19/2011 | PPO | AETNA | |
| 10/26/2011 | P344 | APU | 10/26/2011 | TRICARE | TRICARE | |
| 10/26/2011 | P71 | ADOL | 10/13/2011 | TRICARE | TRICARE | |
| 10/26/2011 | P144 | ADOL | 10/17/2011 | BX | BXBS HORIZON | |
| 10/26/2011 | P294 | ADOL | 10/17/2011 | BX | BXBS | |
| 10/26/2011 | P291 | ADOL | 10/17/2011 | PPO | Mayo Medical (MMSI) | |
| 10/26/2011 | P143 | ADOL | 10/17/2011 | MCO | AMERIGROUP | |
| 10/26/2011 | P356 | ADOL | 10/18/2011 | PPO | UBH | |
| 10/26/2011 | P376 | ADOL | 10/18/2011 | MCO | WELLCARE | |
| 10/26/2011 | P217 | ADOL | 10/18/2011 | PPO | CIGNA | |
| 10/26/2011 | P67 | ADOL | 10/19/2011 | MCO | WELLCARE | |
| 10/26/2011 | P283 | ADOL | 10/19/2011 | PPO | UBH | |
| 10/26/2011 | P184 | ADOL | 10/24/2011 | MCO | AMERIGROUP | |
| 10/26/2011 | P126 | ADOL | 10/24/2011 | TRICARE | TRICARE | |
| 10/26/2011 | P288 | ADOL | 10/24/2011 | PPO | UBH | |
| 10/26/2011 | P9 | ADOL | 10/24/2011 | MCO | AMERIGROUP | |
| 10/26/2011 | P320 | ADOL | 10/25/2011 | BX | BXBS | |
| 10/26/2011 | P65 | ADOL | 10/26/2011 | PPO | UBH | |
| 10/26/2011 | P122 | ADOL | 10/26/2011 | MCO | WELLCARE | |
| 10/26/2011 | P187 | ADOL | 10/26/2011 | MCO | WELLCARE | |
| 10/26/2011 | P193 | ADOL | ADMIT | PPO | UBH | 25 |

4

| | | | | | EXHIBIT "L" | |
|---|---|---|---|---|---|---|
| | | | | Sample Listing of Patients and Dates Who Defendants' Billing Records Show Were Seen by Dr. Martelli | | |
| DATE | PATIENT NO. | PRO | ADMIT DATE | FIN CLASS | INSURANCE | PATIENT TOTAL |
| 11/7/2011 | P174 | ADOL | 10/27/2011 | TRICARE | TRICARE | |
| 11/7/2011 | P117 | ADOL | 10/28/2011 | BX | BX OF GA | |
| 11/7/2011 | P321 | ADOL | 10/31/2011 | BX | BXBS | |
| 11/7/2011 | P352 | ADOL | 10/31/2011 | PPO | MERITAIN | |
| 11/7/2011 | P104 | ADOL | 11/1/2011 | BX | FEDERAL | |
| 11/7/2011 | P98 | ADOL | 11/2/2011 | BX | FEDERAL | |
| 11/7/2011 | P411 | ADOL | 11/3/2011 | PPO | CARE/NTWK SAV. | |
| 11/7/2011 | P86 | ADOL | 11/3/2011 | PPO | UBH | |
| 11/7/2011 | P151 | ADOL | 11/5/2011 | MCO | AMERIGROUP | |
| 11/7/2011 | P283 | ADOL | 11/5/2011 | PPO | UBH | |
| 11/7/2011 | P142 | ADOL | 11/7/2011 | MCO | WELLCARE | |
| 11/7/2011 | P160 | ADOL | 11/7/2011 | PPO | UBH | |
| 11/7/2011 | P325 | ADOL | 11/7/2011 | MCO | CENPATICO | |
| 11/7/2011 | P115 | ADOL | 11/7/2011 | TRICARE | TRICARE | |
| 11/7/2011 | P467 | ADOL | 11/7/2011 | TRICARE | TRICARE | 15 |
| | | | | | | |
| 11/8/2011 | P117 | ADOL | 10/28/2011 | BX | BX OF GA | |
| 11/8/2011 | P321 | ADOL | 10/31/2011 | BX | BXBS | |
| 11/8/2011 | P352 | ADOL | 10/31/2011 | PPO | MERITAIN | |
| 11/8/2011 | P104 | ADOL | 11/1/2011 | BX | FEDERAL | |
| 11/8/2011 | P98 | ADOL | 11/2/2011 | BX | FEDERAL | |
| 11/8/2011 | P411 | ADOL | 11/3/2011 | PPO | CARE/NTWK SAV. | |
| 11/8/2011 | P86 | ADOL | 11/3/2011 | PPO | UBH | |
| 11/8/2011 | P151 | ADOL | 11/5/2011 | MCO | AMERIGROUP | |
| 11/8/2011 | P283 | ADOL | 11/5/2011 | PPO | UBH | |
| 11/8/2011 | P142 | ADOL | 11/7/2011 | MCO | WELLCARE | |
| 11/8/2011 | P160 | ADOL | 11/7/2011 | PPO | UBH | |
| 11/8/2011 | P325 | ADOL | 11/7/2011 | MCO | CENPATICO | |
| 11/8/2011 | P115 | ADOL | 11/7/2011 | TRICARE | TRICARE | |
| 11/8/2011 | P467 | ADOL | 11/7/2011 | TRICARE | TRICARE | |
| 11/8/2011 | P295 | ADOL | 11/8/2011 | TRICARE | TRICARE | |
| 11/8/2011 | P377 | ADOL | 11/8/2011 | MCO | WELLCARE | 16 |
| | | | | | | |
| 11/9/2011 | P117 | ADOL | 10/28/2011 | BX | BX OF GA | |
| 11/9/2011 | P352 | ADOL | 10/31/2011 | PPO | MERITAIN | |
| 11/9/2011 | P98 | ADOL | 11/2/2011 | BX | FEDERAL | |
| 11/9/2011 | P411 | ADOL | 11/3/2011 | PPO | CARE/NTWK SAV. | |
| 11/9/2011 | P86 | ADOL | 11/3/2011 | PPO | UBH | |
| 11/9/2011 | P151 | ADOL | 11/5/2011 | MCO | AMERIGROUP | |
| 11/9/2011 | P283 | ADOL | 11/5/2011 | PPO | UBH | |
| 11/9/2011 | P142 | ADOL | 11/7/2011 | MCO | WELLCARE | |
| 11/9/2011 | P160 | ADOL | 11/7/2011 | PPO | UBH | |
| 11/9/2011 | P325 | ADOL | 11/7/2011 | MCO | CENPATICO | |
| 11/9/2011 | P115 | ADOL | 11/7/2011 | TRICARE | TRICARE | |
| 11/9/2011 | P467 | ADOL | 11/7/2011 | TRICARE | TRICARE | |
| 11/9/2011 | P295 | ADOL | 11/8/2011 | TRICARE | TRICARE | |
| 11/9/2011 | P377 | ADOL | 11/8/2011 | MCO | WELLCARE | |
| 11/9/2011 | P440 | ADOL | 11/9/2011 | MCO | MAGELLAN | |

5

## EXHIBIT "L"

Sample Listing of Patients and Dates Who Defendants' Billing Records Show Were Seen by Dr. Martelli

| DATE | PATIENT NO. | PRO | ADMIT DATE | FIN CLASS | INSURANCE | PATIENT TOTAL |
|------|-------------|-----|------------|-----------|-----------|---------------|
| 11/9/2011 | P124 | ADOL | 11/9/2011 | HMO | BX HMO | 16 |
| | | | | | | |
| 11/10/2011 | P117 | ADOL | 10/28/2011 | BX | BX OF GA | |
| 11/10/2011 | P352 | ADOL | 10/31/2011 | PPO | MERITAIN | |
| 11/10/2011 | P98 | ADOL | 11/2/2011 | BX | FEDERAL | |
| 11/10/2011 | P86 | ADOL | 11/3/2011 | PPO | UBH | |
| 11/10/2011 | P151 | ADOL | 11/5/2011 | MCO | AMERIGROUP | |
| 11/10/2011 | P283 | ADOL | 11/5/2011 | PPO | UBH | |
| 11/10/2011 | P142 | ADOL | 11/7/2011 | MCO | WELLCARE | |
| 11/10/2011 | P160 | ADOL | 11/7/2011 | PPO | UBH | |
| 11/10/2011 | P325 | ADOL | 11/7/2011 | MCO | CENPATICO | |
| 11/10/2011 | P115 | ADOL | 11/7/2011 | TRICARE | TRICARE | |
| 11/10/2011 | P295 | ADOL | 11/8/2011 | TRICARE | TRICARE | |
| 11/10/2011 | P377 | ADOL | 11/8/2011 | MCO | WELLCARE | |
| 11/10/2011 | P440 | ADOL | 11/9/2011 | MCO | MAGELLAN | |
| 11/10/2011 | P124 | ADOL | 11/9/2011 | HMO | BX HMO | |
| 11/10/2011 | P382 | ADOL | 11/10/2011 | PPO | UBH | 15 |
| | | | | | | |
| 11/21/2011 | P115 | ADOL | 11/7/2011 | | TRICARE | |
| 11/21/2011 | P382 | ADOL | 11/10/2011 | | UBH | |
| 11/21/2011 | P113 | ADOL | 11/13/2011 | | UBH | |
| 11/21/2011 | P282 | ADOL | 11/14/2011 | | AMERIGROUP | |
| 11/21/2011 | P430 | ADOL | 11/15/2011 | | CENPATICO | |
| 11/21/2011 | P469 | ADOL | 11/16/2011 | | UBH | |
| 11/21/2011 | P14 | ADOL | 11/16/2011 | | TRICARE | |
| 11/21/2011 | P296 | ADOL | 11/16/2011 | | FIRST HEALTH | |
| 11/21/2011 | P307 | ADOL | 11/16/2011 | | AMERIGROUP | |
| 11/21/2011 | P360 | ADOL | 11/17/2011 | | MAGELLAN | |
| 11/21/2011 | P250 | ADOL | 11/17/2011 | | TRICARE | |
| 11/21/2011 | P182 | ADOL | 11/17/2011 | | CHARITY | |
| 11/21/2011 | P362 | ADOL | 11/17/2011 | | MAGELLAN | |
| 11/21/2011 | P175 | ADOL | 11/18/2011 | | MAGELLAN | |
| 11/21/2011 | P128 | ADOL | 11/20/2011 | | TRICARE | 15 |
| | | | | | | |
| 12/1/2011 | P14 | ADOL | 11/16/2011 | | TRICARE | |
| 12/1/2011 | P128 | ADOL | 11/20/2011 | | TRICARE | |
| 12/1/2011 | P92 | ADOL | 11/21/2011 | | TRICARE | |
| 12/1/2011 | P174 | ADOL | 11/26/2011 | | TRICARE | |
| 12/1/2011 | P417 | ADOL | 11/28/2011 | | AMERIGROUP | |
| 12/1/2011 | P426 | ADOL | 11/28/2011 | | COVENTRY | |
| 12/1/2011 | P85 | ADOL | 11/29/2011 | | BXBS GA | |
| 12/1/2011 | P335 | ADOL | 11/29/2011 | | BXBS GA | |
| 12/1/2011 | P122 | ADOL | 11/30/2011 | | MAGELLAN | |
| 12/1/2011 | P259 | ADOL | 11/30/2011 | | COMMERICAL | |
| 12/1/2011 | P253 | ADOL | 11/30/2011 | | AMERIGROUP | |
| 12/1/2011 | P15 | ADOL | 11/30/2011 | | MAGELLAN | |
| 12/1/2011 | P374 | ADOL | 12/1/2011 | | TRICARE | |
| 12/1/2011 | P448 | ADOL | 12/1/2011 | | CENPATICO | 14 |
| | | | | | | |

6

| | | | EXHIBIT "L" | | | |
|---|---|---|---|---|---|---|
| | | | | | | |

Sample Listing of Patients and Dates Who Defendants' Billing Records Show Were Seen by Dr. Martelli

| DATE | PATIENT NO. | PRO | ADMIT DATE | FIN CLASS | INSURANCE | PATIENT TOTAL |
|---|---|---|---|---|---|---|
| 12/2/2011 | P14 | ADOL | 11/16/2011 | | TRICARE | |
| 12/2/2011 | P128 | ADOL | 11/20/2011 | | TRICARE | |
| 12/2/2011 | P92 | ADOL | 11/21/2011 | | TRICARE | |
| 12/2/2011 | P417 | ADOL | 11/28/2011 | | AMERIGROUP | |
| 12/2/2011 | P426 | ADOL | 11/28/2011 | | COVENTRY | |
| 12/2/2011 | P85 | ADOL | 11/29/2011 | | BXBS GA | |
| 12/2/2011 | P335 | ADOL | 11/29/2011 | | BXBS GA | |
| 12/2/2011 | P122 | ADOL | 11/30/2011 | | MAGELLAN | |
| 12/2/2011 | P259 | ADOL | 11/30/2011 | | BXBS GA | |
| 12/2/2011 | P253 | ADOL | 11/30/2011 | | AMERIGROUP | |
| 12/2/2011 | P15 | ADOL | 11/30/2011 | | MAGELLAN | |
| 12/2/2011 | P374 | ADOL | 12/1/2011 | | TRICARE | |
| 12/2/2011 | P448 | ADOL | 12/1/2011 | | CENPATICO | |
| 12/2/2011 | P414 | ADOL | 12/1/2011 | | AMERIGROUP | |
| 12/2/2011 | P113 | ADOL | 12/1/2011 | | UBH | |
| 12/2/2011 | P287 | ADOL | midnight | | MAGELLAN | 15 |
| | | | | | | |
| 12/5/2011 | P14 | ADOL | 11/16/2011 | | TRICARE | |
| 12/5/2011 | P128 | ADOL | 11/20/2011 | | TRICARE | |
| 12/5/2011 | P92 | ADOL | 11/21/2011 | | TRICARE | |
| 12/5/2011 | P417 | ADOL | 11/28/2011 | | AMERIGROUP | |
| 12/5/2011 | P426 | ADOL | 11/28/2011 | | COVENTRY | |
| 12/5/2011 | P85 | ADOL | 11/29/2011 | | BXBS GA | |
| 12/5/2011 | P335 | ADOL | 11/29/2011 | | BXBS GA | |
| 12/5/2011 | P122 | ADOL | 11/30/2011 | | MAGELLAN | |
| 12/5/2011 | P259 | ADOL | 11/30/2011 | | BXBS GA | |
| 12/5/2011 | P253 | ADOL | 11/30/2011 | | AMERIGROUP | |
| 12/5/2011 | P15 | ADOL | 11/30/2011 | | MAGELLAN | |
| 12/5/2011 | P374 | ADOL | 12/1/2011 | | TRICARE | |
| 12/5/2011 | P448 | ADOL | 12/1/2011 | | CENPATICO | |
| 12/5/2011 | P414 | ADOL | 12/1/2011 | | AMERIGROUP | |
| 12/5/2011 | P113 | ADOL | 12/1/2011 | | UBH | |
| 12/5/2011 | P287 | ADOL | 12/2/2011 | | MAGELLAN | |
| 12/5/2011 | P351 | ADOL | 12/2/2011 | | VALUE OPT | 17 |
| | | | | | | |
| 12/6/2011 | P14 | ADOL | 11/16/2011 | | TRICARE | |
| 12/6/2011 | P92 | ADOL | 11/21/2011 | | TRICARE | |
| 12/6/2011 | P417 | ADOL | 11/28/2011 | | AMERIGROUP | |
| 12/6/2011 | P335 | ADOL | 11/29/2011 | | BXBS GA | |
| 12/6/2011 | P122 | ADOL | 11/30/2011 | | MAGELLAN | |
| 12/6/2011 | P259 | ADOL | 11/30/2011 | | BXBS GA | |
| 12/6/2011 | P253 | ADOL | 11/30/2011 | | AMERIGROUP | |
| 12/6/2011 | P15 | ADOL | 11/30/2011 | | MAGELLAN | |
| 12/6/2011 | P374 | ADOL | 12/1/2011 | | TRICARE | |
| 12/6/2011 | P448 | ADOL | 12/1/2011 | | CENPATICO | |
| 12/6/2011 | P414 | ADOL | 12/1/2011 | | AMERIGROUP | |
| 12/6/2011 | P113 | ADOL | 12/1/2011 | | UBH | |
| 12/6/2011 | P287 | ADOL | 12/2/2011 | | MAGELLAN | |
| 12/6/2011 | P351 | ADOL | 12/2/2011 | | VALUE OPT | 14 |

7

| EXHIBIT "L" | | | | | | |
|---|---|---|---|---|---|---|
| Sample Listing of Patients and Dates Who Defendants' Billing Records Show Were Seen by Dr. Martelli | | | | | | |
| DATE | PATIENT NO. | PRO | ADMIT DATE | FIN CLASS | INSURANCE | PATIENT TOTAL |
| 12/8/2011 | P14 | ADOL | 11/16/2011 | | TRICARE | |
| 12/8/2011 | P92 | ADOL | 11/21/2011 | | TRICARE | |
| 12/8/2011 | P417 | ADOL | 11/28/2011 | | AMERIGROUP | |
| 12/8/2011 | P335 | ADOL | 11/29/2011 | | BXBS GA | |
| 12/8/2011 | P122 | ADOL | 11/30/2011 | | MAGELLAN | |
| 12/8/2011 | P15 | ADOL | 11/30/2011 | | MAGELLAN | |
| 12/8/2011 | P374 | ADOL | 12/1/2011 | | TRICARE | |
| 12/8/2011 | P448 | ADOL | 12/1/2011 | | CENPATICO | |
| 12/8/2011 | P414 | ADOL | 12/1/2011 | | AMERIGROUP | |
| 12/8/2011 | P113 | ADOL | 12/1/2011 | | UBH | |
| 12/8/2011 | P351 | ADOL | 12/2/2011 | | VALUE OPT | |
| 12/8/2011 | P155 | ADOL | 12/7/2011 | | AMERIGROUP | |
| 12/8/2011 | P106 | ADOL | 12/7/2011 | | MAGELLAN | |
| 12/8/2011 | P41 | ADOL | 12/7/2011 | | CARE NETWK/ SA | 14 |
| | | | | | | |
| 12/18/2011 | P417 | ADOL | 11/28/2011 | | AMERIGROUP | |
| 12/18/2011 | P374 | ADOL | 12/1/2011 | | TRICARE | |
| 12/18/2011 | P351 | ADOL | 12/2/2011 | | VALUE OPT | |
| 12/18/2011 | P242 | ADOL | 12/12/2011 | | TRICARE | |
| 12/18/2011 | P75 | ADOL | 12/12/2011 | | UBH | |
| 12/18/2011 | P128 | ADOL | 12/13/2011 | | TRICRE | |
| 12/18/2011 | P170 | ADOL | 12/13/2011 | | AMERIGROUP | |
| 12/18/2011 | P353 | ADOL | 12/13/2011 | | BXBS GA | |
| 12/18/2011 | P25 | ADOL | 12/13/2011 | | FIRST HEALTH | |
| 12/18/2011 | P381 | ADOL | 12/13/2011 | | CENPATICO | |
| 12/18/2011 | P271 | ADOL | 12/14/2011 | | TRICARE | |
| 12/18/2011 | P68 | ADOL | 12/15/2011 | | AMERIGROUP | |
| 12/18/2011 | P373 | ADOL | 12/16/2011 | | TRICARE | 13 |
| | | | | | | |
| 1/4/2012 | P128 | ADOL | 12/13/2011 | | TRICARE | |
| 1/4/2012 | P373 | ADOL | 12/16/2011 | | TRICARE | |
| 1/4/2012 | P154 | ADOL | 12/18/2011 | | TRICARE | |
| 1/4/2012 | P136 | ADOL | 12/26/2011 | | BXBS GA | |
| 1/4/2012 | P412 | ADOL | 12/26/2011 | | TRICARE | |
| 1/4/2012 | P187 | ADOL | 12/26/2011 | | MAGELLAN | |
| 1/4/2012 | P94 | ADOL | 12/27/2011 | | MAGELLAN | |
| 1/4/2012 | P312 | ADOL | 12/28/2011 | | MAGELLAN | |
| 1/4/2012 | P382 | ADOL | 12/28/2011 | | UBH | |
| 1/4/2012 | P346 | ADOL | 12/28/2011 | | MAGELLAN | |
| 1/4/2012 | P208 | ADOL | 12/29/2011 | | AMERIGROUP | |
| 1/4/2012 | P69 | ADOL | 12/29/2011 | | UBH | |
| 1/4/2012 | P274 | ADOL | 12/30/2011 | | BXBS GA | |
| 1/4/2012 | P436 | ADOL | 1/1/2012 | | TRICARE | |
| 1/4/2012 | P378 | ADOL | 1/1/2012 | | TRICRE | |
| 1/4/2012 | P325 | ADOL | 1/3/2012 | | CENPATICO | 16 |
| | | | | | | |
| 2/6/2012 | P154 | ADOL | 12/8/2011 | | TRICARE | |
| 2/6/2012 | P30 | ADOL | 1/26/2012 | | TRICARE | |

8

| | | | | | | |
|---|---|---|---|---|---|---|
|  | **EXHIBIT "L"** |
|  | **Sample Listing of Patients and Dates Who Defendants' Billing Records Show Were Seen by Dr. Martelli** |
| **DATE** | **PATIENT NO.** | **PRO** | **ADMIT DATE** | **FIN CLASS** | **INSURANCE** | **PATIENT TOTAL** |
| 2/6/2012 | P373 | ADOL | 1/28/2012 | | TRICARE | |
| 2/6/2012 | P238 | ADOL | 1/28/2012 | | TRICARE | |
| 2/6/2012 | P308 | ADOL | 1/28/2012 | | CIGNA | |
| 2/6/2012 | P275 | ADOL | 1/31/2012 | | AMERIGROUP | |
| 2/6/2012 | P149 | ADOL | 1/31/2012 | | BXBS GA | |
| 2/6/2012 | P265 | ADOL | 2/1/2012 | | MAGELLAN | |
| 2/6/2012 | P138 | ADOL | 2/1/2012 | | AMERIGROUP | |
| 2/6/2012 | P370 | ADOL | 2/2/2012 | | BXBS FEDERAL | |
| 2/6/2012 | P250 | ADOL | 2/2/2012 | | TRICARE | |
| 2/6/2012 | P156 | ADOL | 2/2/2012 | | BXBS GA | |
| 2/6/2012 | P235 | ADOL | 2/2/2012 | | AMERIGROUP | |
| 2/6/2012 | P8 | ADOL | 2/3/2012 | | MAGELLAN | |
| 2/6/2012 | P303 | ADOL | 2/4/2012 | | UBH | |
| 2/6/2012 | P39 | ADOL | 2/5/2012 | | UBH | 16 |
| | | | | | | |
| 2/14/2012 | P373 | ADOL | 1/28/2012 | | TRICARE | |
| 2/14/2012 | P91 | ADOL | 2/6/2012 | | TRICARE | |
| 2/14/2012 | P18 | ADOL | 2/6/2012 | | AMERIGROUP | |
| 2/14/2012 | P404 | ADOL | 2/6/2012 | | HEALTHGRAM | |
| 2/14/2012 | P159 | ADOL | 2/8/2012 | | TRICARE | |
| 2/14/2012 | P436 | ADOL | 2/8/2012 | | TRICARE | |
| 2/14/2012 | P332 | ADOL | 2/9/2012 | | UBH | |
| 2/14/2012 | P454 | ADOL | 2/10/2012 | | TRICARE | |
| 2/14/2012 | P212 | ADOL | 2/10/2012 | | PRIVATE HEALTHCARE | |
| 2/14/2012 | P116 | ADOL | 2/11/2012 | | MAGELLAN | |
| 2/14/2012 | P112 | ADOL | 2/11/2012 | | BXBS GA | |
| 2/14/2012 | P418 | ADOL | 2/11/2012 | | TRICARE | |
| 2/14/2012 | P232 | ADOL | 2/12/2012 | | TRICARE | |
| 2/14/2012 | P70 | ADOL | 2/13/2012 | | TRICARE | 14 |
| | | | | | | |
| 2/15/2012 | P373 | ADOL | 1/28/2012 | | TRICARE | |
| 2/15/2012 | P91 | ADOL | 2/6/2012 | | TRICARE | |
| 2/15/2012 | P18 | ADOL | 2/6/2012 | | AMERIGROUP | |
| 2/15/2012 | P404 | ADOL | 2/6/2012 | | HEALTHGRAM | |
| 2/15/2012 | P436 | ADOL | 2/8/2012 | | TRICARE | |
| 2/15/2012 | P332 | ADOL | 2/9/2012 | | UBH | |
| 2/15/2012 | P454 | ADOL | 2/10/2012 | | TRICARE | |
| 2/15/2012 | P212 | ADOL | 2/10/2012 | | PRIVATE HEALTHCARE | |
| 2/15/2012 | P116 | ADOL | 2/11/2012 | | MAGELLAN | |
| 2/15/2012 | P112 | ADOL | 2/11/2012 | | BXBS GA | |
| 2/15/2012 | P418 | ADOL | 2/11/2012 | | TRICARE | |
| 2/15/2012 | P232 | ADOL | 2/12/2012 | | TRICARE | |
| 2/15/2012 | P70 | ADOL | 2/13/2012 | | TRICARE | |
| 2/15/2012 | P421 | ADOL | 2/14/2012 | | FIRST HEALTH | |
| 2/15/2012 | P185 | ADOL | 2/14/2012 | | UBH | 15 |
| | | | | | | |
| 2/17/2012 | P373 | ADOL | 1/28/2012 | | TRICARE | |
| 2/17/2012 | P404 | ADOL | 2/6/2012 | | HEALTHGRAM | |
| 2/17/2012 | P436 | ADOL | 2/8/2012 | | TRICARE | |

9

| | EXHIBIT "L" | | | | | |
|---|---|---|---|---|---|---|
| Sample Listing of Patients and Dates Who Defendants' Billing Records Show Were Seen by Dr. Martelli | | | | | | |
| **DATE** | **PATIENT NO.** | **PRO** | **ADMIT DATE** | **FIN CLASS** | **INSURANCE** | **PATIENT TOTAL** |
| 2/17/2012 | P454 | ADOL | 2/10/2012 | | TRICARE | |
| 2/17/2012 | P212 | ADOL | 2/10/2012 | | PRIVATE HEALTHCARE | |
| 2/17/2012 | P116 | ADOL | 2/11/2012 | | MAGELLAN | |
| 2/17/2012 | P418 | ADOL | 2/11/2012 | | TRICARE | |
| 2/17/2012 | P232 | ADOL | 2/12/2012 | | TRICARE | |
| 2/17/2012 | P70 | ADOL | 2/13/2012 | | TRICARE | |
| 2/17/2012 | P421 | ADOL | 2/14/2012 | | FIRST HEALTH | |
| 2/17/2012 | P185 | ADOL | 2/14/2012 | | UBH | |
| 2/17/2012 | P249 | ADOL | 2/15/2012 | | TRICARE | |
| 2/17/2012 | P400 | ADOL | 2/15/2012 | | TRICARE | |
| 2/17/2012 | P227 | ADOL | 2/15/2012 | | MAGELLAN | |
| 2/17/2012 | P308 | ADOL | 2/15/2012 | | CIGNA | |
| 2/17/2012 | P183 | ADOL | 2/16/2012 | | TRICARE | |
| 2/17/2012 | P374 | ADOL | 2/16/2012 | | TRICARE | 17 |
| | | | | | | |
| 2/20/2012 | P373 | ADOL | 1/28/2012 | | TRICARE | |
| 2/20/2012 | P436 | ADOL | 2/8/2012 | | TRICARE | |
| 2/20/2012 | P454 | ADOL | 2/10/2012 | | TRICARE | |
| 2/20/2012 | P212 | ADOL | 2/10/2012 | | PRIVATE HEALTHCARE | |
| 2/20/2012 | P232 | ADOL | 2/12/2012 | | TRICARE | |
| 2/20/2012 | P70 | ADOL | 2/13/2012 | | TRICARE | |
| 2/20/2012 | P421 | ADOL | 2/14/2012 | | FIRST HEALTH | |
| 2/20/2012 | P185 | ADOL | 2/14/2012 | | UBH | |
| 2/20/2012 | P249 | ADOL | 2/15/2012 | | TRICARE | |
| 2/20/2012 | P400 | ADOL | 2/15/2012 | | TRICARE | |
| 2/20/2012 | P227 | ADOL | 2/15/2012 | | MAGELLAN | |
| 2/20/2012 | P308 | ADOL | 2/15/2012 | | CIGNA | |
| 2/20/2012 | P183 | ADOL | 2/16/2012 | | TRICARE | |
| 2/20/2012 | P374 | ADOL | 2/16/2012 | | TRICARE | |
| 2/20/2012 | P245 | ADOL | 2/17/2012 | | TRICARE | |
| 2/20/2012 | P164 | ADOL | 2/18/2012 | | TRICARE | |
| 2/20/2012 | P194 | ADOL | 2/20/2012 | | TRICARE | |
| 2/20/2012 | P315 | ADOL | 2/20/2012 | | AMERIGROUP | |
| 2/20/2012 | P151 | ADOL | 2/20/2012 | | AMERIGROUP | 19 |
| | | | | | | |
| 2/23/2012 | P373 | ADOL | 1/28/2012 | | TRICARE | |
| 2/23/2012 | P436 | ADOL | 2/8/2012 | | TRICARE | |
| 2/23/2012 | P454 | ADOL | 2/10/2012 | | TRICARE | |
| 2/23/2012 | P232 | ADOL | 2/12/2012 | | TRICARE | |
| 2/23/2012 | P70 | ADOL | 2/13/2012 | | TRICARE | |
| 2/23/2012 | P249 | ADOL | 2/15/2012 | | TRICARE | |
| 2/23/2012 | P400 | ADOL | 2/15/2012 | | TRICARE | |
| 2/23/2012 | P227 | ADOL | 2/15/2012 | | MAGELLAN | |
| 2/23/2012 | P183 | ADOL | 2/16/2012 | | TRICARE | |
| 2/23/2012 | P374 | ADOL | 2/16/2012 | | TRICARE | |
| 2/23/2012 | P245 | ADOL | 2/17/2012 | | TRICARE | |
| 2/23/2012 | P164 | ADOL | 2/18/2012 | | TRICARE | |
| 2/23/2012 | P194 | ADOL | 2/20/2012 | | TRICARE | |
| 2/23/2012 | P315 | ADOL | 2/20/2012 | | AMERIGROUP | |

10

| | | | | EXHIBIT "L" | | |
|---|---|---|---|---|---|---|
| Sample Listing of Patients and Dates Who Defendants' Billing Records Show Were Seen by Dr. Martelli | | | | | | |
| DATE | PATIENT NO. | PRO | ADMIT DATE | FIN CLASS | INSURANCE | PATIENT TOTAL |
| 2/23/2012 | P151 | ADOL | 2/20/2012 | | AMERIGROUP | |
| 2/23/2012 | P131 | ADOL | 2/20/2012 | | MAGELLAN | |
| 2/23/2012 | P139 | ADOL | 2/21/2012 | | BXBS GA | |
| 2/23/2012 | P397 | ADOL | 2/21/2012 | | FIRST HEALTH | 18 |
| 2/24/2012 | P373 | ADOL | 1/28/2012 | | TRICARE | |
| 2/24/2012 | P436 | ADOL | 2/8/2012 | | TRICARE | |
| 2/24/2012 | P454 | ADOL | 2/10/2012 | | TRICARE | |
| 2/24/2012 | P232 | ADOL | 2/12/2012 | | TRICARE | |
| 2/24/2012 | P249 | ADOL | 2/15/2012 | | TRICARE | |
| 2/24/2012 | P227 | ADOL | 2/15/2012 | | MAGELLAN | |
| 2/24/2012 | P183 | ADOL | 2/16/2012 | | TRICARE | |
| 2/24/2012 | P245 | ADOL | 2/17/2012 | | TRICARE | |
| 2/24/2012 | P164 | ADOL | 2/18/2012 | | TRICARE | |
| 2/24/2012 | P194 | ADOL | 2/20/2012 | | TRICARE | |
| 2/24/2012 | P315 | ADOL | 2/20/2012 | | AMERIGROUP | |
| 2/24/2012 | P151 | ADOL | 2/20/2012 | | AMERIGROUP | |
| 2/24/2012 | P131 | ADOL | 2/20/2012 | | MAGELLAN | |
| 2/24/2012 | P139 | ADOL | 2/21/2012 | | BXBS GA | |
| 2/24/2012 | P397 | ADOL | 2/21/2012 | | FIRST HEALTH | 15 |
| 2/28/2012 | P373 | ADOL | 1/28/2012 | | TRICARE | |
| 2/28/2012 | P164 | ADOL | 2/18/2012 | | TRICARE | |
| 2/28/2012 | P194 | ADOL | 2/20/2012 | | TRICARE | |
| 2/28/2012 | P315 | ADOL | 2/20/2012 | | AMERIGROUP | |
| 2/28/2012 | P151 | ADOL | 2/20/2012 | | AMERIGROUP | |
| 2/28/2012 | P131 | ADOL | 2/20/2012 | | MAGELLAN | |
| 2/28/2012 | P139 | ADOL | 2/21/2012 | | BXBS GA | |
| 2/28/2012 | P397 | ADOL | 2/21/2012 | | FIRST HEALTH | |
| 2/28/2012 | P127 | ADOL | 2/24/2012 | | MAGELLAN | |
| 2/28/2012 | P171 | ADOL | 2/24/2012 | | AMERIGROUP | |
| 2/28/2012 | P419 | ADOL | 2/25/2012 | | TRICARE | |
| 2/28/2012 | P236 | ADOL | 2/25/2012 | | AMERIGROUP | |
| 2/28/2012 | P186 | ADOL | 2/26/2012 | | TRICARE | |
| 2/28/2012 | P308 | ADOL | 2/27/2012 | | CIGNA | |
| 2/28/2012 | P16 | ADOL | 2/27/2012 | | TRICARE | |
| 2/28/2012 | P255 | ADOL | 2/28/2012 | | BXBS FEDERAL | 16 |
| 3/5/2012 | P131 | ADOL | 2/20/2012 | | MAGELLAN | |
| 3/5/2012 | P139 | ADOL | 2/21/2012 | | BXBS GA | |
| 3/5/2012 | P127 | ADOL | 2/24/2012 | | MAGELLAN | |
| 3/5/2012 | P171 | ADOL | 2/24/2012 | | AMERIGROUP | |
| 3/5/2012 | P236 | ADOL | 2/25/2012 | | AMERIGROUP | |
| 3/5/2012 | P308 | ADOL | 2/27/2012 | | CIGNA | |
| 3/5/2012 | P16 | ADOL | 2/27/2012 | | TRICARE | |
| 3/5/2012 | P255 | ADOL | 2/28/2012 | | BXBS FEDERAL | |
| 3/5/2012 | P270 | ADOL | 2/28/2012 | | MAGELLAN | |
| 3/5/2012 | P101 | ADOL | 2/28/2012 | | UBH | |
| 3/5/2012 | P159 | ADOL | 2/28/2012 | | TRICARE | |

11

## EXHIBIT "L"

Sample Listing of Patients and Dates Who Defendants' Billing Records Show Were Seen by Dr. Martelli

| DATE | PATIENT NO. | PRO | ADMIT DATE | FIN CLASS | INSURANCE | PATIENT TOTAL |
|------|-------------|-----|------------|-----------|-----------|---------------|
| 3/5/2012 | P184 | ADOL | 2/29/2012 | | AMERIGROUP | |
| 3/5/2012 | P83 | ADOL | 2/29/2012 | | INDUSTRY BUYING GRP | |
| 3/5/2012 | P99 | ADOL | 2/29/2012 | | UBH | |
| 3/5/2012 | P58 | ADOL | 2/29/2012 | | MAGELLAN | |
| 3/5/2012 | P191 | ADOL | 2/29/2012 | | CIGNA | 16 |
| 3/6/2012 | P139 | ADOL | 2/21/2012 | | BXBS GA | |
| 3/6/2012 | P127 | ADOL | 2/24/2012 | | MAGELLAN | |
| 3/6/2012 | P171 | ADOL | 2/24/2012 | | AMERIGROUP | |
| 3/6/2012 | P236 | ADOL | 2/25/2012 | | AMERIGROUP | |
| 3/6/2012 | P308 | ADOL | 2/27/2012 | | CIGNA | |
| 3/6/2012 | P16 | ADOL | 2/27/2012 | | TRICARE | |
| 3/6/2012 | P255 | ADOL | 2/28/2012 | | BXBS FEDERAL | |
| 3/6/2012 | P270 | ADOL | 2/28/2012 | | MAGELLAN | |
| 3/6/2012 | P101 | ADOL | 2/28/2012 | | UBH | |
| 3/6/2012 | P159 | ADOL | 2/28/2012 | | TRICARE | |
| 3/6/2012 | P184 | ADOL | 2/29/2012 | | AMERIGROUP | |
| 3/6/2012 | P83 | ADOL | 2/29/2012 | | INDUSTRY BUYING GRP | |
| 3/6/2012 | P99 | ADOL | 2/29/2012 | | UBH | |
| 3/6/2012 | P58 | ADOL | 2/29/2012 | | MAGELLAN | |
| 3/6/2012 | P191 | ADOL | 2/29/2012 | | CIGNA | |
| 3/6/2012 | P281 | ADOL | 3/5/2012 | | MAGELLAN | 16 |
| 3/8/2012 | P270 | ADOL | 2/28/2012 | | MAGELLAN | |
| 3/8/2012 | P159 | ADOL | 2/28/2012 | | TRICARE | |
| 3/8/2012 | P184 | ADOL | 2/29/2012 | | AMERIGROUP | |
| 3/8/2012 | P83 | ADOL | 2/29/2012 | | INDUSTRY BUYING GRP | |
| 3/8/2012 | P99 | ADOL | 2/29/2012 | | UBH | |
| 3/8/2012 | P80 | ADOL | 3/1/2012 | | TRICARE | |
| 3/8/2012 | P402 | ADOL | 3/1/2012 | | UBH | |
| 3/8/2012 | P121 | ADOL | 3/1/2012 | | AETNA | |
| 3/8/2012 | P438 | ADOL | 3/1/2012 | | TRICARE | |
| 3/8/2012 | P235 | ADOL | 3/2/2012 | | AMERIGROUP | |
| 3/8/2012 | P191 | ADOL | 3/3/2012 | | CIGNA | |
| 3/8/2012 | P281 | ADOL | 3/5/2012 | | MAGELLAN | |
| 3/8/2012 | P92 | ADOL | 3/6/2012 | | TRICARE | |
| 3/8/2012 | P195 | ADOL | 3/6/2012 | | HMO/PPO | |
| 3/8/2012 | P73 | ADOL | 3/7/2012 | | MAGELLAN | |
| 3/8/2012 | P57 | ADOL | 3/7/2012 | | BEECHSTREET | |
| 3/8/2012 | P394 | ADOL | 3/7/2012 | | UBH | |
| 3/8/2012 | P132 | ADOL | 3/8/2012 | | BXBS GA | |
| 3/8/2012 | P140 | ADOL | 3/8/2012 | | COMMERCIAL INS | |
| 3/8/2012 | P248 | ADOL | 3/8/2012 | | MAGELLAN | |
| 3/8/2012 | P218 | ADOL | 3/8/2012 | | AMERIGROUP | |
| 3/8/2012 | P189 | ADOL | 3/8/2012 | | MAGELLAN | |
| 3/8/2012 | P339 | ADOL | 3/8/2012 | | MAGELLAN | 23 |
| 3/18/2012 | P402 | ADOL | 3/1/2012 | | UBH | |
| 3/18/2012 | P235 | ADOL | 3/2/2012 | | AMERIGROUP | |

12

| | | | EXHIBIT "L" | | | |
|---|---|---|---|---|---|---|
| Sample Listing of Patients and Dates Who Defendants' Billing Records Show Were Seen by Dr. Martelli | | | | | | |
| DATE | PATIENT NO. | PRO | ADMIT DATE | FIN CLASS | INSURANCE | PATIENT TOTAL |
| 3/18/2012 | P92 | ADOL | 3/6/2012 | | TRICARE | |
| 3/18/2012 | P394 | ADOL | 3/7/2012 | | UBH | |
| 3/18/2012 | P339 | ADOL | 3/8/2012 | | AMERIGROUP | |
| 3/18/2012 | P347 | ADOL | 3/9/2012 | | MAGELLAN | |
| 3/18/2012 | P329 | ADOL | 3/10/2012 | | MAGELLAN | |
| 3/18/2012 | P459 | ADOL | 3/11/2012 | | AMERIGROUP | |
| 3/18/2012 | P302 | ADOL | 3/12/2012 | | HMO/PPO | |
| 3/18/2012 | P370 | ADOL | 3/12/2012 | | BXBS FEDERAL | |
| 3/18/2012 | P317 | ADOL | 3/13/2012 | | MAGELLAN | |
| 3/18/2012 | P445 | ADOL | 3/14/2012 | | TRICARE | |
| 3/18/2012 | P232 | ADOL | 3/14/2012 | | TRICARE | |
| 3/18/2012 | P168 | ADOL | 3/14/2012 | | AETNA | |
| 3/18/2012 | P16 | ADOL | 3/14/2012 | | TRICARE | |
| 3/18/2012 | P300 | ADOL | 3/14/2012 | | AMERIGROUP | |
| 3/18/2012 | P60 | ADOL | 3/14/2012 | | TRICARE | |
| 3/18/2012 | P428 | ADOL | 3/14/2012 | | CIGNA | |
| 3/18/2012 | P354 | ADOL | 3/16/2012 | | MAGELLAN | |
| 3/18/2012 | P257 | ADOL | 3/17/2012 | | BXBS GA | |
| 3/18/2012 | P207 | ADOL | 3/17/2012 | | CIGNA | |
| 3/18/2012 | P40 | ADOL | 3/18/2012 | | BXBS GA | |
| 3/18/2012 | P62 | ADOL | 3/18/2012 | | TRICARE | 23 |
| | | | | | | |
| 3/22/2012 | P92 | ADOL | 3/6/2012 | | TRICARE | |
| 3/22/2012 | P394 | ADOL | 3/7/2012 | | UBH | |
| 3/22/2012 | P347 | ADOL | 3/9/2012 | | MAGELLAN | |
| 3/22/2012 | P329 | ADOL | 3/10/2012 | | MAGELLAN | |
| 3/22/2012 | P459 | ADOL | 3/11/2012 | | AMERIGROUP | |
| 3/22/2012 | P445 | ADOL | 3/14/2012 | | TRICARE | |
| 3/22/2012 | P232 | ADOL | 3/14/2012 | | TRICARE | |
| 3/22/2012 | P168 | ADOL | 3/14/2012 | | AETNA | |
| 3/22/2012 | P16 | ADOL | 3/14/2012 | | TRICARE | |
| 3/22/2012 | P60 | ADOL | 3/14/2012 | | TRICARE | |
| 3/22/2012 | P257 | ADOL | 3/17/2012 | | BXBS GA | |
| 3/22/2012 | P207 | ADOL | 3/17/2012 | | CIGNA | |
| 3/22/2012 | P62 | ADOL | 3/18/2012 | | TRICARE | |
| 3/22/2012 | P342 | ADOL | 3/19/2012 | | TRICARE | |
| 3/22/2012 | P271 | ADOL | 3/19/2012 | | TRICARE | |
| 3/22/2012 | P318 | ADOL | 3/20/2012 | | MAGELLAN | |
| 3/22/2012 | P425 | ADOL | 3/20/2012 | | TRICARE | |
| 3/22/2012 | P278 | ADOL | 3/20/2012 | | MAGELLAN | |
| 3/22/2012 | P462 | ADOL | 3/21/2012 | | BXBS GA | |
| 3/22/2012 | P383 | ADOL | 3/21/2012 | | CIGNA | |
| 3/22/2012 | P461 | ADOL | 3/21/2012 | | CENPATICO | |
| 3/22/2012 | P120 | ADOL | 3/22/2012 | | CENPATICO | |
| 3/22/2012 | P150 | ADOL | 3/22/2012 | | CENPATICO | |
| 3/22/2012 | P456 | ADOL | 3/22/2012 | | MAGELLAN | 24 |
| | | | | | | |
| 3/28/2012 | P92 | ADOL | 3/6/2012 | | TRICARE | |
| 3/28/2012 | P347 | ADOL | 3/9/2012 | | MAGELLAN | |

13

| EXHIBIT "L" | | | | | | |
|---|---|---|---|---|---|---|
| Sample Listing of Patients and Dates Who Defendants' Billing Records Show Were Seen by Dr. Martelli | | | | | | |
| DATE | PATIENT NO. | PRO | ADMIT DATE | FIN CLASS | INSURANCE | PATIENT TOTAL |
| 3/28/2012 | P459 | ADOL | 3/11/2012 | | AMERIGROUP | |
| 3/28/2012 | P445 | ADOL | 3/14/2012 | | TRICARE | |
| 3/28/2012 | P168 | ADOL | 3/14/2012 | | AETNA | |
| 3/28/2012 | P60 | ADOL | 3/14/2012 | | TRICARE | |
| 3/28/2012 | P257 | ADOL | 3/17/2012 | | BXBS GA | |
| 3/28/2012 | P62 | ADOL | 3/18/2012 | | TRICARE | |
| 3/28/2012 | P383 | ADOL | 3/21/2012 | | CIGNA | |
| 3/28/2012 | P120 | ADOL | 3/22/2012 | | CENPATICO | |
| 3/28/2012 | P150 | ADOL | 3/22/2012 | | CENPATICO | |
| 3/28/2012 | P456 | ADOL | 3/22/2012 | | MAGELLAN | |
| 3/28/2012 | P389 | ADOL | 3/24/2012 | | UBH | |
| 3/28/2012 | P249 | ADOL | 3/27/2012 | | TRICARE | |
| 3/28/2012 | P198 | ADOL | 3/28/2012 | | MEDICAID GA | |
| 3/28/2012 | P464 | ADOL | 3/28/2012 | | MEMORIAL HEALTH | |
| 3/28/2012 | P181 | ADOL | 3/28/2012 | | TRICARE | |
| 3/28/2012 | P234 | ADOL | 3/28/2012 | | UBH | 18 |
| | | | | | | |
| 3/30/2012 | P92 | ADOL | 3/6/2012 | | TRICARE | |
| 3/30/2012 | P347 | ADOL | 3/9/2012 | | MAGELLAN | |
| 3/30/2012 | P445 | ADOL | 3/14/2012 | | TRICARE | |
| 3/30/2012 | P168 | ADOL | 3/14/2012 | | AETNA | |
| 3/30/2012 | P60 | ADOL | 3/14/2012 | | TRICARE | |
| 3/30/2012 | P62 | ADOL | 3/18/2012 | | TRICARE | |
| 3/30/2012 | P383 | ADOL | 3/21/2012 | | CIGNA | |
| 3/30/2012 | P120 | ADOL | 3/22/2012 | | CENPATICO | |
| 3/30/2012 | P456 | ADOL | 3/22/2012 | | MAGELLAN | |
| 3/30/2012 | P389 | ADOL | 3/24/2012 | | UBH | |
| 3/30/2012 | P249 | ADOL | 3/27/2012 | | TRICARE | |
| 3/30/2012 | P198 | ADOL | 3/28/2012 | | MEDICAID GA | |
| 3/30/2012 | P464 | ADOL | 3/28/2012 | | MEMORIAL HEALTH | |
| 3/30/2012 | P181 | ADOL | 3/28/2012 | | TRICARE | |
| 3/30/2012 | P234 | ADOL | 3/28/2012 | | UBH | |
| 3/30/2012 | P364 | ADOL | 3/30/2012 | | MAGELLAN | 16 |
| | | | | | | |
| 4/3/2012 | P92 | ADOL | 3/6/2012 | | TRICARE | |
| 4/3/2012 | P347 | ADOL | 3/9/2012 | | MAGELLAN | |
| 4/3/2012 | P445 | ADOL | 3/14/2012 | | TRICARE | |
| 4/3/2012 | P60 | ADOL | 3/14/2012 | | TRICARE | |
| 4/3/2012 | P383 | ADOL | 3/21/2012 | | CIGNA | |
| 4/3/2012 | P120 | ADOL | 3/22/2012 | | CENPATICO | |
| 4/3/2012 | P456 | ADOL | 3/22/2012 | | MAGELLAN | |
| 4/3/2012 | P389 | ADOL | 3/24/2012 | | UBH | |
| 4/3/2012 | P249 | ADOL | 3/27/2012 | | TRICARE | |
| 4/3/2012 | P198 | ADOL | 3/28/2012 | | MEDICAID GA | |
| 4/3/2012 | P464 | ADOL | 3/28/2012 | | MEMORIAL HEALTH | |
| 4/3/2012 | P181 | ADOL | 3/28/2012 | | TRICARE | |
| 4/3/2012 | P234 | ADOL | 3/28/2012 | | UBH | |
| 4/3/2012 | P364 | ADOL | 3/30/2012 | | MAGELLAN | |
| 4/3/2012 | P337 | ADOL | 3/30/2012 | | UBH | |

14

## EXHIBIT "L"

Sample Listing of Patients and Dates Who Defendants' Billing Records Show Were Seen by Dr. Martelli

| DATE | PATIENT NO. | PRO | ADMIT DATE | FIN CLASS | INSURANCE | PATIENT TOTAL |
|------|-------------|-----|------------|-----------|-----------|---------------|
| 4/3/2012 | P242 | ADOL | 3/30/2012 | | TRICARE | |
| 4/3/2012 | P435 | ADOL | 3/30/2012 | | MAGELLAN | |
| 4/3/2012 | P231 | ADOL | 3/31/2012 | | FIRST HEALTH | |
| 4/3/2012 | P256 | ADOL | 4/2/2012 | | AMERIGROUP | |
| 4/3/2012 | P465 | ADOL | 4/2/2012 | | BBS GA | |
| 4/3/2012 | P380 | ADOL | 4/3/2012 | | TRICARE | |
| 4/3/2012 | P261 | ADOL | 4/4/2012 | | TRICARE | 22 |
| | | | | | | |
| 4/4/2012 | P92 | ADOL | 3/6/2012 | | TRICARE | |
| 4/4/2012 | P347 | ADOL | 3/9/2012 | | MAGELLAN | |
| 4/4/2012 | P445 | ADOL | 3/14/2012 | | TRICARE | |
| 4/4/2012 | P60 | ADOL | 3/14/2012 | | TRICARE | |
| 4/4/2012 | P383 | ADOL | 3/21/2012 | | CIGNA | |
| 4/4/2012 | P120 | ADOL | 3/22/2012 | | CENPATICO | |
| 4/4/2012 | P456 | ADOL | 3/22/2012 | | MAGELLAN | |
| 4/4/2012 | P389 | ADOL | 3/24/2012 | | UBH | |
| 4/4/2012 | P249 | ADOL | 3/27/2012 | | TRICARE | |
| 4/4/2012 | P198 | ADOL | 3/28/2012 | | MEDICAID GA | |
| 4/4/2012 | P464 | ADOL | 3/28/2012 | | MEMORIAL HEALTH | |
| 4/4/2012 | P181 | ADOL | 3/28/2012 | | TRICARE | |
| 4/4/2012 | P234 | ADOL | 3/28/2012 | | UBH | |
| 4/4/2012 | P364 | ADOL | 3/30/2012 | | MAGELLAN | |
| 4/4/2012 | P337 | ADOL | 3/30/2012 | | UBH | |
| 4/4/2012 | P242 | ADOL | 3/30/2012 | | TRICARE | |
| 4/4/2012 | P435 | ADOL | 3/30/2012 | | MAGELLAN | |
| 4/4/2012 | P231 | ADOL | 3/31/2012 | | FIRST HEALTH | |
| 4/4/2012 | P256 | ADOL | 4/2/2012 | | AMERIGROUP | |
| 4/4/2012 | P465 | ADOL | 4/2/2012 | | BBS GA | |
| 4/4/2012 | P380 | ADOL | 4/3/2012 | | TRICARE | |
| 4/4/2012 | P261 | ADOL | 4/4/2012 | | TRICARE | |
| 4/4/2012 | P20 | ADOL | 4/4/2012 | | VALUE OPT | |
| 4/4/2012 | P369 | ADOL | 4/4/2012 | | BXBS GA | |
| 4/4/2012 | P82 | ADOL | 4/4/2012 | | UBH | |
| 4/4/2012 | P276 | ADOL | 4/4/2012 | | MEDICAID GA | |
| 4/4/2012 | P56 | ADOL | 4/4/2012 | | MAGELLAN | 27 |
| | | | | | | |
| 4/5/2012 | P92 | ADOL | 3/6/2012 | | TRICARE | |
| 4/5/2012 | P347 | ADOL | 3/9/2012 | | MAGELLAN | |
| 4/5/2012 | P445 | ADOL | 3/14/2012 | | TRICARE | |
| 4/5/2012 | P60 | ADOL | 3/14/2012 | | TRICARE | |
| 4/5/2012 | P383 | ADOL | 3/21/2012 | | CIGNA | |
| 4/5/2012 | P120 | ADOL | 3/22/2012 | | CENPATICO | |
| 4/5/2012 | P456 | ADOL | 3/22/2012 | | MAGELLAN | |
| 4/5/2012 | P389 | ADOL | 3/24/2012 | | UBH | |
| 4/5/2012 | P249 | ADOL | 3/27/2012 | | TRICARE | |
| 4/5/2012 | P198 | ADOL | 3/28/2012 | | MEDICAID GA | |
| 4/5/2012 | P464 | ADOL | 3/28/2012 | | MEMORIAL HEALTH | |
| 4/5/2012 | P181 | ADOL | 3/28/2012 | | TRICARE | |
| 4/5/2012 | P234 | ADOL | 3/28/2012 | | UBH | |

15

| EXHIBIT "L" | | | | | | |
|---|---|---|---|---|---|---|
| Sample Listing of Patients and Dates Who Defendants' Billing Records Show Were Seen by Dr. Martelli | | | | | | |
| DATE | PATIENT NO. | PRO | ADMIT DATE | FIN CLASS | INSURANCE | PATIENT TOTAL |
| 4/5/2012 | P364 | ADOL | 3/30/2012 | | MAGELLAN | |
| 4/5/2012 | P337 | ADOL | 3/30/2012 | | UBH | |
| 4/5/2012 | P242 | ADOL | 3/30/2012 | | TRICARE | |
| 4/5/2012 | P435 | ADOL | 3/30/2012 | | MAGELLAN | |
| 4/5/2012 | P231 | ADOL | 3/31/2012 | | FIRST HEALTH | |
| 4/5/2012 | P256 | ADOL | 4/2/2012 | | AMERIGROUP | |
| 4/5/2012 | P465 | ADOL | 4/2/2012 | | BBS GA | |
| 4/5/2012 | P380 | ADOL | 4/3/2012 | | TRICARE | |
| 4/5/2012 | P261 | ADOL | 4/4/2012 | | TRICARE | |
| 4/5/2012 | P20 | ADOL | 4/4/2012 | | VALUE OPT | |
| 4/5/2012 | P369 | ADOL | 4/4/2012 | | BXBS GA | |
| 4/5/2012 | P82 | ADOL | 4/4/2012 | | UBH | |
| 4/5/2012 | P276 | ADOL | 4/4/2012 | | MEDICAID GA | |
| 4/5/2012 | P56 | ADOL | 4/4/2012 | | MAGELLAN | |
| 4/5/2012 | P179 | ADOL | 4/5/2012 | | CARE NETWORK | 28 |
| | | | | | | |
| 4/9/2012 | P92 | ADOL | 3/6/2012 | | TRICARE | |
| 4/9/2012 | P347 | ADOL | 3/9/2012 | | MAGELLAN | |
| 4/9/2012 | P445 | ADOL | 3/14/2012 | | TRICARE | |
| 4/9/2012 | P120 | ADOL | 3/22/2012 | | CENPATICO | |
| 4/9/2012 | P456 | ADOL | 3/22/2012 | | MAGELLAN | |
| 4/9/2012 | P249 | ADOL | 3/27/2012 | | TRICARE | |
| 4/9/2012 | P198 | ADOL | 3/28/2012 | | MEDICAID GA | |
| 4/9/2012 | P181 | ADOL | 3/28/2012 | | TRICARE | |
| 4/9/2012 | P337 | ADOL | 3/30/2012 | | UBH | |
| 4/9/2012 | P242 | ADOL | 3/30/2012 | | TRICARE | |
| 4/9/2012 | P435 | ADOL | 3/30/2012 | | MAGELLAN | |
| 4/9/2012 | P256 | ADOL | 4/2/2012 | | AMERIGROUP | |
| 4/9/2012 | P465 | ADOL | 4/2/2012 | | BBS GA | |
| 4/9/2012 | P380 | ADOL | 4/3/2012 | | TRICARE | |
| 4/9/2012 | P261 | ADOL | 4/4/2012 | | TRICARE | |
| 4/9/2012 | P369 | ADOL | 4/4/2012 | | BXBS GA | |
| 4/9/2012 | P82 | ADOL | 4/4/2012 | | UBH | |
| 4/9/2012 | P276 | ADOL | 4/4/2012 | | MEDICAID GA | |
| 4/9/2012 | P56 | ADOL | 4/4/2012 | | MAGELLAN | |
| 4/9/2012 | P179 | ADOL | 4/5/2012 | | CARE NETWORK | |
| 4/9/2012 | P219 | ADOL | 4/6/2012 | | UBH | |
| 4/9/2012 | P145 | ADOL | 4/9/2012 | | HMO/PPO NEGOTIATED | |
| 4/9/2012 | P463 | ADOL | 4/9/2012 | | MAGELLAN | |
| 4/9/2012 | P138 | ADOL | 4/10/2012 | | AMERIGROUP | |
| 4/9/2012 | P293 | ADOL | 4/10/2012 | | AMERIGROUP | 25 |
| | | | | | | |
| 4/12/2012 | P92 | ADOL | 3/6/2012 | | TRICARE | |
| 4/12/2012 | P347 | ADOL | 3/9/2012 | | MAGELLAN | |
| 4/12/2012 | P445 | ADOL | 3/14/2012 | | TRICARE | |
| 4/12/2012 | P456 | ADOL | 3/22/2012 | | MAGELLAN | |
| 4/12/2012 | P198 | ADOL | 3/28/2012 | | MEDICAID GA | |
| 4/12/2012 | P181 | ADOL | 3/28/2012 | | TRICARE | |
| 4/12/2012 | P242 | ADOL | 3/30/2012 | | TRICARE | |

16

| | | | | EXHIBIT "L" | | |
|---|---|---|---|---|---|---|
| | | | Sample Listing of Patients and Dates Who Defendants' Billing Records Show Were Seen by Dr. Martelli | | | |
| DATE | PATIENT NO. | PRO | ADMIT DATE | FIN CLASS | INSURANCE | PATIENT TOTAL |
| 4/12/2012 | P380 | ADOL | 4/3/2012 | | TRICARE | |
| 4/12/2012 | P261 | ADOL | 4/4/2012 | | TRICARE | |
| 4/12/2012 | P82 | ADOL | 4/4/2012 | | UBH | |
| 4/12/2012 | P56 | ADOL | 4/4/2012 | | MAGELLAN | |
| 4/12/2012 | P179 | ADOL | 4/5/2012 | | CARE NETWORK | |
| 4/12/2012 | P145 | ADOL | 4/9/2012 | | HMO/PPO NEGOTIATED | |
| 4/12/2012 | P463 | ADOL | 4/9/2012 | | MAGELLAN | |
| 4/12/2012 | P138 | ADOL | 4/10/2012 | | AMERIGROUP | |
| 4/12/2012 | P293 | ADOL | 4/10/2012 | | AMERIGROUP | |
| 4/12/2012 | P254 | ADOL | 4/10/2012 | | AMERIGROUP | |
| 4/12/2012 | P461 | ADOL | 4/11/2012 | | CENPATICO | |
| 4/12/2012 | P452 | ADOL | 4/11/2012 | | MAGELLAN | |
| 4/12/2012 | P36 | ADOL | 4/12/2012 | | BXBS GA | |
| 4/12/2012 | P402 | ADOL | 4/12/2012 | | UBH | |
| 4/12/2012 | P406 | ADOL | 4/12/2012 | | AMERIGROUP | |
| 4/12/2012 | P19 | ADOL | 4/12/2012 | | MAGELLAN | |
| 4/12/2012 | P398 | ADOL | 4/12/2012 | | CIGNA | |
| 4/12/2012 | P431 | ADOL | 4/12/2012 | | UBH | 25 |
| | | | | | | |
| 4/20/2012 | P456 | ADOL | 3/22/2012 | | MAGELLAN | |
| 4/20/2012 | P198 | ADOL | 3/28/2012 | | MEDICAID GA | |
| 4/20/2012 | P181 | ADOL | 3/28/2012 | | TRICARE | |
| 4/20/2012 | P380 | ADOL | 4/3/2012 | | TRICARE | |
| 4/20/2012 | P56 | ADOL | 4/4/2012 | | MAGELLAN | |
| 4/20/2012 | P179 | ADOL | 4/5/2012 | | CARE NETWORK | |
| 4/20/2012 | P145 | ADOL | 4/9/2012 | | HMO/PPO NEGOTIATED | |
| 4/20/2012 | P138 | ADOL | 4/10/2012 | | AMERIGROUP | |
| 4/20/2012 | P293 | ADOL | 4/10/2012 | | AMERIGROUP | |
| 4/20/2012 | P254 | ADOL | 4/10/2012 | | AMERIGROUP | |
| 4/20/2012 | P452 | ADOL | 4/11/2012 | | MAGELLAN | |
| 4/20/2012 | P402 | ADOL | 4/12/2012 | | UBH | |
| 4/20/2012 | P406 | ADOL | 4/12/2012 | | AMERIGROUP | |
| 4/20/2012 | P431 | ADOL | 4/12/2012 | | UBH | |
| 4/20/2012 | P210 | ADOL | 4/15/2012 | | BXBS GA | |
| 4/20/2012 | P242 | ADOL | 4/15/2012 | | TRICARE | |
| 4/20/2012 | P26 | ADOL | 4/16/2012 | | MAGELLAN | |
| 4/20/2012 | P390 | ADOL | 4/16/2012 | | MAGELLAN | |
| 4/20/2012 | P228 | ADOL | 4/17/2012 | | MAGELLAN | |
| 4/20/2012 | P110 | ADOL | 4/18/2012 | | CIGNA | |
| 4/20/2012 | P371 | ADOL | 4/18/2012 | | AMERIGROUP | |
| 4/20/2012 | P343 | ADOL | 4/18/2012 | | AETNA | |
| 4/20/2012 | P165 | ADOL | 4/19/2012 | | TRICARE | |
| 4/20/2012 | P76 | ADOL | 4/19/2012 | | MAGELLAN | 24 |
| | | | | | | |
| 4/21/2012 | P456 | ADOL | 3/22/2012 | | MAGELLAN | |
| 4/21/2012 | P198 | ADOL | 3/28/2012 | | MEDICAID GA | |
| 4/21/2012 | P181 | ADOL | 3/28/2012 | | TRICARE | |
| 4/21/2012 | P380 | ADOL | 4/3/2012 | | TRICARE | |
| 4/21/2012 | P56 | ADOL | 4/4/2012 | | MAGELLAN | |

| | EXHIBIT "L" | | | | | |
|---|---|---|---|---|---|---|
| Sample Listing of Patients and Dates Who Defendants' Billing Records Show Were Seen by Dr. Martelli | | | | | | |
| DATE | PATIENT NO. | PRO | ADMIT DATE | FIN CLASS | INSURANCE | PATIENT TOTAL |
| 4/21/2012 | P145 | ADOL | 4/9/2012 | | HMO/PPO NEGOTIATED | |
| 4/21/2012 | P254 | ADOL | 4/10/2012 | | AMERIGROUP | |
| 4/21/2012 | P452 | ADOL | 4/11/2012 | | MAGELLAN | |
| 4/21/2012 | P402 | ADOL | 4/12/2012 | | UBH | |
| 4/21/2012 | P406 | ADOL | 4/12/2012 | | AMERIGROUP | |
| 4/21/2012 | P210 | ADOL | 4/15/2012 | | BXBS GA | |
| 4/21/2012 | P242 | ADOL | 4/15/2012 | | TRICARE | |
| 4/21/2012 | P26 | ADOL | 4/16/2012 | | MAGELLAN | |
| 4/21/2012 | P390 | ADOL | 4/16/2012 | | MAGELLAN | |
| 4/21/2012 | P228 | ADOL | 4/17/2012 | | MAGELLAN | |
| 4/21/2012 | P110 | ADOL | 4/18/2012 | | CIGNA | |
| 4/21/2012 | P371 | ADOL | 4/18/2012 | | AMERIGROUP | |
| 4/21/2012 | P343 | ADOL | 4/18/2012 | | AETNA | |
| 4/21/2012 | P165 | ADOL | 4/19/2012 | | TRICARE | |
| 4/21/2012 | P76 | ADOL | 4/19/2012 | | MAGELLAN | |
| 4/21/2012 | P394 | ADOL | 4/20/2012 | | UBH | |
| 4/21/2012 | P147 | ADOL | 4/21/2012 | | CENPATICO | |
| 4/21/2012 | P451 | ADOL | 4/21/2012 | | TRICARE | 23 |
| | | | | | | |
| 4/26/2012 | P456 | ADOL | 3/22/2012 | | MAGELLAN | |
| 4/26/2012 | P181 | ADOL | 3/28/2012 | | TRICARE | |
| 4/26/2012 | P402 | ADOL | 4/12/2012 | | UBH | |
| 4/26/2012 | P242 | ADOL | 4/15/2012 | | TRICARE | |
| 4/26/2012 | P26 | ADOL | 4/16/2012 | | MAGELLAN | |
| 4/26/2012 | P371 | ADOL | 4/18/2012 | | AMERIGROUP | |
| 4/26/2012 | P343 | ADOL | 4/18/2012 | | AETNA | |
| 4/26/2012 | P165 | ADOL | 4/19/2012 | | TRICARE | |
| 4/26/2012 | P394 | ADOL | 4/20/2012 | | UBH | |
| 4/26/2012 | P147 | ADOL | 4/21/2012 | | CENPATICO | |
| 4/26/2012 | P451 | ADOL | 4/21/2012 | | TRICARE | |
| 4/26/2012 | P289 | ADOL | 4/23/2012 | | MULTIPLAN | |
| 4/26/2012 | P255 | ADOL | 4/24/2012 | | BXBS FEDERAL | |
| 4/26/2012 | P331 | ADOL | 4/24/2012 | | MAGELLAN | |
| 4/26/2012 | P3 | ADOL | 4/25/2012 | | TRICARE | |
| 4/26/2012 | P184 | ADOL | 4/26/2012 | | AMERIGROUP | |
| 4/26/2012 | P79 | ADOL | 4/26/2012 | | BXBS FEDERAL | |
| 4/26/2012 | P308 | ADOL | 4/26/2012 | | CIGNA | 18 |
| | | | | | | |
| 5/1/2012 | P456 | ADOL | 3/22/2012 | | MAGELLAN | |
| 5/1/2012 | P181 | ADOL | 3/28/2012 | | TRICARE | |
| 5/1/2012 | P402 | ADOL | 4/12/2012 | | UBH | |
| 5/1/2012 | P242 | ADOL | 4/15/2012 | | TRICARE | |
| 5/1/2012 | P26 | ADOL | 4/16/2012 | | MAGELLAN | |
| 5/1/2012 | P394 | ADOL | 4/20/2012 | | UBH | |
| 5/1/2012 | P289 | ADOL | 4/23/2012 | | MULTIPLAN | |
| 5/1/2012 | P184 | ADOL | 4/26/2012 | | AMERIGROUP | |
| 5/1/2012 | P79 | ADOL | 4/26/2012 | | BXBS FEDERAL | |
| 5/1/2012 | P308 | ADOL | 4/26/2012 | | CIGNA | |
| 5/1/2012 | P174 | ADOL | 4/27/2012 | | TRICARE | |

| | | | | EXHIBIT "L" | | |
|---|---|---|---|---|---|---|
| Sample Listing of Patients and Dates Who Defendants' Billing Records Show Were Seen by Dr. Martelli | | | | | | |
| DATE | PATIENT NO. | PRO | ADMIT DATE | FIN CLASS | INSURANCE | PATIENT TOTAL |
| 5/1/2012 | P336 | ADOL | 4/30/2012 | | BXBS GA | |
| 5/1/2012 | P424 | ADOL | 4/30/2012 | | MAGELLAN | |
| 5/1/2012 | P441 | ADOL | 5/1/2012 | | AMERIGROUP | |
| 5/1/2012 | P196 | ADOL | 5/1/2012 | | TRICARE | |
| 5/1/2012 | P238 | ADOL | 5/1/2012 | | TRICARE | |
| 5/1/2012 | P46 | ADOL | 5/1/2012 | | TRICARE | 17 |
| | | | | | | |
| 5/11/2012 | P308 | ADOL | 4/26/2012 | | CIGNA | |
| 5/11/2012 | P336 | ADOL | 4/30/2012 | | BXBS GA | |
| 5/11/2012 | P196 | ADOL | 5/1/2012 | | TRICARE | |
| 5/11/2012 | P238 | ADOL | 5/1/2012 | | TRICARE | |
| 5/11/2012 | P46 | ADOL | 5/1/2012 | | TRICARE | |
| 5/11/2012 | P235 | ADOL | 5/4/2012 | | AMERIGROUP | |
| 5/11/2012 | P337 | ADOL | 5/4/2012 | | UBH | |
| 5/11/2012 | P233 | ADOL | 5/4/2012 | | CENPATICO | |
| 5/11/2012 | P264 | ADOL | 5/5/2012 | | BXBS GA | |
| 5/11/2012 | P305 | ADOL | 5/8/2012 | | MAGELLAN | |
| 5/11/2012 | P324 | ADOL | 5/9/2012 | | AMERIGROUP | |
| 5/11/2012 | P250 | ADOL | 5/9/2012 | | TRICARE | |
| 5/11/2012 | P262 | ADOL | 5/9/2012 | | MAGELLAN | |
| 5/11/2012 | P434 | ADOL | 5/9/2012 | | AMERIGROUP | |
| 5/11/2012 | P77 | ADOL | 5/10/2012 | | TRICARE | |
| 5/11/2012 | P427 | ADOL | 5/10/2012 | | AETNA | |
| 5/11/2012 | P444 | ADOL | 5/10/2012 | | MAGELLAN | |
| 5/11/2012 | P90 | ADOL | 5/10/2012 | | TRICARE | |
| 5/11/2012 | P216 | ADOL | 5/10/2012 | | BXBS GA | |
| 5/11/2012 | P52 | ADOL | 5/10/2012 | | AMERIGROUP | |
| 5/11/2012 | P468 | ADOL | 5/11/2012 | | AMERIGROUP | |
| 5/11/2012 | P361 | ADOL | 5/11/2012 | | MAGELLAN | 22 |
| | | | | | | |
| 5/12/2012 | P308 | ADOL | 4/26/2012 | | CIGNA | |
| 5/12/2012 | P196 | ADOL | 5/1/2012 | | TRICARE | |
| 5/12/2012 | P235 | ADOL | 5/4/2012 | | AMERIGROUP | |
| 5/12/2012 | P337 | ADOL | 5/4/2012 | | UBH | |
| 5/12/2012 | P233 | ADOL | 5/4/2012 | | CENPATICO | |
| 5/12/2012 | P264 | ADOL | 5/5/2012 | | BXBS GA | |
| 5/12/2012 | P305 | ADOL | 5/8/2012 | | MAGELLAN | |
| 5/12/2012 | P324 | ADOL | 5/9/2012 | | AMERIGROUP | |
| 5/12/2012 | P250 | ADOL | 5/9/2012 | | TRICARE | |
| 5/12/2012 | P262 | ADOL | 5/9/2012 | | MAGELLAN | |
| 5/12/2012 | P434 | ADOL | 5/9/2012 | | AMERIGROUP | |
| 5/12/2012 | P77 | ADOL | 5/10/2012 | | TRICARE | |
| 5/12/2012 | P427 | ADOL | 5/10/2012 | | AETNA | |
| 5/12/2012 | P444 | ADOL | 5/10/2012 | | MAGELLAN | |
| 5/12/2012 | P90 | ADOL | 5/10/2012 | | TRICARE | |
| 5/12/2012 | P216 | ADOL | 5/10/2012 | | BXBS GA | |
| 5/12/2012 | P52 | ADOL | 5/10/2012 | | AMERIGROUP | |
| 5/12/2012 | P468 | ADOL | 5/11/2012 | | AMERIGROUP | |
| 5/12/2012 | P361 | ADOL | 5/11/2012 | | MAGELLAN | |

GAMD  Page 200

| EXHIBIT "L" | | | | | | |
|---|---|---|---|---|---|---|
| Sample Listing of Patients and Dates Who Defendants' Billing Records Show Were Seen by Dr. Martelli | | | | | | |
| **DATE** | **PATIENT NO.** | **PRO** | **ADMIT DATE** | **FIN CLASS** | **INSURANCE** | **PATIENT TOTAL** |
| 5/12/2012 | P192 | ADOL | 5/11/2012 | | BXBS GA | |
| 5/12/2012 | P158 | ADOL | 5/11/2012 | | CIGNA | |
| 5/12/2012 | P96 | ADOL | 5/12/2012 | | TRICARE | 22 |
| | | | | | | |
| 5/14/2012 | P308 | ADOL | 4/26/2012 | | CIGNA | |
| 5/14/2012 | P196 | ADOL | 5/1/2012 | | TRICARE | |
| 5/14/2012 | P235 | ADOL | 5/4/2012 | | AMERIGROUP | |
| 5/14/2012 | P337 | ADOL | 5/4/2012 | | UBH | |
| 5/14/2012 | P233 | ADOL | 5/4/2012 | | CENPATICO | |
| 5/14/2012 | P305 | ADOL | 5/8/2012 | | MAGELLAN | |
| 5/14/2012 | P324 | ADOL | 5/9/2012 | | AMERIGROUP | |
| 5/14/2012 | P250 | ADOL | 5/9/2012 | | TRICARE | |
| 5/14/2012 | P262 | ADOL | 5/9/2012 | | MAGELLAN | |
| 5/14/2012 | P77 | ADOL | 5/10/2012 | | TRICARE | |
| 5/14/2012 | P427 | ADOL | 5/10/2012 | | AETNA | |
| 5/14/2012 | P444 | ADOL | 5/10/2012 | | MAGELLAN | |
| 5/14/2012 | P216 | ADOL | 5/10/2012 | | BXBS GA | |
| 5/14/2012 | P52 | ADOL | 5/10/2012 | | AMERIGROUP | |
| 5/14/2012 | P468 | ADOL | 5/11/2012 | | AMERIGROUP | |
| 5/14/2012 | P361 | ADOL | 5/11/2012 | | MAGELLAN | |
| 5/14/2012 | P158 | ADOL | 5/11/2012 | | CIGNA | |
| 5/14/2012 | P96 | ADOL | 5/12/2012 | | TRICARE | |
| 5/14/2012 | P433 | ADOL | 5/14/2012 | | TRICARE | |
| 5/14/2012 | P181 | ADOL | 5/14/2012 | | TRICARE | 20 |
| | | | | | | |
| 5/16/2012 | P196 | ADOL | 5/1/2012 | | TRICARE | |
| 5/16/2012 | P305 | ADOL | 5/8/2012 | | MAGELLAN | |
| 5/16/2012 | P324 | ADOL | 5/9/2012 | | AMERIGROUP | |
| 5/16/2012 | P250 | ADOL | 5/9/2012 | | TRICARE | |
| 5/16/2012 | P77 | ADOL | 5/10/2012 | | TRICARE | |
| 5/16/2012 | P427 | ADOL | 5/10/2012 | | AETNA | |
| 5/16/2012 | P216 | ADOL | 5/10/2012 | | BXBS GA | |
| 5/16/2012 | P52 | ADOL | 5/10/2012 | | AMERIGROUP | |
| 5/16/2012 | P468 | ADOL | 5/11/2012 | | AMERIGROUP | |
| 5/16/2012 | P361 | ADOL | 5/11/2012 | | MAGELLAN | |
| 5/16/2012 | P158 | ADOL | 5/11/2012 | | CIGNA | |
| 5/16/2012 | P96 | ADOL | 5/12/2012 | | TRICARE | |
| 5/16/2012 | P433 | ADOL | 5/14/2012 | | TRICARE | |
| 5/16/2012 | P181 | ADOL | 5/14/2012 | | TRICARE | 14 |
| | | | | | | |
| 5/20/2012 | P250 | ADOL | 5/9/2012 | | TRICARE | |
| 5/20/2012 | P262 | ADOL | 5/9/2012 | | MAGELLAN | |
| 5/20/2012 | P427 | ADOL | 5/10/2012 | | AETNA | |
| 5/20/2012 | P216 | ADOL | 5/10/2012 | | BXBS GA | |
| 5/20/2012 | P361 | ADOL | 5/11/2012 | | MAGELLAN | |
| 5/20/2012 | P158 | ADOL | 5/11/2012 | | CIGNA | |
| 5/20/2012 | P96 | ADOL | 5/12/2012 | | TRICARE | |
| 5/20/2012 | P433 | ADOL | 5/14/2012 | | TRICARE | |
| 5/20/2012 | P181 | ADOL | 5/14/2012 | | TRICARE | |

GAMD  Page 201

| | | | | | | |
|---|---|---|---|---|---|---|
| **EXHIBIT "L"** | | | | | | |
| **Sample Listing of Patients and Dates Who Defendants' Billing Records Show Were Seen by Dr. Martelli** | | | | | | |
| **DATE** | **PATIENT NO.** | **PRO** | **ADMIT DATE** | **FIN CLASS** | **INSURANCE** | **PATIENT TOTAL** |
| 5/20/2012 | P279 | ADOL | 5/17/2012 | | UBH | |
| 5/20/2012 | P324 | ADOL | 5/16/2012 | | AMERIGROUP | |
| 5/20/2012 | P322 | ADOL | 5/18/2012 | | MAGELLAN | |
| 5/20/2012 | P243 | ADOL | 5/18/2012 | | MAGELLAN | |
| 5/20/2012 | P147 | ADOL | 5/19/2012 | | CENPATICO | |
| 5/20/2012 | P196 | ADOL | 5/19/2012 | | TRICARE | |
| 5/20/2012 | P52 | ADOL | 5/20/2012 | | AMERIGROUP | 16 |
| | | | | | | |
| 5/22/2012 | P250 | ADOL | 5/9/2012 | | TRICARE | |
| 5/22/2012 | P262 | ADOL | 5/9/2012 | | MAGELLAN | |
| 5/22/2012 | P427 | ADOL | 5/10/2012 | | AETNA | |
| 5/22/2012 | P216 | ADOL | 5/10/2012 | | BXBS GA | |
| 5/22/2012 | P96 | ADOL | 5/12/2012 | | TRICARE | |
| 5/22/2012 | P181 | ADOL | 5/14/2012 | | TRICARE | |
| 5/22/2012 | P279 | ADOL | 5/17/2012 | | UBH | |
| 5/22/2012 | P324 | ADOL | 5/16/2012 | | AMERIGROUP | |
| 5/22/2012 | P322 | ADOL | 5/18/2012 | | MAGELLAN | |
| 5/22/2012 | P243 | ADOL | 5/18/2012 | | MAGELLAN | |
| 5/22/2012 | P147 | ADOL | 5/19/2012 | | CENPATICO | |
| 5/22/2012 | P196 | ADOL | 5/19/2012 | | TRICARE | |
| 5/22/2012 | P52 | ADOL | 5/20/2012 | | AMERIGROUP | |
| 5/22/2012 | P54 | ADOL | 5/21/2012 | | BXBS GA | |
| 5/22/2012 | P440 | ADOL | 5/21/2012 | | MAGELLAN | |
| 5/22/2012 | P313 | ADOL | 5/22/2012 | | MAGELLAN | |
| 5/22/2012 | P48 | ADOL | 5/22/2012 | | TRICARE | |
| 5/22/2012 | P21 | ADOL | 5/22/2012 | | HUMANA CHOICE | 18 |
| | | | | | | |
| 5/23/2012 | P250 | ADOL | 5/9/2012 | | TRICARE | |
| 5/23/2012 | P262 | ADOL | 5/9/2012 | | MAGELLAN | |
| 5/23/2012 | P427 | ADOL | 5/10/2012 | | AETNA | |
| 5/23/2012 | P181 | ADOL | 5/14/2012 | | TRICARE | |
| 5/23/2012 | P279 | ADOL | 5/17/2012 | | UBH | |
| 5/23/2012 | P324 | ADOL | 5/16/2012 | | AMERIGROUP | |
| 5/23/2012 | P322 | ADOL | 5/18/2012 | | MAGELLAN | |
| 5/23/2012 | P243 | ADOL | 5/18/2012 | | MAGELLAN | |
| 5/23/2012 | P147 | ADOL | 5/19/2012 | | CENPATICO | |
| 5/23/2012 | P196 | ADOL | 5/19/2012 | | TRICARE | |
| 5/23/2012 | P52 | ADOL | 5/20/2012 | | AMERIGROUP | |
| 5/23/2012 | P54 | ADOL | 5/21/2012 | | BXBS GA | |
| 5/23/2012 | P440 | ADOL | 5/21/2012 | | MAGELLAN | |
| 5/23/2012 | P313 | ADOL | 5/22/2012 | | MAGELLAN | |
| 5/23/2012 | P48 | ADOL | 5/22/2012 | | TRICARE | |
| 5/23/2012 | P21 | ADOL | 5/22/2012 | | HUMANA CHOICE CARE | |
| 5/23/2012 | P404 | ADOL | 5/23/2012 | | HEALTHGRAM | 17 |
| | | | | | | |
| 9/11/2012 | P222 | ADOL | 8/28/2012 | | AMERIGROUP | |
| 9/11/2012 | P55 | ADOL | 9/4/2012 | | MAGELLAN | |
| 9/11/2012 | P100 | ADOL | 9/5/2012 | | MAGELLAN | |
| 9/11/2012 | P260 | ADOL | 9/5/2012 | | MAGELLAN | |

| EXHIBIT "L" | | | | | | |
|---|---|---|---|---|---|---|
| Sample Listing of Patients and Dates Who Defendants' Billing Records Show Were Seen by Dr. Martelli | | | | | | |
| DATE | PATIENT NO. | PRO | ADMIT DATE | FIN CLASS | INSURANCE | PATIENT TOTAL |
| 9/11/2012 | P392 | ADOL | 9/6/2012 | | AMERIGROUP | |
| 9/11/2012 | P298 | ADOL | 9/6/2012 | | AETNA | |
| 9/11/2012 | P304 | ADOL | 9/6/2012 | | MEMORIAL HEALTH PARTNERS | |
| 9/11/2012 | P31 | ADOL | 9/6/2012 | | BXBS PARTICIPATING | |
| 9/11/2012 | P114 | ADOL | 9/6/2012 | | TRICARE | |
| 9/11/2012 | P432 | ADOL | 9/8/2012 | | UBH | |
| 9/11/2012 | P458 | ADOL | 9/8/2012 | | CIGNA | |
| 9/11/2012 | P319 | ADOL | 9/8/2012 | | MAGELLAN | |
| 9/11/2012 | P235 | ADOL | 9/9/2012 | | AMERIGROUP | |
| 9/11/2012 | P242 | ADOL | 9/11/2012 | | TRICARE | |
| 9/11/2012 | P273 | ADOL | 9/11/2012 | | MULTIPLAN | |
| 9/11/2012 | P372 | ADOL | 9/11/2012 | | TRICARE | 16 |

22

# EXHIBIT "M"
# To Complaint

# CORPORATE INTEGRITY AGREEMENT
# FOR

# BHC Sierra Vista Hospital, Inc.

CORPORATE INTEGRITY AGREEMENT
BETWEEN THE
OFFICE OF INSPECTOR GENERAL
OF THE
DEPARTMENT OF HEALTH AND HUMAN SERVICES
AND
BHC SIERRA VISTA HOSPITAL, INC.

## I.   PREAMBLE

BHC Sierra Vista Hospital, Inc. d/b/a Sierra Vista Hospital (Sierra Vista) hereby enters into this Corporate Integrity Agreement (CIA) with the Office of Inspector General (OIG) of the United States Department of Health and Human Services (HHS) to promote compliance with the statutes, regulations, and written directives of Medicare, Medicaid, and all other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) (Federal health care program requirements). Contemporaneously with this CIA, Sierra Vista is entering into a Settlement Agreement with the United States.

## II.   TERM AND SCOPE OF THE CIA

A.   The period of the compliance obligations assumed by Sierra Vista under this CIA shall be five years from the effective date of this CIA. The "Effective Date" shall be the date on which the final signatory of this CIA executes this CIA, unless otherwise specified. Each one-year period, beginning with the one-year period following the Effective Date, shall be referred to as a "Reporting Period."

B.   Sections VII, X, and XI shall expire no later than 120 days after OIG's receipt of: (1) Sierra Vista's final annual report; or (2) any additional materials submitted by Sierra Vista pursuant to OIG's request, whichever is later.

C.   The scope of this CIA shall be governed by the following definitions:

1.   "Covered Persons" includes:

a.   all owners, officers, directors, trustees, and employees of Sierra Vista;

1

        b.      all contractors, subcontractors, agents, and other persons who provide patient care items or services or who perform billing or coding functions on behalf of Sierra Vista, excluding vendors whose sole connection with Sierra Vista is selling or otherwise providing medical supplies or equipment to Sierra Vista and who do not bill the Federal health care programs for such medical supplies or equipment; and

        c.      all physicians and other non-physician practitioners who are members of Sierra Vista's active medical staff.

Notwithstanding the above, this term does not include part-time or per diem employees, contractors, subcontractors, agents, and other persons who are not reasonably expected to work more than 160 hours per year, except that any such individuals shall become "Covered Persons" at the point when they work more than 160 hours during the calendar year.

      2.      "Relevant Covered Persons" includes persons involved in the delivery of patient care items or services and/or in the preparation or submission of claims for reimbursement from any Federal health care program.

## III.   **CORPORATE INTEGRITY OBLIGATIONS**

Sierra Vista shall establish and maintain a Compliance Program that includes the following elements:

    A.    Compliance Officer and Committee

      1.     *Compliance Officer.* Within 90 days after the Effective Date, Sierra Vista shall appoint an individual to serve as its Compliance Officer and shall maintain a Compliance Officer for the term of the CIA. The Compliance Officer shall be responsible for developing and implementing policies, procedures, and practices designed to ensure compliance with the requirements set forth in this CIA and with Federal health care program requirements. The Compliance Officer shall be a member of senior management of Sierra Vista, shall report directly to the Chief Executive Officer of Sierra Vista, shall make periodic (at least quarterly) reports regarding compliance matters directly to the Board of Trustees of Sierra Vista, and shall be authorized to report on such matters to the Board of Trustees at any time. The Compliance Officer shall not be or be subordinate to the General Counsel or Chief Financial Officer. The Compliance Officer

2

shall be responsible for monitoring the day-to-day compliance activities engaged in by Sierra Vista as well as for any reporting obligations created under this CIA. Any noncompliance job responsibilities of the Compliance Officer shall be limited and must not interfere with the Compliance Officer's ability to perform the duties outlined in this CIA.

Sierra Vista shall report to OIG, in writing, any change in the identity of the Compliance Officer, or any actions or changes that would affect the Compliance Officer's ability to perform the duties necessary to meet the obligations in this CIA, within five days after such a change.

2.    *Compliance Committee.* Within 90 days after the Effective Date, Sierra Vista shall appoint a Compliance Committee. The Compliance Committee shall, at a minimum, include the Compliance Officer and other members of senior management necessary to meet the requirements of this CIA (e.g., senior executives of relevant departments, such as billing, clinical, human resources, audit, and operations). The Compliance Officer shall chair the Compliance Committee and the Committee shall support the Compliance Officer in fulfilling his/her responsibilities (e.g., shall assist in the analysis of the Sierra Vista's risk areas and shall oversee monitoring of internal and external audits and investigations). The Compliance Committee shall meet at least quarterly.

Sierra Vista shall report to OIG, in writing, any changes in the composition of the Compliance Committee, or any actions or changes that would affect the Compliance Committee's ability to perform the duties necessary to meet the obligations in this CIA, within 15 days after such a change.

3.    *Board of Trustees Compliance Obligations.* The Board of Trustees (Board) shall be responsible for the review and oversight of matters related to compliance with Federal health care program requirements and the obligations of this CIA.

The Board shall, at a minimum, be responsible for the following:

a.    meeting at least quarterly to review and oversee Sierra Vista's Compliance Program, including but not limited to the performance of the Compliance Officer and Compliance Committee;

3

      b.     ensuring that Sierra Vista adopts and implements policies, procedures, and practices designed to ensure compliance with the requirements set forth in this CIA and Federal health care program requirements; and

      c.     for each Reporting Period of the CIA, adopting a resolution, signed by each member of the Board summarizing its review and oversight of Sierra Vista's compliance with Federal health care program requirements and the obligations of this CIA.

At minimum, the resolution shall include the following language:

"The Board of Trustees has made a reasonable inquiry into the operations of Sierra Vista's Compliance Program including the performance of the Compliance Officer and the Compliance Committee. Based on its inquiry and review, the Board has concluded that, to the best of its knowledge, Sierra Vista has implemented an effective Compliance Program to meet Federal health care program requirements and the obligations of the CIA."

If the Board is unable to provide such a conclusion in the resolution, the Board shall include in the resolution a written explanation of the reasons why it is unable to provide the conclusion and the steps it is taking to implement an effective Compliance Program at Sierra Vista.

Sierra Vista shall report to OIG, in writing, any changes in the composition of the Board, or any actions or changes that would affect the Board's ability to perform the duties necessary to meet the obligations in this CIA, within 15 days after such a change.

    B.   <u>Written Standards</u>

      1.    *Code of Conduct.* Within 90 days after the Effective Date, Sierra Vista shall develop, implement, and distribute a written Code of Conduct to all Covered Persons. Distribution may be by electronic means. Sierra Vista shall make the promotion of, and adherence to, the Code of Conduct an element in evaluating the performance of all employees. The Code of Conduct shall, at a minimum, set forth:

      a.     Sierra Vista's commitment to full compliance with all Federal health care program requirements, including its commitment

4

to prepare and submit accurate claims consistent with such requirements;

b.    Sierra Vista's requirement that all of its Covered Persons shall be expected to comply with all Federal health care program requirements and with Sierra Vista's own Policies and Procedures;

c.    the requirement that all of Sierra Vista's Covered Persons shall be expected to report to the Compliance Officer, or other appropriate individual designated by Sierra Vista, suspected violations of any Federal health care program requirements or of Sierra Vista's own Policies and Procedures; and

d.    the right of all individuals to use the Disclosure Program described in Section III.E, and Sierra Vista's commitment to nonretaliation and to maintain, as appropriate, confidentiality and anonymity with respect to such disclosures.

Within 90 days after the Effective Date, each Covered Person shall certify, in writing, that he or she has received, read, understood, and shall abide by Sierra Vista's Code of Conduct. Certification may be secured by electronic means. New Covered Persons shall receive the Code of Conduct and shall complete the required certification within 30 days after becoming a Covered Person or within 90 days after the Effective Date, whichever is later.

Sierra Vista shall periodically review the Code of Conduct to determine if revisions are appropriate and shall make any necessary revisions based on such review. Any revised Code of Conduct shall be distributed within 30 days after any revisions are finalized. Each Covered Person shall certify, in writing, that he or she has received, read, understood, and shall abide by the revised Code of Conduct within 30 days after the distribution of the revised Code of Conduct.

2.    *Policies and Procedures.* Within 90 days after the Effective Date, Sierra Vista shall implement written Policies and Procedures regarding the operation of its compliance program, including the compliance program requirements outlined in this CIA and Sierra Vista's compliance with Federal health care program requirements, including Policies and Procedures regarding documentation and medical reasonableness and necessity.

5

Within 120 days after the Effective Date, the Policies and Procedures shall be made available to all Covered Persons. Appropriate and knowledgeable staff shall be available to explain the Policies and Procedures.

At least annually, Sierra Vista shall assess and update, as necessary, the Policies and Procedures. Within 30 days after the effective date of any revisions, any such revised Policies and Procedures shall be made available to all Covered Persons.

C.      Training and Education

1.      *General Training*. Within 90 days after the Effective Date, Sierra Vista shall provide at least two hours of General Training to each Covered Person. This training, at a minimum, shall explain Sierra Vista's:

    a.      CIA requirements; and

    b.      Compliance Program, including the Code of Conduct.

New Covered Persons shall receive the General Training described above within 30 days after becoming a Covered Person or within 90 days after the Effective Date, whichever is later. After receiving the initial General Training described above, each Covered Person shall receive at least one hour of General Training in each subsequent Reporting Period.

2.      *Specific Training*. Within 120 days after the Effective Date, each Relevant Covered Person shall receive at least four hours of Specific Training in addition to the General Training required above. This Specific Training shall include a discussion of:

    a.      the Federal health care program requirements regarding the accurate coding and submission of claims;

    b.      policies, procedures, and other requirements applicable to the documentation of medical records;

    c.      the personal obligation of each individual involved in the claims submission process to ensure that such claims are accurate;

6

d.      applicable reimbursement statutes, regulations, and program
        requirements and directives;

e.      the legal sanctions for violations of the Federal health care
        program requirements;

f.      examples of proper and improper claims submission
        practices; and

g.      examples of proper and improper medical necessity
        documentation.

New Relevant Covered Persons shall receive this training within 30 days after the
beginning of their employment or becoming Relevant Covered Persons, or within 120
days after the Effective Date, whichever is later.

After receiving the initial Specific Training described in this section, each
Relevant Covered Person shall receive at least two hours of Specific Training, in addition
to the General Training, in each subsequent Reporting Period.

3.      *Board Member Training.* Within 90 days after the Effective Date,
Sierra Vista shall provide at least two hours of training to each member of the Board of
Trustees, in addition to the General Training. This training shall address the
responsibilities of board members and corporate governance.

New members of the Board of Trustees shall receive the Board Member Training
described above within 30 days after becoming a member or within 90 days after the
Effective Date, whichever is later.

4.      *Certification.* Each individual who is required to attend training
shall certify, in writing, or in electronic form, if applicable, that he or she has received the
required training. The certification shall specify the type of training received and the date
received. The Compliance Officer (or designee) shall retain the certifications, along with
all course materials.

5.      *Qualifications of Trainer.* Persons providing the training shall be
knowledgeable about the subject area.

7

      6.    *Update of Training.* Sierra Vista shall review the training annually, and, where appropriate, update the training to reflect changes in Federal health care program requirements, any issues discovered during internal audits or the Claims Review, and any other relevant information.

      7.    *Computer-based Training.* Sierra Vista may provide the training required under this CIA through appropriate computer-based training approaches. If Sierra Vista chooses to provide computer-based training, it shall make available appropriately qualified and knowledgeable staff or trainers to answer questions or provide additional information to the individuals receiving such training.

      8.    *Exception for Active Medical Staff Members.* Sierra Vista shall make the General Training and Specific Training (as appropriate) described in this section available to all of Sierra Vista's active medical staff members and shall use its best efforts to encourage such active medical staff members to complete the training. The Compliance Officer shall maintain records of all active medical staff members who receive training, including the type of training and the date received.

    D.    Review Procedures

        1.    *General Description*

            a.    *Engagement of Independent Review Organization.* Within 90 days after the Effective Date, Sierra Vista shall engage an entity (or entities), such as an accounting, auditing, or consulting firm (hereinafter "Independent Review Organization" or "IRO"), to perform the reviews listed in this Section III.D. The applicable requirements relating to the IRO are outlined in Appendix A to this CIA, which is incorporated by reference.

            b.    *Retention of Records.* The IRO and Sierra Vista shall retain and make available to OIG, upon request, all work papers, supporting documentation, correspondence, and draft reports (those exchanged between the IRO and Sierra Vista) related to the reviews.

      2.    *Claims Review.* The IRO shall review Sierra Vista's coding, billing, and claims submission to the Federal health care programs and the reimbursement received (Claims Review) and shall prepare a Claims Review Report, as outlined in Appendix B to this CIA, which is incorporated by reference.

8

3.    *Unallowable Cost Review.*  For the first Reporting Period, the IRO shall conduct a review of Sierra Vista's compliance with the unallowable cost provisions of the Settlement Agreement.  The IRO shall determine whether Sierra Vista has complied with its obligations not to charge to, or otherwise seek payment from, federal or state payors for unallowable costs (as defined in the Settlement Agreement) and its obligation to identify to applicable federal or state payors any unallowable costs included in payments previously sought from the United States, or any state Medicaid program.  This unallowable costs analysis shall include, but not be limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by Sierra Vista or any affiliates.  To the extent that such cost reports, cost statements, information reports, or payment requests, even if already settled, have been adjusted to account for the effect of the inclusion of the unallowable costs, the IRO shall determine if such adjustments were proper.  In making this determination, the IRO may need to review cost reports and/or financial statements from the year in which the Settlement Agreement was executed, as well as from previous years.

4.    *Unallowable Cost Review Report.*  The IRO shall prepare a report based upon the Unallowable Cost Review performed (Unallowable Cost Review Report).  The Unallowable Cost Review Report shall include the IRO's findings and supporting rationale regarding the Unallowable Cost Review and whether Sierra Vista has complied with its obligation not to charge to, or otherwise seek payment from, federal or state payors for unallowable costs (as defined in the Settlement Agreement) and its obligation to identify to applicable federal or state payors any unallowable costs included in payments previously sought from such payor.

5.    *Validation Review.*  In the event OIG has reason to believe that: (a) Sierra Vista's Claims Review or Unallowable Cost Review fails to conform to the requirements of this CIA; or (b) the IRO's findings or Claims Review or Unallowable Cost Review results are inaccurate, OIG may, at its sole discretion, conduct its own review to determine whether the Claims Review or Unallowable Cost Review complied with the requirements of the CIA and/or the findings or Claims Review or Unallowable Cost Review results are inaccurate (Validation Review).  Sierra Vista shall pay for the reasonable cost of any such review performed by OIG or any of its designated agents.  Any Validation Review of Reports submitted as part of Sierra Vista's final Annual Report shall be initiated no later than one year after Sierra Vista's final submission (as described in Section II) is received by OIG.

9

Prior to initiating a Validation Review, OIG shall notify Sierra Vista of its intent to do so and provide a written explanation of why OIG believes such a review is necessary. To resolve any concerns raised by OIG, Sierra Vista may request a meeting with OIG to: (a) discuss the results of any Claims Review or Unallowable Cost Review submissions or findings; (b) present any additional information to clarify the results of the Claims Review or Unallowable Cost Review or to correct the inaccuracy of the Claims Review or Unallowable Cost Review; and/or (c) propose alternatives to the proposed Validation Review. Sierra Vista agrees to provide any additional information as may be requested by OIG under this Section III.D.5 in an expedited manner. OIG will attempt in good faith to resolve any Claims Review or Unallowable Cost Review issues with Sierra Vista prior to conducting a Validation Review. However, the final determination as to whether or not to proceed with a Validation Review shall be made at the sole discretion of OIG.

      6.    *Independence and Objectivity Certification.* The IRO shall include in its report(s) to Sierra Vista a certification or sworn affidavit that it has evaluated its professional independence and objectivity and has concluded that it is, in fact, independent and objective.

      E.    <u>Disclosure Program</u>

Within 90 days after the Effective Date, Sierra Vista shall establish a Disclosure Program or formally participate in a Disclosure Program which is operated by its corporate parent. In either event, the Disclosure Program will include a mechanism (e.g., a toll-free compliance telephone line) to enable individuals to disclose, to the Compliance Officer or some other person who is not in the disclosing individual's chain of command, any identified issues or questions associated with Sierra Vista's policies, conduct, practices, or procedures with respect to a Federal health care program believed by the individual to be a potential violation of criminal, civil, or administrative law. Sierra Vista shall appropriately publicize the existence of the disclosure mechanism (e.g., via periodic e-mails to employees or by posting the information in prominent common areas).

The Disclosure Program shall emphasize a nonretribution, nonretaliation policy, and shall include a reporting mechanism for anonymous communications for which appropriate confidentiality shall be maintained. Upon receipt of a disclosure, the Compliance Officer (or designee) shall gather all relevant information from the disclosing individual. The Compliance Officer (or designee) shall make a preliminary, good faith inquiry into the allegations set forth in every disclosure to ensure that he or she has obtained all of the information necessary to determine whether a further review

10

should be conducted. For any disclosure that is sufficiently specific so that it reasonably: (1) permits a determination of the appropriateness of the alleged improper practice; and (2) provides an opportunity for taking corrective action, Sierra Vista shall conduct an internal review of the allegations set forth in the disclosure and ensure that proper follow-up is conducted.

The Compliance Officer (or designee) shall maintain a disclosure log, which shall include a record and summary of each disclosure received (whether anonymous or not), the status of the respective internal reviews, and any corrective action taken in response to the internal reviews.

F.    Ineligible Persons

1.    *Definitions.* For purposes of this CIA:

a.    an "Ineligible Person" shall include an individual or entity who:

i.    is currently excluded, debarred, suspended, or otherwise ineligible to participate in the Federal health care programs or in Federal procurement or nonprocurement programs; or

ii.    has been convicted of a criminal offense that falls within the scope of 42 U.S.C. § 1320a-7(a), but has not yet been excluded, debarred, suspended, or otherwise declared ineligible.

b.    "Exclusion Lists" include:

i.    the HHS/OIG List of Excluded Individuals/Entities (available through the Internet at http://www.oig.hhs.gov); and

ii.    the General Services Administration's List of Parties Excluded from Federal Programs (available through the Internet at http://www.epls.gov).

*11*

2. *Screening Requirements.* Sierra Vista shall ensure that all prospective and current Covered Persons are not Ineligible Persons, by implementing the following screening requirements.

    a. Sierra Vista shall screen all prospective Covered Persons against the Exclusion Lists prior to engaging their services and, as part of the hiring or contracting process, shall require such Covered Persons to disclose whether they are Ineligible Persons.

    b. Sierra Vista shall screen all Covered Persons against the Exclusion Lists within 90 days after the Effective Date and on an annual basis thereafter.

    c. Sierra Vista shall implement a policy requiring all Covered Persons to disclose immediately any debarment, exclusion, suspension, or other event that makes that person an Ineligible Person.

Nothing in Section III.F affects Sierra Vista's responsibility to refrain from (and liability for) billing Federal health care programs for items or services furnished, ordered, or prescribed by excluded persons. Sierra Vista understands that items or services furnished by excluded persons are not payable by Federal health care programs and that Sierra Vista may be liable for overpayments and/or criminal, civil, and administrative sanctions for employing or contracting with an excluded person regardless of whether Sierra Vista meets the requirements of Section III.F.

3. *Removal Requirement.* If Sierra Vista has actual notice that a Covered Person has become an Ineligible Person, Sierra Vista shall remove such Covered Person from responsibility for, or involvement with, Sierra Vista's business operations related to the Federal health care programs and shall remove such Covered Person from any position for which the Covered Person's compensation or the items or services furnished, ordered, or prescribed by the Covered Person are paid in whole or part, directly or indirectly, by Federal health care programs or otherwise with Federal funds at least until such time as the Covered Person is reinstated into participation in the Federal health care programs.

12

4. *Pending Charges and Proposed Exclusions.* If Sierra Vista has actual notice that a Covered Person is charged with a criminal offense that falls within the scope of 42 U.S.C. §§ 1320a-7(a), 1320a-7(b)(1)-(3), or is proposed for exclusion during the Covered Person's employment or contract term or during the term of a physician's or other practitioner's medical staff privileges, Sierra Vista shall take all appropriate actions to ensure that the responsibilities of that Covered Person have not and shall not adversely affect the quality of care rendered to any beneficiary, patient, or resident, or any claims submitted to any Federal health care program.

G.    Notification of Government Investigation or Legal Proceedings

Within 30 days after discovery, Sierra Vista shall notify OIG, in writing, of any ongoing investigation or legal proceeding known to Sierra Vista conducted or brought by a governmental entity or its agents involving an allegation that Sierra Vista has committed a crime or has engaged in fraudulent activities. This notification shall include a description of the allegation, the identity of the investigating or prosecuting agency, and the status of such investigation or legal proceeding. Sierra Vista shall also provide written notice to OIG within 30 days after the resolution of the matter, and shall provide OIG with a description of the findings and/or results of the investigation or proceedings, if any.

H.    Repayment of Overpayments

1. *Definition of Overpayments.* For purposes of this CIA, an "Overpayment" shall mean the amount of money Sierra Vista has received in excess of the amount due and payable under any Federal health care program requirements.

2. *Repayment of Overpayments*

a.    If, at any time, Sierra Vista identifies or learns of any Overpayment, Sierra Vista shall repay the Overpayment to the appropriate payor (e.g., Medicare fiscal intermediary or carrier) within 30 days after identification of the Overpayment and take remedial steps within 60 days after identification (or such additional time as may be agreed to by the payor) to correct the problem, including preventing the underlying problem and the Overpayment from recurring. If not yet quantified, within 30 days after identification, Sierra Vista shall notify the payor of its efforts to quantify the Overpayment amount along with a schedule of when such

13

           work is expected to be completed. Notification and repayment to the payor shall be done in accordance with the payor's policies.

      b.     Notwithstanding the above, notification and repayment of any Overpayment amount that routinely is reconciled or adjusted pursuant to policies and procedures established by the payor should be handled in accordance with such policies and procedures.

I.     <u>Reportable Events</u>

     1.    *Definition of Reportable Event.* For purposes of this CIA, a "Reportable Event" means anything that involves:

      a.     a substantial Overpayment;

      b.     a matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program for which penalties or exclusion may be authorized;

      c.     the employment of or contracting with a Covered Person who is an Ineligible Person as defined by Section III.F.1.a; or

      d.     the filing of a bankruptcy petition by Sierra Vista.

A Reportable Event may be the result of an isolated event or a series of occurrences.

     2.    *Reporting of Reportable Events.* If Sierra Vista determines (after a reasonable opportunity to conduct an appropriate review or investigation of the allegations) through any means that there is a Reportable Event, Sierra Vista shall notify OIG, in writing, within 30 days after making the determination that the Reportable Event exists.

     3.    *Reportable Events under Section III.I.1.a.* For Reportable Events under Section III.I.1.a, the report to OIG shall be made at the same time as the repayment to the payor required in Section III.H, and shall include:

14

a.  a copy of the notification and repayment to the payor required in Section III.H.2;

b.  a description of the steps taken by Sierra Vista to identify and quantify the Overpayment;

c.  a complete description of the Reportable Event, including the relevant facts, persons involved, and legal and Federal health care program authorities implicated;

d.  a description of Sierra Vista's actions taken to correct the Reportable Event; and

e.  any further steps Sierra Vista plans to take to address the Reportable Event and prevent it from recurring.

4.  *Reportable Events under Section III.I.1.b and c.* For Reportable Events under Section III.I.1.b and III.I.1.c, the report to OIG shall include:

a.  a complete description of the Reportable Event, including the relevant facts, persons involved, and legal and Federal health care program authorities implicated;

b.  a description of Sierra Vista's actions taken to correct the Reportable Event;

c.  any further steps Sierra Vista plans to take to address the Reportable Event and prevent it from recurring; and

d.  if the Reportable Event has resulted in an Overpayment, a description of the steps taken by Sierra Vista to identify and quantify the Overpayment.

5.  *Reportable Events under Section III.I.1.d.* For Reportable Events under Section III.I.1.d, the report to the OIG shall include documentation of the bankruptcy filing and a description of any Federal health care program authorities implicated.

15

BHC Sierra Vista Hospital, Inc.
Corporate Integrity Agreement

6. *Reportable Events Involving the Stark Law.* Notwithstanding the reporting requirements outlined above, any Reportable Event that involves only a probable violation of section 1877 of the Social Security Act, 42 U.S.C. §1395nn (the Stark Law) should be submitted by Sierra Vista to the Centers for Medicare & Medicaid Services (CMS) through the self-referral disclosure protocol (SRDP), with a copy to the OIG. The requirements of Section III.H.2 that require repayment to the payor of any identified Overpayment within 30 days shall not apply to any Overpayment that may result from a probable violation of only the Stark Law that is disclosed to CMS pursuant to the SRDP.

## IV. CHANGES TO BUSINESS UNITS OR LOCATIONS

### A. Change or Closure of Unit or Location

In the event that, after the Effective Date, Sierra Vista changes locations or closes a business unit or location related to the furnishing of items or services that may be reimbursed by Federal health care programs, Sierra Vista shall notify OIG of this fact as soon as possible, but no later than within 30 days after the date of change or closure of the location.

### B. Purchase or Establishment of New Unit or Location

In the event that, after the Effective Date, Sierra Vista purchases or establishes a new business unit or location related to the furnishing of items or services that may be reimbursed by Federal health care programs, Sierra Vista shall notify OIG at least 30 days prior to such purchase or the operation of the new business unit or location. This notification shall include the address of the new business unit or location, phone number, fax number, the location's Medicare and state Medicaid program provider number and/or supplier number(s); and the name and address of each Medicare and state Medicaid program contractor to which Sierra Vista currently submits claims. Each new business unit or location and all Covered Persons at each new business unit or location shall be subject to the applicable requirements of this CIA.

### C. Sale of Unit or Location

In the event that, after the Effective Date, Sierra Vista proposes to sell any or all of its business units or locations that are subject to this CIA, Sierra Vista shall notify OIG of the proposed sale at least 30 days prior to the sale of such business unit or location. This notification shall include a description of the business unit or location to be sold, a brief

16

BHC Sierra Vista Hospital, Inc.
Corporate Integrity Agreement

description of the terms of the sale, and the name and contact information of the prospective purchaser. This CIA shall be binding on the purchaser of such business unit or location, unless otherwise determined and agreed to in writing by the OIG.

## V.  **IMPLEMENTATION AND ANNUAL REPORTS**

### A.  Implementation Report

Within 150 days after the Effective Date, Sierra Vista shall submit a written report to OIG summarizing the status of its implementation of the requirements of this CIA (Implementation Report). The Implementation Report shall, at a minimum, include:

1.  the name, address, phone number, and position description of the Compliance Officer required by Section III.A, and a summary of other noncompliance job responsibilities the Compliance Officer may have;

2.  the names and positions of the members of the Compliance Committee required by Section III.A;

3.  a copy of Sierra Vista's Code of Conduct required by Section III.B.1;

4.  the number of individuals required to complete the Code of Conduct certification required by Section III.B.1, the percentage of individuals who have completed such certification, and an explanation of any exceptions (the documentation supporting this information shall be available to OIG upon request);

5.  a summary of all Policies and Procedures required by Section III.B (copies of the Policies and Procedures shall be made available to OIG upon request);

6.  the following information regarding each type of training required by Section III.C:

a.  a description of such training, including a summary of the topics covered, the length of sessions, and a schedule of training sessions;

17

      b.    the number of individuals required to be trained, percentage of individuals actually trained, and an explanation of any exceptions; and

      c.    with respect to active medical staff members, the number and percentage who completed the training, the type of training and the date received, and a description of Sierra Vista's efforts to encourage medical staff members to complete the training.

A copy of all training materials and the documentation supporting this information shall be made available to OIG upon request.

      7.    a description of the Disclosure Program required by Section III.E;

      8.    the following information regarding the IRO(s): (a) identity, address, and phone number; (b) a copy of the engagement letter; (c) information to demonstrate that the IRO has the qualifications outlined in Appendix A to this CIA; (d) a summary and description of any and all current and prior engagements and agreements between Sierra Vista and the IRO; and (e) a certification from the IRO regarding its professional independence and objectivity with respect to Sierra Vista;

      9.    a description of the process by which Sierra Vista fulfills the requirements of Section III.F regarding Ineligible Persons;

      10.    a list of all of Sierra Vista's locations (including locations and mailing addresses); the corresponding name under which each location is doing business; the corresponding phone numbers and fax numbers; each location's Medicare and state Medicaid program provider number and/or supplier number(s); and the name and address of each Medicare and state Medicaid program contractor to which Sierra Vista currently submits claims;

      11.    a description of Sierra Vista's corporate structure, including identification of any parent and sister companies, subsidiaries, and their respective lines of business; and

      12.    the certifications required by Section V.C.

B.    Annual Reports

Sierra Vista shall submit to OIG annually a report with respect to the status of, and findings regarding, Sierra Vista's compliance activities for each of the five Reporting Periods (Annual Report). Each Annual Report shall include, at a minimum:

1.    any change in the identity, position description, or other noncompliance job responsibilities of the Compliance Officer and any change in the membership of the Compliance Committee described in Section III.A;

2.    the Board resolution required by Section III.A.3;

3.    a summary of any changes or amendments to Sierra Vista's Code of Conduct required by Section III.B.1 and the reason for such changes, along with a copy of the revised Code of Conduct;

4.    the number of individuals required to complete the Code of Conduct certification required by Section III.B.1, the percentage of individuals who have completed such certification, and an explanation of any exceptions (the documentation supporting this information shall be made available to OIG upon request);

5.    a summary of any significant changes or amendments to the Policies and Procedures required by Section III.B and the reasons for such changes (e.g., change in contractor policy);

6.    the following information regarding each type of training required by Section III.C:

    a.    a description of the initial and annual training, including a summary of the topics covered, the length of sessions, and a schedule of training sessions;

    b.    the number of individuals required to complete the initial and annual training, the percentage of individuals who actually completed the initial and annual training, and an explanation of any exceptions; and

19

      c.     with respect to active medical staff members, the number and percentage who completed the training, the type of training and the date received, and a description of Sierra Vista's efforts to encourage medical staff members to complete the training.

A copy of all training materials and the documentation to support this information shall be made available to OIG upon request.

      7.     a complete copy of all reports prepared pursuant to Section III.D, along with a copy of the IRO's engagement letter;

      8.     Sierra Vista's response to the reports prepared pursuant to Section III.D, along with corrective action plan(s) related to any issues raised by the reports;

      9.     a summary and description of any and all current and prior engagements and agreements between Sierra Vista and the IRO (if different from what was submitted as part of the Implementation Report);

      10.     a certification from the IRO regarding its professional independence and objectivity with respect to Sierra Vista;

      11.     a summary of Reportable Events (as defined in Section III.I) identified during the Reporting Period and the status of any corrective action relating to all such Reportable Events;

      12.     a report of the aggregate Overpayments that have been returned to the Federal health care programs. Overpayment amounts shall be broken down into the following categories: inpatient Medicare, outpatient Medicare, Medicaid (report each applicable state separately, if applicable), and other Federal health care programs. Overpayment amounts that are routinely reconciled or adjusted pursuant to policies and procedures established by the payor do not need to be included in this aggregate Overpayment report;

      13.     a summary of the disclosures in the disclosure log required by Section III.E that relate to Federal health care programs (the complete disclosure log shall be made available to OIG upon request);

14.    any changes to the process by which Sierra Vista fulfills the
requirements of Section III.F regarding Ineligible Persons;

15.    a summary describing any ongoing investigation or legal proceeding
required to have been reported pursuant to Section III.G. The summary shall include a
description of the allegation, the identity of the investigating or prosecuting agency, and
the status of such investigation or legal proceeding;

16.    a description of all changes to the most recently provided list of
Sierra Vista's locations (including addresses) as required by Section V.A.10; the
corresponding name under which each location is doing business; the corresponding
phone numbers and fax numbers; each location's Medicare and state Medicaid program
provider number(s) and/or supplier number(s); and the name and address of each
Medicare and state Medicaid program contractor to which Sierra Vista currently submits
claims; and

17.    the certifications required by Section V.C.

The first Annual Report shall be received by OIG no later than 60 days after the
end of the first Reporting Period. Subsequent Annual Reports shall be received by OIG
no later than the anniversary date of the due date of the first Annual Report.

C.    Certifications

The Implementation Report and each Annual Report shall include a certification
by the Compliance Officer that:

1.    to the best of his or her knowledge, except as otherwise described in
the report, Sierra Vista is in compliance with all of the requirements of this CIA;

2.    he or she has reviewed the report and has made reasonable inquiry
regarding its content and believes that the information in the report is accurate and
truthful; and

3.    to the best of his or her knowledge, Sierra Vista has complied with
its obligations under the Settlement Agreement: (a) not to resubmit to any Federal health
care program payors any previously denied claims related to the Covered Conduct
addressed in the Settlement Agreement, and not to appeal any such denials of claims; (b)
not to charge to or otherwise seek payment from federal or state payors for unallowable
costs (as defined in the Settlement Agreement); and (c) to identify and adjust any past
charges or claims for unallowable costs.

21

BHC Sierra Vista Hospital, Inc.
Corporate Integrity Agreement

D.    Designation of Information

Sierra Vista shall clearly identify any portions of its submissions that it believes are trade secrets, or information that is commercial or financial and privileged or confidential, and therefore potentially exempt from disclosure under the Freedom of Information Act (FOIA), 5 U.S.C. § 552. Sierra Vista shall refrain from identifying any information as exempt from disclosure if that information does not meet the criteria for exemption from disclosure under FOIA.

## VI.    NOTIFICATIONS AND SUBMISSION OF REPORTS

Unless otherwise stated in writing after the Effective Date, all notifications and reports required under this CIA shall be submitted to the following entities:

> OIG:
> Administrative and Civil Remedies Branch
> Office of Counsel to the Inspector General
> Office of Inspector General
> U.S. Department of Health and Human Services
> Cohen Building, Room 5527
> 330 Independence Avenue, S.W.
> Washington, DC 20201
> Telephone: (202) 619-2078
> Facsimile: (202) 205-0604

> BHC Sierra Vista Hospital:
> Sterling Alexander
> 8001 Bruceville Road
> Sacramento, CA 95823
> Telephone: (916) 423-2000
> E-Mail: Sterling.Alexander@uhsinc.com

Unless otherwise specified, all notifications and reports required by this CIA may be made by certified mail, overnight mail, hand delivery, or other means, provided that there is proof that such notification was received. For purposes of this requirement, internal facsimile confirmation sheets do not constitute proof of receipt. Upon request by OIG, Sierra Vista may be required to provide OIG with an electronic copy of each notification or report required by this CIA in searchable portable document format (pdf), in addition to a paper copy.

22

BHC Sierra Vista Hospital, Inc.
Corporate Integrity Agreement

## VII.   OIG INSPECTION, AUDIT, AND REVIEW RIGHTS

In addition to any other rights OIG may have by statute, regulation, or contract, OIG or its duly authorized representative(s) may examine or request copies of Sierra Vista's books, records, and other documents and supporting materials and/or conduct on-site reviews of any of Sierra Vista's locations for the purpose of verifying and evaluating: (a) Sierra Vista's compliance with the terms of this CIA; and (b) Sierra Vista's compliance with the requirements of the Federal health care programs in which it participates.  The documentation described above shall be made available by Sierra Vista to OIG or its duly authorized representative(s) at all reasonable times for inspection, audit, or reproduction.  Furthermore, for purposes of this provision, OIG or its duly authorized representative(s) may interview any of Sierra Vista's employees, contractors, or agents who consent to be interviewed at the individual's place of business during normal business hours or at such other place and time as may be mutually agreed upon between the individual and OIG.  Sierra Vista shall assist OIG or its duly authorized representative(s) in contacting and arranging interviews with such individuals upon OIG's request.  Sierra Vista's employees may elect to be interviewed with or without a representative of Sierra Vista present.

## VIII.   DOCUMENT AND RECORD RETENTION

Sierra Vista shall maintain for inspection all documents and records relating to reimbursement from the Federal health care programs and to compliance with this CIA for six years (or longer if otherwise required by law) from the Effective Date.

## IX.   DISCLOSURES

Consistent with HHS's FOIA procedures, set forth in 45 C.F.R. Part 5, OIG shall make a reasonable effort to notify Sierra Vista prior to any release by OIG of information submitted by Sierra Vista pursuant to its obligations under this CIA and identified upon submission by Sierra Vista as trade secrets, or information that is commercial or financial and privileged or confidential, under the FOIA rules.  With respect to such releases, Sierra Vista shall have the rights set forth at 45 C.F.R. § 5.65(d).

## X.   BREACH AND DEFAULT PROVISIONS

Sierra Vista is expected to fully and timely comply with all of its CIA obligations.

23

A. <u>Stipulated Penalties for Failure to Comply with Certain Obligations</u>

As a contractual remedy, Sierra Vista and OIG hereby agree that failure to comply with certain obligations as set forth in this CIA may lead to the imposition of the following monetary penalties (hereinafter referred to as "Stipulated Penalties") in accordance with the following provisions.

1.      A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day Sierra Vista fails to establish and implement any of the following obligations as described in Section III:

    a.      a Compliance Officer;

    b.      a Compliance Committee;

    c.      a written Code of Conduct;

    d.      written Policies and Procedures;

    e.      the training of Covered Persons, Relevant Covered Persons, and Board Members;

    f.      a Disclosure Program;

    g.      Ineligible Persons screening and removal requirements;

    h.      notification of Government investigations or legal proceedings; and

    i.      reporting of Reportable Events.

2.      A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day Sierra Vista fails to engage and use an IRO, as required in Section III.D, Appendix A, and Appendix B.

3.      A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day Sierra Vista fails to submit the Implementation Report or any Annual Reports to OIG in accordance with the requirements of Section V by the deadlines for submission.

24

4.    A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day Sierra Vista fails to submit any Claims Review Report or Unallowable Cost Review Report in accordance with the requirements of Section III.D and Appendix B.

5.    A Stipulated Penalty of $1,500 for each day Sierra Vista fails to grant access as required in Section VII. (This Stipulated Penalty shall begin to accrue on the date Sierra Vista fails to grant access.)

6.    A Stipulated Penalty of $5,000 for each false certification submitted by or on behalf of Sierra Vista as part of its Implementation Report, Annual Report, additional documentation to a report (as requested by the OIG), or otherwise required by this CIA.

7.    A Stipulated Penalty of $1,000 for each day Sierra Vista fails to comply fully and adequately with any obligation of this CIA. OIG shall provide notice to Sierra Vista stating the specific grounds for its determination that Sierra Vista has failed to comply fully and adequately with the CIA obligation(s) at issue and steps Sierra Vista shall take to comply with the CIA. (This Stipulated Penalty shall begin to accrue 10 days after Sierra Vista receives this notice from OIG of the failure to comply.) A Stipulated Penalty as described in this Subsection shall not be demanded for any violation for which OIG has sought a Stipulated Penalty under Subsections 1- 6 of this Section.

## B.   Timely Written Requests for Extensions

Sierra Vista may, in advance of the due date, submit a timely written request for an extension of time to perform any act or file any notification or report required by this CIA. Notwithstanding any other provision in this Section, if OIG grants the timely written request with respect to an act, notification, or report, Stipulated Penalties for failure to perform the act or file the notification or report shall not begin to accrue until one day after Sierra Vista fails to meet the revised deadline set by OIG. Notwithstanding any other provision in this Section, if OIG denies such a timely written request, Stipulated Penalties for failure to perform the act or file the notification or report shall not begin to accrue until three business days after Sierra Vista receives OIG's written denial of such request or the original due date, whichever is later. A "timely written request" is defined as a request in writing received by OIG at least five business days prior to the date by which any act is due to be performed or any notification or report is due to be filed.

25

C.    Payment of Stipulated Penalties

1.    *Demand Letter.*  Upon a finding that Sierra Vista has failed to comply with any of the obligations described in Section X.A and after determining that Stipulated Penalties are appropriate, OIG shall notify Sierra Vista of:  (a) Sierra Vista's failure to comply; and (b) OIG's exercise of its contractual right to demand payment of the Stipulated Penalties.  (This notification shall be referred to as the "Demand Letter.")

2.    *Response to Demand Letter.*  Within 10 days after the receipt of the Demand Letter, Sierra Vista shall either:  (a) cure the breach to OIG's satisfaction and pay the applicable Stipulated Penalties or (b) request a hearing before an HHS administrative law judge (ALJ) to dispute OIG's determination of noncompliance, pursuant to the agreed upon provisions set forth below in Section X.E.  In the event Sierra Vista elects to request an ALJ hearing, the Stipulated Penalties shall continue to accrue until Sierra Vista cures, to OIG's satisfaction, the alleged breach in dispute.  Failure to respond to the Demand Letter in one of these two manners within the allowed time period shall be considered a material breach of this CIA and shall be grounds for exclusion under Section X.D.

3.    *Form of Payment.*  Payment of the Stipulated Penalties shall be made by electronic funds transfer to an account specified by OIG in the Demand Letter.

4.    *Independence from Material Breach Determination.*  Except as set forth in Section X.D.1.c, these provisions for payment of Stipulated Penalties shall not affect or otherwise set a standard for OIG's decision that Sierra Vista has materially breached this CIA, which decision shall be made at OIG's discretion and shall be governed by the provisions in Section X.D, below.

D.    Exclusion for Material Breach of this CIA

1.    *Definition of Material Breach.*  A material breach of this CIA means:

        a.    a repeated or flagrant violation of the obligations under this CIA, including, but not limited to, the obligations addressed in Section X.A;

26

     b.  a failure by Sierra Vista to report a Reportable Event, take corrective action, and make the appropriate refunds, as required in Section III.I;

     c.  a failure to respond to a Demand Letter concerning the payment of Stipulated Penalties in accordance with Section X.C; or

     d.  a failure to engage and use an IRO in accordance with Section III.D, Appendix A, and Appendix B.

  2.  *Notice of Material Breach and Intent to Exclude.* The parties agree that a material breach of this CIA by Sierra Vista constitutes an independent basis for Sierra Vista's exclusion from participation in the Federal health care programs. Upon a determination by OIG that Sierra Vista has materially breached this CIA and that exclusion is the appropriate remedy, OIG shall notify Sierra Vista of: (a) Sierra Vista's material breach; and (b) OIG's intent to exercise its contractual right to impose exclusion. (This notification shall be referred to as the "Notice of Material Breach and Intent to Exclude.")

  3.  *Opportunity to Cure.* Sierra Vista shall have 30 days from the date of receipt of the Notice of Material Breach and Intent to Exclude to demonstrate to OIG's satisfaction that:

     a.  Sierra Vista is in compliance with the obligations of the CIA cited by OIG as being the basis for the material breach;

     b.  the alleged material breach has been cured; or

     c.  the alleged material breach cannot be cured within the 30 day period, but that: (i) Sierra Vista has begun to take action to cure the material breach; (ii) Sierra Vista is pursuing such action with due diligence; and (iii) Sierra Vista has provided to OIG a reasonable timetable for curing the material breach.

  4.  *Exclusion Letter.* If, at the conclusion of the 30 day period, Sierra Vista fails to satisfy the requirements of Section X.D.3, OIG may exclude Sierra Vista from participation in the Federal health care programs. OIG shall notify Sierra Vista in writing of its determination to exclude Sierra Vista. (This letter shall be referred to as

27

the "Exclusion Letter.") Subject to the Dispute Resolution provisions in Section X.E, below, the exclusion shall go into effect 30 days after the date of Sierra Vista's receipt of the Exclusion Letter. The exclusion shall have national effect and shall also apply to all other Federal procurement and nonprocurement programs. Reinstatement to program participation is not automatic. After the end of the period of exclusion, Sierra Vista may apply for reinstatement by submitting a written request for reinstatement in accordance with the provisions at 42 C.F.R. §§ 1001.3001-.3004.

     E.    <u>Dispute Resolution</u>

         1.    *Review Rights*. Upon OIG's delivery to Sierra Vista of its Demand Letter or of its Exclusion Letter, and as an agreed-upon contractual remedy for the resolution of disputes arising under this CIA, Sierra Vista shall be afforded certain review rights comparable to the ones that are provided in 42 U.S.C. § 1320a-7(f) and 42 C.F.R. Part 1005 as if they applied to the Stipulated Penalties or exclusion sought pursuant to this CIA. Specifically, OIG's determination to demand payment of Stipulated Penalties or to seek exclusion shall be subject to review by an HHS ALJ and, in the event of an appeal, the HHS Departmental Appeals Board (DAB), in a manner consistent with the provisions in 42 C.F.R. § 1005.2-1005.21. Notwithstanding the language in 42 C.F.R. § 1005.2(c), the request for a hearing involving Stipulated Penalties shall be made within 10 days after receipt of the Demand Letter and the request for a hearing involving exclusion shall be made within 25 days after receipt of the Exclusion Letter.

         2.    *Stipulated Penalties Review*. Notwithstanding any provision of Title 42 of the United States Code or Title 42 of the Code of Federal Regulations, the only issues in a proceeding for Stipulated Penalties under this CIA shall be: (a) whether Sierra Vista was in full and timely compliance with the obligations of this CIA for which OIG demands payment; and (b) the period of noncompliance. Sierra Vista shall have the burden of proving its full and timely compliance and the steps taken to cure the noncompliance, if any. OIG shall not have the right to appeal to the DAB an adverse ALJ decision related to Stipulated Penalties. If the ALJ agrees with OIG with regard to a finding of a breach of this CIA and orders Sierra Vista to pay Stipulated Penalties, such Stipulated Penalties shall become due and payable 20 days after the ALJ issues such a decision unless Sierra Vista requests review of the ALJ decision by the DAB. If the ALJ decision is properly appealed to the DAB and the DAB upholds the determination of OIG, the Stipulated Penalties shall become due and payable 20 days after the DAB issues its decision.

28

3. *Exclusion Review.* Notwithstanding any provision of Title 42 of the United States Code or Title 42 of the Code of Federal Regulations, the only issues in a proceeding for exclusion based on a material breach of this CIA shall be:

a. whether Sierra Vista was in material breach of this CIA;

b. whether such breach was continuing on the date of the Exclusion Letter; and

c. whether the alleged material breach could not have been cured within the 30-day period, but that: (i) Sierra Vista had begun to take action to cure the material breach within that period; (ii) Sierra Vista has pursued and is pursuing such action with due diligence; and (iii) Sierra Vista provided to OIG within that period a reasonable timetable for curing the material breach and Sierra Vista has followed the timetable.

For purposes of the exclusion herein, exclusion shall take effect only after an ALJ decision favorable to OIG, or, if the ALJ rules for Sierra Vista, only after a DAB decision in favor of OIG. Sierra Vista's election of its contractual right to appeal to the DAB shall not abrogate OIG's authority to exclude Sierra Vista upon the issuance of an ALJ's decision in favor of OIG. If the ALJ sustains the determination of OIG and determines that exclusion is authorized, such exclusion shall take effect 20 days after the ALJ issues such a decision, notwithstanding that Sierra Vista may request review of the ALJ decision by the DAB. If the DAB finds in favor of OIG after an ALJ decision adverse to OIG, the exclusion shall take effect 20 days after the DAB decision. Sierra Vista shall waive its right to any notice of such an exclusion if a decision upholding the exclusion is rendered by the ALJ or DAB. If the DAB finds in favor of Sierra Vista, Sierra Vista shall be reinstated effective on the date of the original exclusion.

4. *Finality of Decision.* The review by an ALJ or DAB provided for above shall not be considered to be an appeal right arising under any statutes or regulations. Consequently, the parties to this CIA agree that the DAB's decision (or the ALJ's decision if not appealed) shall be considered final for all purposes under this CIA.

## XI. EFFECTIVE AND BINDING AGREEMENT

Sierra Vista and OIG agree as follows:

29

A.    This CIA shall be binding on the successors, assigns, and transferees of Sierra Vista.

B.    This CIA shall become final and binding on the date the final signature is obtained on the CIA.

C.    This CIA constitutes the complete agreement between the parties and may not be amended except by written consent of the parties to this CIA.

D.    OIG may agree to a suspension of Sierra Vista's obligations under this CIA based on a certification by Sierra Vista that it is no longer providing health care items or services that will be billed to any Federal health care program and that it does not have any ownership or control interest, as defined in 42 U.S.C. §1320a-3, in any entity that bills any Federal health care program. If Sierra Vista is relieved of its CIA obligations, Sierra Vista will be required to notify OIG in writing at least 30 days in advance if Sierra Vista plans to resume providing health care items or services that are billed to any Federal health care program or to obtain an ownership or control interest in any entity that bills any Federal health care program. At such time, OIG shall evaluate whether the CIA will be reactivated or modified.

E.    The undersigned Sierra Vista signatory represent and warrant that he is authorized to execute this CIA. The undersigned OIG signatory represents that he is signing this CIA in his official capacity and that he is authorized to execute this CIA.

F.    This CIA may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same CIA. Facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this CIA.

30

BHC Sierra Vista Hospital, Inc.
Corporate Integrity Agreement

**ON BEHALF OF SIERRA VISTA**

/Michael Zauner/                                    3/28/12

Michael Zauner                                      DATE
Chief Executive Officer
BHC Sierra Vista Hospital, Inc.


/Judith Waltz/                                      4/04/2012

Judith Waltz                                        DATE
Counsel for BHC Sierra Vista Hospital, Inc.
Foley & Lardner LLP
555 California Street, 17th Floor
San Francisco, CA   94104-1520
Telephone (415) 438-6412
Fax:  (415) 434-4507

31

## ON BEHALF OF THE OFFICE OF INSPECTOR GENERAL
## OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES

/Gregory E. Demske/                                    4/23/12

Gregory E. Demske                                      DATE
Chief Counsel to the Inspector General
Office of Inspector General
U. S. Department of Health and Human Services

/Andrea L. Treese Berlin/                              4/17/12

Andrea L. Treese Berlin                                DATE
Senior Counsel
Office of Inspector General
U. S. Department of Health and Human Services

32

**APPENDIX A**

**INDEPENDENT REVIEW ORGANIZATION**

This Appendix contains the requirements relating to the Independent Review Organization (IRO) required by Section III.D of the CIA.

A.    IRO Engagement

1.    Sierra Vista shall engage an IRO that possesses the qualifications set forth in Paragraph B, below, to perform the responsibilities in Paragraph C, below. The IRO shall conduct the review in a professionally independent and objective fashion, as set forth in Paragraph D. Within 30 days after OIG receives the information identified in Section V.A.8 of the CIA or any additional information submitted by Sierra Vista in response to a request by OIG, whichever is later, OIG will notify Sierra Vista if the IRO is unacceptable. Absent notification from OIG that the IRO is unacceptable, Sierra Vista may continue to engage the IRO.

2.    If Sierra Vista engages a new IRO during the term of the CIA, this IRO shall also meet the requirements of this Appendix. If a new IRO is engaged, Sierra Vista shall submit the information identified in Section V.A.8 of the CIA to OIG within 30 days of engagement of the IRO. Within 30 days after OIG receives this information or any additional information submitted by Sierra Vista at the request of OIG, whichever is later, OIG will notify Sierra Vista if the IRO is unacceptable. Absent notification from OIG that the IRO is unacceptable, Sierra Vista may continue to engage the IRO.

B.    IRO Qualifications

The IRO shall:

1.    assign individuals to conduct the Claims Review, and Unallowable Cost Review, if applicable, who have expertise in the billing, coding, reporting, and other requirements of psychiatric services, including partial hospitalization services, and in the general requirements of the Federal health care program(s) from which Sierra Vista seeks reimbursement;

2.    assign individuals to design and select the Claims Review sample who are knowledgeable about the appropriate statistical sampling techniques;

3.    assign individuals to conduct the coding review portions of the Claims Review who have a nationally recognized coding certification and who have maintained this certification (e.g., completed applicable continuing education requirements); and

1

BHC Sierra Vista Hospital, Inc.
Corporate Integrity Agreement – Appendix A

    4.      have sufficient staff and resources to conduct the reviews required by the CIA on a timely basis.

    C.    <u>IRO Responsibilities</u>

The IRO shall:

    1.      perform each Claims Review and Unallowable Cost review, if applicable, in accordance with the specific requirements of the CIA;

    2.      follow all applicable rules and reimbursement guidelines of Medicare, Medicaid, and all other Federal health care programs in making assessments in the Claims Review;

    3.      if in doubt of the application of a particular Medicare, Medicaid or other Federal health care program policy or regulation, request clarification from the appropriate authority (<u>e.g.</u>, fiscal intermediary or carrier);

    4.      respond to all OIG inquires in a prompt, objective, and factual manner; and

    5.      prepare timely, clear, well-written reports that include all the information required by Appendix B to the CIA.

    D.    <u>IRO Independence and Objectivity</u>

The IRO must perform the Claims Review in a professionally independent and objective fashion, as appropriate to the nature of the engagement, taking into account any other business relationships or engagements that may exist between the IRO and Sierra Vista.

    E.    <u>IRO Removal/Termination</u>

    1.      *Provider and IRO.* If Sierra Vista terminates its IRO or if the IRO withdraws from the engagement during the term of the CIA, Sierra Vista must submit a notice explaining its reasons for termination or the reason for withdrawal to OIG no later than 30 days after termination or withdrawal. Sierra Vista must engage a new IRO in accordance with Paragraph A of this Appendix and within 60 days of termination or withdrawal of the prior IRO or at least 60 days prior to the end of the current Reporting Period, whichever is earlier.

2

2.    *OIG Removal of IRO.*  In the event OIG has reason to believe the IRO does not possess the qualifications described in Paragraph B, is not independent and objective as set forth in Paragraph D, or has failed to carry out its responsibilities as described in Paragraph C, OIG may, at its sole discretion, require Sierra Vista to engage a new IRO in accordance with Paragraph A of this Appendix.  Sierra Vista must engage a new IRO within 60 days of termination of the prior IRO or at least 60 days prior to the end of the current Reporting Period, whichever is earlier.

Prior to requiring Sierra Vista to engage a new IRO, OIG shall notify Sierra Vista of its intent to do so and provide a written explanation of why OIG believes such a step is necessary.  To resolve any concerns raised by OIG, Sierra Vista may present additional information regarding the IRO's qualifications, independence or performance of its responsibilities.  OIG will attempt in good faith to resolve any differences regarding the IRO with Sierra Vista prior to requiring Sierra Vista to terminate the IRO.  However, the final determination as to whether or not to require Sierra Vista to engage a new IRO shall be made at the sole discretion of OIG.

3

BHC Sierra Vista Hospital, Inc.
Corporate Integrity Agreement – Appendix A

## APPENDIX B

## CLAIMS REVIEW

A.     Claims Review.  The IRO shall perform the Claims Review annually to cover each of the five Reporting Periods.  The IRO shall perform all components of each Claims Review.

1.     *Definitions*.  For the purposes of the Claims Review, the following definitions shall be used:

a.     Overpayment:  The amount of money Sierra Vista has received in excess of the amount due and payable under any Federal health care program requirements.

b.     Paid Claim:  A claim submitted by Sierra Vista and for which Sierra Vista has received reimbursement from the Medicare program or any Medicaid program.

c.     Population:  The Population shall be defined as all Paid Claims during the 12-month period covered by the Claims Review.

d.     Error Rate:  The Error Rate shall be the percentage of net Overpayments identified in the sample.  The net Overpayments shall be calculated by subtracting all underpayments identified in the sample from all gross Overpayments identified in the sample.  (Note:  Any potential cost settlements or other supplemental payments should not be included in the net Overpayment calculation.  Rather, only underpayments identified as part of the Discovery Sample shall be included as part of the net Overpayment calculation.)

The Error Rate is calculated by dividing the net Overpayment identified in the sample by the total dollar amount associated with the Paid Claims in the sample.

2.     *Discovery Sample.*  The IRO shall randomly select and review a sample of 50 Paid Claims (Discovery Sample).  The Paid Claims shall be reviewed based on the supporting documentation available at Sierra Vista's office or under Sierra Vista's control and applicable billing and coding regulations and guidance to determine whether the claim was correctly coded, submitted, and reimbursed.

1

BHC Sierra Vista Hospital, Inc.
Corporate Integrity Agreement – Appendix B

If the Error Rate (as defined above) for the Discovery Sample is less than 5%, no additional sampling is required, nor is the Systems Review required. (Note: The guidelines listed above do not imply that this is an acceptable error rate. Accordingly, Sierra Vista should, as appropriate, further analyze any errors identified in the Discovery Sample. Sierra Vista recognizes that OIG or other HHS component, in its discretion and as authorized by statute, regulation, or other appropriate authority may also analyze or review Paid Claims included, or errors identified, in the Discovery Sample or any other segment of the universe.)

        3.    *Full Sample.* If the Discovery Sample indicates that the Error Rate is 5% or greater, the IRO shall select an additional sample of Paid Claims (Full Sample) using commonly accepted sampling methods. The Full Sample shall be designed to: (1) estimate the actual Overpayment in the population with a 90% confidence level and with a maximum relative precision of 25% of the point estimate; and (2) conform with the Centers for Medicare and Medicaid Services' statistical sampling for overpayment estimation guidelines. The Paid Claims selected for the Full Sample shall be reviewed based on supporting documentation available at Sierra Vista or under Sierra Vista's control and applicable billing and coding regulations and guidance to determine whether the claim was correctly coded, submitted, and reimbursed. For purposes of calculating the size of the Full Sample, the Discovery Sample may serve as the probe sample, if statistically appropriate. Additionally, the IRO may use the Paid Claims sampled as part of the Discovery Sample, and the corresponding findings for those Paid Claims, as part of its Full Sample, if: (1) statistically appropriate and (2) the IRO selects the Full Sample Paid Claims using the seed number generated by the Discovery Sample. OIG, in its sole discretion, may refer the findings of the Full Sample (and any related workpapers) received from Sierra Vista to the appropriate Federal health care program payor, including the Medicare contractor (e.g., carrier, fiscal intermediary, or DMERC), for appropriate follow-up by that payor.

        4.    *Systems Review.* If Sierra Vista's Discovery Sample identifies an Error Rate of 5% or greater, Sierra Vista's IRO shall also conduct a Systems Review. The Systems Review shall consist of the following:

            a.    a review of Sierra Vista's billing and coding systems and processes relating to claims submitted to Federal health care programs (including, but not limited to, the operation of the billing system, the process by which claims are coded, safeguards to ensure proper coding, claims submission and billing; and procedures to identify and correct inaccurate coding and billing);

2

        b.      for each claim in the Discovery Sample and Full Sample that resulted in an Overpayment, the IRO shall review the system(s) and process(es) that generated the claim and identify any problems or weaknesses that may have resulted in the identified Overpayments. The IRO shall provide its observations and recommendations on suggested improvements to the system(s) and the process(es) that generated the claim.

5.    *Other Requirements*

        a.      Supplemental Materials. The IRO shall request all documentation and materials required for its review of the Paid Claims selected as part of the Discovery Sample or Full Sample (if applicable), and Sierra Vista shall furnish such documentation and materials to the IRO prior to the IRO initiating its review of the Discovery Sample or Full Sample (if applicable). If the IRO accepts any supplemental documentation or materials from Sierra Vista after the IRO has completed its initial review of the Discovery Sample or Full Sample (if applicable) (Supplemental Materials), the IRO shall identify in the Claims Review Report the Supplemental Materials, the date the Supplemental Materials were accepted, and the relative weight the IRO gave to the Supplemental Materials in its review. In addition, the IRO shall include a narrative in the Claims Review Report describing the process by which the Supplemental Materials were accepted and the IRO's reasons for accepting the Supplemental Materials.

        b.      Paid Claims without Supporting Documentation. Any Paid Claim for which Sierra Vista cannot produce documentation sufficient to support the Paid Claim shall be considered an error and the total reimbursement received by Sierra Vista for such Paid Claim shall be deemed an Overpayment. Replacement sampling for Paid Claims with missing documentation is not permitted.

3

      c.     <u>Use of First Samples Drawn</u>.  For the purposes of all samples (Discovery Sample(s) and Full Sample(s)) discussed in this Appendix, the Paid Claims selected in each first sample shall be used (<u>i.e.</u>, it is not permissible to generate more than one list of random samples and then select one for use with the Discovery Sample or Full Sample).

      6.    *Repayment of Identified Overpayments*.  Sierra Vista shall repay within 30 days any Overpayment(s) identified in the Discovery Sample or the Full Sample (if applicable), regardless of the Error Rate, to the appropriate payor and in accordance with payor refund policies.  Sierra Vista shall make available to OIG all documentation that reflects the refund of the Overpayment(s) to the payor.

      B.    <u>Claims Review Report</u>.  The IRO shall prepare a Claims Review Report as described in this Appendix for each Claims Review performed.  The following information shall be included in the Claims Review Report for each Discovery Sample and Full Sample (if applicable).

      1.    *Claims Review Methodology*

      a.     <u>Claims Review Population</u>.  A description of the Population subject to the Claims Review.

      b.     <u>Claims Review Objective</u>.  A clear statement of the objective intended to be achieved by the Claims Review.

      c.     <u>Source of Data</u>.  A description of the specific documentation relied upon by the IRO when performing the Claims Review (<u>e.g.</u>, medical records, physician orders, certificates of medical necessity, requisition forms, local medical review policies (including title and policy number), CMS program memoranda (including title and issuance number), Medicare carrier or intermediary manual or bulletins (including issue and date), other policies, regulations, or directives).

      d.     <u>Review Protocol</u>.  A narrative description of how the Claims Review was conducted and what was evaluated.

      e.     <u>Supplemental Materials</u>.  A description of any Supplemental Materials as required by A.5.a., above.

4

2. *Statistical Sampling Documentation*

   a. A copy of the printout of the random numbers generated by the "Random Numbers" function of the statistical sampling software used by the IRO.

   b. A copy of the statistical software printout(s) estimating how many Paid Claims are to be included in the Full Sample, if applicable.

   c. A description or identification of the statistical sampling software package used to select the sample and determine the Full Sample size, if applicable.

3. *Claims Review Findings*

   a. Narrative Results

      i. A description of Sierra Vista's billing and coding system(s), including the identification, by position description, of the personnel involved in coding and billing.

      ii. A narrative explanation of the IRO's findings and supporting rationale (including reasons for errors, patterns noted, etc.) regarding the Claims Review, including the results of the Discovery Sample, and the results of the Full Sample (if any).

   b. Quantitative Results

      i. Total number and percentage of instances in which the IRO determined that the Paid Claims submitted by Sierra Vista (Claim Submitted) differed from what should have been the correct claim (Correct Claim), regardless of the effect on the payment.

      ii. Total number and percentage of instances in which the Claim Submitted differed from the Correct Claim and in which such difference resulted in an Overpayment to Sierra Vista.

5